1  Henry C. Su (SBN 211202; suh@howrey.com)
   Katharine L. Altemus (SBN 227080; altemusk@howrey.com)
2  HOWREY LLP
   1950 University Avenue, 4th Floor
3  East Palo Alto, California  94303
   Telephone:  (650) 798-3500
4  Facsimile:  (650) 798-3600

5  Robert Ruyak
   Matthew Wolf (Admitted *Pro Hac Vice*)
6  Marc Cohn (Admitted *Pro Hac Vice*)
   HOWREY LLP
7  1299 Pennsylvania Avenue, NW
   Washington, DC 20004
8  Telephone:  (202) 783-0800
   Facsimile:  (202) 383-6610
9
   Attorneys for Plaintiffs
10 HOLOGIC, INC., CYTYC CORPORATION and HOLOGIC L.P.

11                    UNITED STATES DISTRICT COURT

12                  NORTHERN DISTRICT OF CALIFORNIA

13                        SAN JOSE DIVISION

14 HOLOGIC, INC., CYTYC CORPORATION,              Case No. C08 00133 RMW (RS)
   and HOLOGIC L.P.,
15                                                **PLAINTIFFS' OPENING CLAIM
                   Plaintiffs,                    CONSTRUCTION BRIEF (PATENT L.R. 4-
16                                                5(a))**
          vs.
17                                                Markman Hearing
   SENORX, INC.,                                  Date: June 25, 2008
18                                                Time: To Be Set
                   Defendant.                     Room: Courtroom 6, 4th Floor
19                                                Judge: Hon. Ronald M. Whyte
20 AND RELATED COUNTERCLAIMS.

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page(s)

I.    PRELIMINARY STATEMENT ............................................................................................. 1

II.   BACKGROUND ................................................................................................................ 1

      A.    THE TECHNOLOGY ................................................................................................ 1

      B.    THE EXPERTS ........................................................................................................ 2

III.  APPLICABLE LAW ........................................................................................................ 2

IV.   CONSTRUCTION OF '813 PATENT TERMS ................................................................. 4

      A.    "inner spatial volume" (All Asserted Claims) ............................................. 5

      B.    "predetermined constant spacing between said inner spatial volume
            and the radiation transparent wall" (All Asserted Claims) ........................... 7

      C.    "means…for rendering uniform the radial absorbed dose profile of
            the emissions from the one of the inner spatial volume and outer
            chamber containing the radionuclides" (All Asserted Claims) ...................... 9

      D.    "inner, closed chamber" (Asserted Claim 11) ............................................. 10

      E.    "plurality of radioactive solid particles" (Asserted Claim 12) .................... 12

      F.    "predetermined locations" (Asserted Claim 12) .......................................... 12

      G.    "plurality of radioactive solid particles placed at predetermined
            locations" (Asserted Claim 12) .................................................................... 12

V.    CONSTRUCTION OF '204 PATENT TERMS ................................................................. 13

      A.    "inner spatial volume" (All Asserted Claims) ............................................. 14

      B.    "outer spatial volume" (All Asserted Claims) ............................................. 14

      C.    "providing a controlled dose at the outer spatial volume
            expandable surface to reduce or prevent necrosis in healthy tissue
            proximate to the expandable surface" (Asserted Claim 4) ........................... 15

      D.    "predetermined spacing…between said inner spatial volume and
            the expandable surface element" (Asserted Claim 4 ..................................... 16

      F.    "plurality of solid radiation sources" (Asserted Claim 17) .......................... 16

      F.    "three-dimensional isodose profile that is substantially similar in
            shape to the expandable surface element" (All Asserted Claims) ................ 17

      G.    "isodose profile having a shape substantially similar to the shape of
            the outer spatial volume" (Claim 17) ........................................................... 18

VI.   CONSTRUCTION OF '142 PATENT TERMS ..................................................... 19

A.   "located so as to be spaced apart from the apparatus volume" (Claim 1) ...................................................................................................... 19

B.   "being provided on at least two elongate members extending into the apparatus volume" (Claim 6) .......................................................... 20

C.   "at least one of the elongate members being shaped to provide asymmetric placement of the radiation source with respect to a longitudinal axis through the apparatus volume" (Claim 6) ...................... 21

D.   "apparatus volume" (Claims 1 & 6) ............................................................. 22

E.   "three-dimensional apparatus volume configured to fill an interstitial void" (Claims 1 & 8) .................................................................... 22

F.   "asymmetrically located and arranged within the expandable surface" (Claim 1) ..................................................................................... 23

G.   "predetermined asymmetric isodose curves (All Asserted Claims) ............ 24

H.   "plurality of solid radiation sources" (Claim 6) ......................................... 25

VII.  CONCLUSION ........................................................................................................ 25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**LP**

# TABLE OF AUTHORITIES

Page(s)

## <u>CASES</u>

*Accord Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) (en banc), *cert. denied,* 126 S. Ct. 1332
   (2006)..........................................................................................................................passim

*Acumed LLC v. Stryker Corp.*,
   483 F.3d 800 (Fed. Cir. 2007)............................................................................................ 6

*Applied Med. Res. Corp. v. U.S. Surgical Corp.*,
   448 F.3d 1324 (Fed. Cir. 2006).......................................................................................... 10

*Bausch & Lomb, Inc. v. Barnes-Hind/Hydrocurve, Inc.*,
   796 F.2d 443 (Fed. Cir. 1986)............................................................................................ 10

*Biagro W. Sales, Inc. v. Grow More, Inc.*,
   423 F.3d 1296 (Fed. Cir. 2005)............................................................................................ 4

*CollegeNet, Inc. v. ApplyYourself, Inc.*,
   418 F.3d 1225 (Fed. Cir. 2005)............................................................................................ 3

*Comark Commc'ns, Inc. v. Harris Corp.*,
   156 F.3d 1182 (Fed. Cir. 1998)............................................................................................ 3

*Elkay Mfg. Co. v. Ebco Mfg. Co.*,
   192 F.3d 973 (Fed. Cir. 1999)............................................................................................ 20

*Epcon Gas Sys., Inc. v. Bauer Compressors, Inc.*,
   279 F.3d 1022 (Fed. Cir. 2002)............................................................................................ 4

*Hockerson-Halberstadt, inc. v. Converse Inc.*,
   183 F.3d 1369 (Fed. Cir. 1999)............................................................................................ 2

*In re Nelson,*
   280 F.2d 172 (C.C.P.A. 1960)............................................................................................ 3

*Jonsson v. The Stanley Works,*
   903 F.2d 812 (Fed.Cir.1990),............................................................................................ 20

*JVW Enters., Inc. v. Interact Accessories, Inc.*,
   424 F.3d 1324 (Fed. Cir. 2005)...............................................................................3, 9, 10, 18

*Kahn v. Gen. Motors Corp.*,
   136 F.3d 1472 (Fed. Cir. 1998)............................................................................................ 4

*Key Pharms. v. Hercon Labs. Corp.*,
   161 F.3d 709 (Fed. Cir. 1998)............................................................................................ 4

**

*Libel-Flarsheim Co. v. Medrad, Inc.,*
    358 F.3d 898 (Fed. Cir. 2004) ................................................................. 6

*MBO Labs., Inc. v. Becton Dickinson,*
    474 F.3d 1323 (Fed. Cir. 2007) ............................................ 3, 18, 21, 24

*MedRad, Inc. v. MRI Devices Corp.,*
    401 F.3d 1313 (Fed. Cir. 2005) ............................................................. 2

*Medtronic, Inc. v. Advanced Cardiovascular Systems, Inc.,*
    248 F.3d 1303 (Fed. Cir. 2001) ........................................................... 20

*Minnesota Mining & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.,*
    976 F.2d 1559 (Fed. Cir. 1992) ........................................................... 10

*NeoMagic Corp. v. Trident Microsystems, Inc.,*
    287 F.3d 1062 (Fed. Cir. 2002) ..................................................... 3, 23

*Oatey Co. v. IPS Corp.,*
    514 F.3d 1271 (Fed. Cir. 2008) .................................................. 8, 11, 23

*Omega Eng'g, Inc. v. Raytek Corp.,*
    334 F.3d 1314 (Fed. Cir. 2003) ...................................................... 14, 17

*PCTEL, Inc. v. Agere Sys., Inc.,*
    2005 WL 2206683, at *3 (N.D. Cal., Sept. 8 2005) ....................... 14, 17

*U.S. Surgical Corp. v. Ethicon, Inc.,*
    103 F.3d 1554 (Fed. Cir. 1997) ..................................................... passim

*Varco, L.P. v. Pason Sysytems USA Corp.,*
    436 F.3d 1368 (Fed. Cir. 2006) ............................................................. 6

*Vitronics Corp. v. Conceptronic, Inc.,*
    90 F.3d 1576 (Fed. Cir. 1996) ......................................................... 3, 20

*Wright Flow Control Corp. v. Velan, Inc.,*
    438 F.3d 1374 (Fed. Cir. 2006) ........................................................... 14

**STATUTES**

35 U.S.C. § 112, ¶ 6 (2006) ................................................................. 4, 10

LP

1    Pursuant to the Stipulated Scheduling Order, Plaintiffs Hologic, Inc., Cytyc Corporation, and

2  Hologic L.P. (collectively, "Hologic") respectfully submit this Brief addressing the construction of

3  disputed terms, phrases and clauses in the asserted claims of U.S. Patent Nos. 5,913,813 (the "'813

4  patent"), 6,413,204 (the "'204 patent"), and 6,482,142 (the "'142 patent") (attached hereto as Exhibits

5  A, B, and C, respectively, to the Declaration of Katharine L. Altemus In Support of Plaintiffs' Opening

6  Claim Construction Brief, "Altemus Decl.")[1].  Hologic currently asserts claims 11 and 12 of the '813

7  patent, claims 4 and 17 of the '204 patent, and claims 1, 6, and 8 of the '142 patent against Defendant

8  SenoRx, Inc. ("SenoRx").

9  **I.    PRELIMINARY STATEMENT**

10    Dramatic differences mark the parties' approach to claim construction.  Hologic proposes

11  constructions that are straightforward.  In many cases, Hologic simply applies the plain meaning of the

12  claim terms as apparent to one of ordinary skill in the art informed by the intrinsic evidence (*i.e.*, the

13  specification and prosecution history).  *Accord Phillips v. AWH Corp.*, 415 F.3d 1303, 1313-15 (Fed.

14  Cir. 2005) (en banc), *cert. denied,* 126 S. Ct. 1332 (2006).  In contrast, SenoRx urges this Court,

15  without support from or contrary to intrinsic evidence, to restrict the plain meaning of the patent

16  claims.  In most cases, SenoRx asks this Court to rewrite the claims to narrow their scope to less than

17  what the inventors actually invented and claimed.  SenoRx also requests that the Court limit the claim

18  terms to exemplary embodiments in the specification—or, in some cases—urges constructions that

19  would exclude preferred embodiments.  Each of these approaches is erroneous under modern claim

20  construction jurisprudence.  SenoRx's strained interpretations of the disputed terms should be rejected.

21  **II.    BACKGROUND**

22    **A.    THE TECHNOLOGY**

23    All three patents-in-suit are related.  The '813 patent is the parent.  The '204 and '142 patents

24  are continuations-in-part of the '813 patent.  Rather than repeat an explanation of the technology of the

25  patents-in-suit with which the Court is well familiar, and in the interest of brevity, Hologic refers the

26

27  [1] Unless otherwise noted, all cited exhibits are exhibits attached to the Altemus Decl.

28

1  Court to synopses of the technology at issue contained within multiple previous filings with, and orders

2  from this Court, as well as to specific discussions of each patent-in-suit, *infra*.  Ex. D at 2-3; Ex. E at 2;

3  Ex. F at 2-3; Ex. G at 4, 6-7.

4  **B.    THE EXPERTS**

5  To demonstrate how one skilled in the art[2] would construe the disputed claim terms, Hologic

6  provides the testimony of Dr. Lynn J. Verhey.  Dr. Verhey is a well-recognized and independent expert

7  in methods of delivering radiation to cancer patients, and unquestionably qualified to provide opinions

8  as one skilled in the relevant art.  He has provided testimony to this Court in the past.  His credentials

9  are summarized within the Declaration of Lynn J. Verhey, Ph.D. ("Verhey Decl."), attached as Exhibit

10  H.

11  **III.    APPLICABLE LAW**

12  Claim construction begins with the words of the claims themselves, which define the subject

13  matter that the inventors intended to claim.  *See Phillips*, 415 F.3d at 1313 ("The inquiry into how a

14  person of ordinary skill in the art understands a claim term provides an objective baseline from which

15  to begin claim interpretation.").  The words of the claims are not interpreted in a vacuum:  they must

16  be read in light of other words in the claim, the patent specification, and the prosecution history (*i.e.*,

17  the intrinsic evidence).  *See MedRad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005).

18  Importantly, "[a]bsent some particular reason to do otherwise, the claim terms must be interpreted as

19  would one of ordinary skill in the art . . . and in light of the particular patent in suit."  *Id.*; *see also*

20  *Phillips*, 415 F.3d at 1313.

21  Contextual language—either in the same claim, or in other claims—may be a key to

22  determining what the inventors intended in their use of certain claim terms; and, in any event, should

23  not be ignored.  *See Hockerson-Halberstadt, inc. v. Converse Inc.*, 183 F.3d 1369, 1374 (Fed. Cir.

24  1999) ("Proper claim construction…demands interpretation of the entire claim in context, not a single

25  element in isolation.").  At least as important, the specification—of which the claims are a part—"is

26

27  ─────────────────

28  [2] *i.e.*, the objective person from whose perspective the intrinsic evidence must be viewed.  *Phillips*, 415 F.3d at 1313.

1   the single best guide to the meaning of the disputed term." *Phillips*, 415 F.3d at 1315. Within the

2   specification, the inventors may "use a term in a manner either more or less expansive than its general

3   usage in the relevant community, and thus expand or limit the scope of the term in the context of the

4   patent claims." *CollegeNet, Inc. v. ApplyYourself, Inc.*, 418 F.3d 1225, 1231 (Fed. Cir. 2005).

5       While the specification is critical to understanding what the inventors claimed as their

6   invention, several principles guide its use in understanding the scope of the claims. First, the Federal

7   Circuit has repeatedly warned against improperly importing limitations into the claim. *See, e.g.*, *MBO*

8   *Labs., Inc. v. Becton Dickinson,* 474 F.3d 1323, 1333 (Fed. Cir. 2007) (stating that importation of

9   limitations into claims is "fraught with 'danger'" (quoting *Phillips*, 415 F.3d at 1323)); *JVW Enters.,*

10  *Inc. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1335 (Fed. Cir. 2005) ("We do not import limitations

11  into claims from examples or embodiments appearing only in a patent's written description, even when

12  a specification describes very specific embodiments of the invention or even describes only a single

13  embodiment . . . ."). Second, a claim construction that excludes preferred embodiments "is rarely, if

14  ever correct and . . . require[s] highly persuasive evidentiary support." *NeoMagic Corp. v. Trident*

15  *Microsystems, Inc.*, 287 F.3d 1062, 1074 (Fed. Cir. 2002) (quoting *Vitronics Corp. v. Conceptronic,*

16  *Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996)). These two principles require this Court to walk a "fine line

17  between reading a claim in light of the specification, and reading a limitation into the claim from the

18  specification." *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998).

19      Third, the prosecution history, though "often lack[ing] the clarity of the specification," may

20  also be considered. *See Phillips*, 415 F.3d at 1317. This exchange between the patent examiner and

21  the inventors was "created by the patentee in attempting to explain and obtain the patent," and may

22  "demonstrat[e] how the inventor understood the invention." *Id.*

23      Lastly, this Court may also consider extrinsic evidence, such as expert testimony. This is

24  because the patent claims and the specification are directed to those skilled in the relevant art—and

25  therefore, a skilled artisan's view on the meaning of certain claim terms is relevant to what the claims

26  mean. *See, e.g.*, *Phillips*, 415 F.3d at 1313 (quoting *In re Nelson*, 280 F.2d 172 (C.C.P.A. 1960), for

27  the proposition that "[t]he descriptions in patents are not addressed to the public generally, to lawyers

28

1   or to judges, but, as section 112 says, to those skilled in the art to which the invention pertains or to

2   which it was most nearly connected"). Thus, expert testimony may be considered in construing the

3   claims so long as it stays true to the intrinsic evidence. *Biagro W. Sales, Inc. v. Grow More, Inc.¸* 423

4   F.3d 1296, 1302 (Fed. Cir. 2005) ("Extrinsic evidence, such as expert testimony, may be useful in

5   claim construction, but it should be considered in the context of the intrinsic evidence."); *Key Pharms.*

6   *v. Hercon Labs. Corp.*, 161 F.3d 709, 716 (Fed. Cir. 1998).

7        One claim term at issue in this litigation is in "means-plus-function" format. *See* 35 U.S.C. §

8   112, ¶ 6 (2006). By statute, this claim term covers both any structure(s) in the specification and

9   equivalents of that/those structures. *Id.* Construction of a "means-plus-function" term "requires

10  identification of the function recited in the claim and a determination of what structures have been

11  disclosed in the specification that correspond to the means for performing" the claimed function.

12  *Epcon Gas Sys., Inc. v. Bauer Compressors, Inc.*, 279 F.3d 1022, 1032 (Fed. Cir. 2002). Those

13  structures that are clearly linked by the specification to the function are the structures that are literally

14  within the scope of the claim—as are their equivalents. *Kahn v. Gen. Motors Corp.*, 136 F.3d 1472,

15  1476 (Fed. Cir. 1998).

16  **IV.   CONSTRUCTION OF '813 PATENT TERMS[3]**

17       The '813 patent relates to an instrument comprising a concentric arrangement of an inner

18  spatial volume and an outer spatial volume defined by an inflatable chamber, disposed near the distal

19  end of a catheter body. One of the volumes contains a source of radiation, while the other volume may

20  contain a radiation absorptive material. In one preferred embodiment, shown in Figure 1 of the patent,

21  the inner volume is defined by an enclosed chamber surrounding the catheter body and containing a

22  radioactive source. The outer chamber, surrounding the inner volume, is then inflated with air or other

23  radiation absorbing material so that its wall contacts the wall of the surgical cavity substantially at all

24  points. The distance between the radiation source and the wall of the outer chamber can be made

25  _____

26  [3] Hologic addresses herein only those terms about which the parties disagree and which Hologic believes to be material to the resolution of this suit. As to terms not addressed, Hologic's position is as set forth in the parties' Joint Claim

27  Construction Statement (to be filed on May 30, 2008, concurrently with parties' Reply Briefs), which Hologic incorporates by reference herein.

28

1  substantially constant.  This embodiment permits the controlled delivery of radiation to a layer of

2  tissue surrounding the surgical cavity.[4]   By manipulating the volume and type of material in the outer

3  chamber, the ratio of the absorbed dose at the surface of the wall of tissue to the dose at the tissue

4  depth where the minimum dose is prescribed to be received can be controlled so as to maximize the

5  efficacy of the treatment and minimize adverse side effects, namely, unwanted necrosis of healthy

6  tissue.

7      The '813 patent teaches that other embodiments can be used to deliver therapeutic radiation to

8  the layer of tissue surrounding a surgical cavity.  Col 2:64 – 4:20; FIGS. 3-5.  These other

9  embodiments include the use of: (1) a radioactive liquid within an inner inflatable chamber; (2) a

10  number of radioactive solid particles; (3) a slurry containing particles of a radioactive isotope; or (4) a

11  solid radioactive source.  Alternatively, these same radiation sources can be placed in the volume of

12  space between the inner chamber and the outer inflatable chamber.  Any of these embodiments might

13  be used as a means of delivering radiation to tissue within the wall of a surgical cavity.

14      **A.    "inner spatial volume" (All Asserted Claims)**

| Hologic's Proposed Construction | SenoRx's Proposed Construction |
|---|---|
| *a region of space surrounded by an outer spatial volume and either enclosed by a polymeric film wall or defined by the outside surface of a solid radionuclide* | A region of space surrounded by an outer spatial volume that is either enclosed by a distensible polymeric film wall or defined by the outside surface of a solid radionuclide sphere |

19      There are two substantive differences between the proposed constructions.  First, where the

20  inner region of space is surrounded by a polymeric film wall, SenoRx seeks to add a requirement that

21  the wall be "distensible."  Secondly, SenoRx seeks to require that if the inner spatial volume is a

22  radionuclide, that radionuclide must be a sphere.  Both of SenoRx's additions to the claim language

23  should be rejected.

24      SenoRx's argument that the claim should be limited to a "distensible polymeric film wall" is

---

[4] The tissue to be treated and the resected cavity can be thought of as an orange peel with the fruit (*i.e.*, the tumor) removed. A radiation source is placed within the space previously occupied by the fruit. The thickness of the "orange peel" corresponds to the thickness of the tissue to be treated – in most procedures the "orange peel" of tissue to be treated is about 2 centimeters thick. *See, e.g.*, '813 patent at FIG. 4.

1    incorrect.  None of the claims refers to a distensible wall.  In fact, during prosecution, claims directed

2    to an embodiment including "an inner closed distensible chamber" were broadened—by deleting the

3    word "distensible."  Ex. I at 1, 2.  "[I]t would be improper to disregard the effect of that action on the

4    scope of those claims."  *Libel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 911 (Fed. Cir. 2004).  Nor

5    does the specification require that the wall be distensible.  Indeed, the "Summary of the Invention"

6    section of the '813 patent, while referring to the "polymeric film wall" does not describe it as

7    "distensible;" a pattern that is repeated elsewhere in the specification.  *See* col. 1:50-55; col. 2:34-36,

8    56-58.  Although established law prohibits a court from limiting the claimed invention to "preferred

9    embodiments or specific examples in the specification," SenoRx attempts to do exactly that.  *See*

10   *Varco, L.P. v. Pason Sysytems USA Corp.,* 436 F.3d 1368, 1375 (Fed. Cir. 2006).  There is no

11   justification for reading the claims so narrowly, as this Court has already recognized.  Ex. F at 3-5, 28

12   (April 27, 2007 Claim Construction Order in *Xoft, Inc. v. Cytyc Corp. et al.*, Case No. C-05-05312

13   RMW [Dkt. No. 109].)

14          SenoRx's second attempt to limit the "inner spatial volume," by requiring a "spherical"

15   radionuclide, is not supported by the intrinsic evidence.[5]  The specification provides that "it is not

16   essential that the chambers 30 and 34 have spherical walls . . . ."  Col. 3:9-10*; see also.* col. 4:25-30

17   ("the invention can be carried out by . . . different equipment and devices . . . various modifications . . .

18   can be accomplished without departing from the scope of the invention.").  Claim 13 further shows that

19   the applicants knew how to insert a spherical limitation when desired, but specifically chose not to do

20   so with respect to claim 1.[6]  *See Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 807 (Fed. Cir. 2007)

21   ("The intrinsic evidence . . . suggests that the patentees knew how to restrict their claim coverage . . . .

22

23

---

24   [5] The Court previously construed "inner spatial volume" to include either a polymeric film wall or a solid radionuclide
     *sphere,* adopting the sphericity language suggested in Xoft's proposed construction without analysis or comment.  The
25   main issue in the Xoft litigation was not the shape of the radionuclide, but whether Xoft's brachytherapy device used *any*
     radionuclide.  Thus, the shape of the radionuclide was a tangential, non-briefed issue.  Given the lack of intrinsic evidence
26   for this limitation, Hologic respectfully advocates that such a limitation is unmerited despite being subsumed within the
     Court's prior construction of "inner spatial volume."

27   [6] Claim 13 reads "The apparatus as in claim 2 wherein the inner and outer chambers are spherical in shape and are
     concentric."

28

1  They could have used the word "[spherical]," as they did [elsewhere]. Instead, they chose a different

2  term that implies a broader scope."). Moreover, one of ordinary skill in the art would appreciate that

3  claiming a "spherical" radionuclide would not reflect the realities of standard brachytherapy practice,

4  as solid radionuclides "generally available as brachytherapy radiation sources" at the time of the

5  invention were and are not necessarily spherical. Col. 4:9-11; Verhey Decl. at 3-4.

**B.    "predetermined constant spacing between said inner spatial volume and the radiation transparent wall" (All Asserted Claims)**

| Hologic's Proposed Construction | SenoRx's Proposed Construction |
|---|---|
| spacing predetermined by one skilled in the art between the wall or edge of the inner spatial volume and the radiation transparent wall of the outer, closed, inflatable chamber, when inflated, which is constant in all directions if the outer chamber is spherical, or constant along a radial plane if the outer chamber is not spherical | Fixed spacing, predetermined by one skilled in the art before administering radiation, between the wall or edge of the inner spatial volume and the radiation transparent wall of the outer, closed inflatable chamber, when inflated, which for each point on the wall or edge of the inner spatial volume, the distance to the closest point on the outer chamber is the same (*i.e.*, the inner spatial volume and outer chamber are concentric and the same shape) |

14    The Court has already considered this claim term and agreed with Hologic's proposed

15  construction. Ex. F at 6-7. In attempting to add "fixed spacing" and "each point on the wall or edge"

16  limitations, among others, SenoRx offers no justification to modify the previous construction and lacks

17  the intrinsic evidence to support its unduly restrictive interpretation. This claim term means that the

18  spacing between the inner spatial volume and the radiation transparent wall of the outer, closed

19  inflatable chamber, when inflated, can be made constant. Ex. H at Ex. C (at 7:2-5). If the outer

20  chamber is spherical, then the distance is constant in all directions. *Id*. If cylindrical, however, then

21  the distance is constant around a radial plane that is perpendicular to the axis of the catheter. *Id*.

22  Figures 1 and 3 (below, left and right, respectively) show the constant spacing between the inner

23  spatial volume and the radiation transparent wall in both the spherical and ellipsoidal configurations.

24  \\

25

26

27

28

1

2

3

4

5

6



7      Rather than elucidate, SenoRx's addition of a "fixed spacing" limitation renders the claim more

8   ambiguous.  The word "fixed" has been cut by SenoRx from whole cloth; it does not appear anywhere

9   in the intrinsic record.  SenoRx's attempt to limit "constant" to "fixed" conflicts with the

10  specification's explanation that "constant" should not be construed too literally—*i.e.*, the objective is

11  to keep the spacing between the inner and outer chambers "somewhat," "substantially" or "generally"

12  constant to avoid hot spots.  Col. 4:15-16; 1:55-57; 3:11-13.  Moreover, it is well understood that one

13  skilled in the art may want to change the spacing during treatment, but as long as the spacing is

14  "constant," this limitation is satisfied.

15      SenoRx also improperly seeks to require that "each point on the wall or edge of the inner

16  spatial volume" be equidistant to "the closest point on the outer chamber." This construction

17  improperly excludes a preferred embodiment of the invention (*see, e.g.,* FIG. 3 above[7]).  The claims

18  generically cover both spherical and non-spherical embodiments.  And the written description further

19  supports this conclusion by referring to both the spherical and non-spherical embodiments as including

20  the claimed "constant spacing."  *See* col. 3:10-13 (describing shape as secondary to a "generally

21  constant spacing").  The claims should be construed accordingly.  *Oatey Co. v. IPS Corp.,* 514 F.3d

22  1271, 1277 (Fed. Cir. 2008) ("At least where claims can reasonably to interpreted to include a specific

23  embodiment, it is incorrect to construe the claims to exclude that embodiment, absent probative

24  evidence on the contrary.").  SenoRx's proposed additions to the Court's prior construction of this term

25  should be rejected.

26  ───────────────

27  [7] In which the distance from the "wall or edge" of the inner spatial volume to the "closing point on the outer chamber" may
    not be the same at each end of the inner spatial volume.

28

1

2

**C.    "means…for rendering uniform the radial absorbed dose profile of the emissions from the one of the inner spatial volume and outer chamber containing the radionuclides" (All Asserted Claims)**

3

| Hologic's Proposed Construction | SenoRx's Proposed Construction |
|---|---|
| function: making the absorbed dose of radiation more uniform to prevent over-treatment of body tissue at or close to the outer wall of the instrument | Function: Making the absorbed dose of radiation substantially more uniform between the surface of the outer chamber and a predetermined depth in the target tissue. |
| structure: a radiation absorbing or attenuating material, e.g., air, x-ray contrast fluid, contrast media used in angiography, water, a gas, or barium sulfate or their equivalents | Structure: A radiation absorbing or attenuating material, e.g., air, x-ray contrast fluid, contrast media used in angiography, water, a gas, barium sulfate, or their equivalents, that performs this function by absorbing or attenuating radiation |

4

5

6

7

8

9

10      The Court has already considered this limitation and agreed with Hologic's proposed

11  construction. Ex. F at 8-10.  For the same reasons set forth in the Court's Claim Construction Order,

12  the Court should adopt Hologic's construction.

13      The first step in the construction of this means-plus-function element is a determination of the

14  claimed function. *JVW Enters.*, 424 F.3d at 1330.  Here, the function identified by the limitation is

15  "rendering uniform the radial absorbed dose profile of the emissions . . . ." Col. 4:49-50.  As Dr.

16  Verhey explains, the radial absorbed dose profile is the absorbed dose in tissue, which varies as a

17  function of distance from the center of the cavity along a direction of interest.  Ex. H at Ex. C (at 6:21-

18  28).  In the '813 patent, the direction of interest would be from the cavity wall to a specific depth in the

19  
target tissue at which a prescribed therapeutic dose is

20  defined.  *Id*.  The specification explains that one goal of

21  the invention was to render the absorbed dose profile in

22  the target tissue more uniform than it would otherwise be -

23  thereby "preventing over-treatment of body tissue at or

24  close to the outer wall 36 of the instrument."  Col. 3:28-

25  33.  Describing Figure 4 (shown left), the written

26  description explains the objective of flattening line 40 to achieve an absorbed dose profile depicted by

27  line 42. *See* Col. 4:14-38.

28

1     The specification does not provide any basis for requiring a "substantial" change in the

2  absorbed dose profiles. Rather, it describes a more "uniform" profile. *See* Abstract ("the apparatus

3  functioning to provide a *more uniform* absorbed dose profile . . ."); Col. 1:63-67 ("so as to provide a

4  *more radially uniform* radiation dosage"); Col. 1, line 36 ("as uniform as possible"); *see also* Ex. F at 9

5  ("[T]he inventor's purpose was to deliver radiation more uniformly than had previously been done,

6  thus preventing over-treatment of body tissue at or close to the outer wall . . . of the instrument.") In

7  this context, "uniform" means uniform enough to serve the objects of the invention. *See Minnesota*

8  *Mining & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.*, 976 F.2d 1559, 1565-67 (Fed. Cir. 1992)

9  ("lubricated" means sufficient lubricant to serve the invention's purpose); *Bausch & Lomb, Inc. v.*

10 *Barnes-Hind/Hydrocurve, Inc.* 796 F.2d 443 (Fed. Cir. 1986) (same). No intrinsic evidence champions

11 a requirement that the radial absorbed dose be "*substantially*" more uniform.

12     The second step in construing this means-plus-function element is an identification of the

13 corresponding structure in the written description. *JVW Enters.*, 424 F.3d at 1330; 35 U.S.C. § 112, ¶

14 6. The parties agree that the corresponding structure disclosed in the specification is "a radiation

15 absorbing or attenuating material," but SenoRx attempts to add the words "*that performs this function*

16 *by absorbing or attenuating radiation*." SenoRx seeks to interject additional function to the claim

17 under the guise of calling it "structure." This, of course, is impermissible. *See, e.g., Applied Med. Res.*

18 *Corp. v. U.S. Surgical Corp.*, 448 F.3d 1324, 1334 (Fed. Cir. 2006) ("A court errs when it improperly

19 imports unclaimed functions into a means-plus-function claim limitation."). Because this language

20 does not describe any structure at all, but rather seeks to impose additional, unclaimed function into the

21 claim, it should be rejected.

22     **D.    "inner, closed chamber" (Asserted Claim 11)[8]**

| Hologic's Proposed Construction | SenoRx's Proposed Construction |
|---|---|
| inner, closed chamber | A compartment located completely inside of the outer chamber and closed off within the outer chamber |

---

[8] This element is contained within Claim 2 on which asserted Claim 11 depends (via Claim 8).

1    The term "inner, closed chamber" should be construed to mean exactly that, an "inner, closed

2    chamber." *See U.S. Surgical Corp. v. Ethicon, Inc.* 103 F.3d 1554, 1568 (Fed. Cir. 1997) (holding that

3    courts are not required to construe every disputed term unless necessary). This term has an ordinary

4    and customary meaning to one of skill in the art without reference to intrinsic or extrinsic evidence,

5    and there is no evidence of any intent by the inventors to impart a novel or special meaning to the term.

6    Thus, "inner, closed chamber" should be construed to mean "inner, closed chamber."

7    SenoRx's proposed construction cannot be correct because it would exclude a preferred

8    embodiment. *See* '813 patent, FIG. 1 & Col. 2:35-37 (describing and depicting an inner "chamber 30

9    [that] is in fluid communication with the inflation port 26," thus the inner spatial volume is not

10   "completely" inside the outer chamber and not "closed off within the outer chamber."); *Oatey,* 514

11   F.3d at 1276-77 (a claim interpretation excluding a preferred embodiment is "rarely, if ever, correct").

12   Indeed, SenoRx's agreement that "outer, closed, inflatable chamber" (in asserted claim 1 of the '813

13   patent) is unambiguous and requires no additional construction belies its contention that the similar

14   term "inner, closed chamber" is unclear and requires construction.

15   Further, the Court already considered and rejected an analogous argument (made with respect

16   to the related '204 patent) in the context of Hologic's Motion for Preliminary Injunction. Ex. F at

17   7:15-8:10. SenoRx argued that the lumens in its Contura device protrude into the catheter shaft and

18   therefore cannot constitute an "inner spatial volume" because they are not completely surrounded by

19   the outer spatial volume. *Id.* The Court disagreed, reasoning that if SenoRx were correct, that

20   construction would impermissibly exclude the embodiments wherein the portion of the device holding

21   the radioactive material in the inner spatial volume was in contact with the outer spatial volume. *Id.* at

22   7:22-8:10. The same reasoning applies to the term "inner, closed chamber" in the related '813 patent,

23   which has essentially the same disclosure as the '204 patent. *See* Ex. A at FIGs. 1, 3 and 5, col. 2:35-

24   42. Thus, to adopt SenoRx's proposed construction of "inner, closed chamber" would impermissibly

25   exclude a preferred embodiment from the claims.

26   \\

27

28

1    **E.    "plurality of radioactive solid particles" (Asserted Claim 12)**

2

| Hologic's Proposed Construction | SenoRx's Proposed Construction |
|---|---|
| plurality of radioactive solid particles | two or more separate radioactive solid particles placed in the inner spatial volume at the same time |

5    This term means what it says - a "plurality of radioactive solid particles." *See Ethicon, Inc.* 103

6    F.3d at 1568.  There was no attempt by the inventors to impart a novel or special meaning to this term

7    and there is no need to further refine the language they chose to define their invention.  Furthermore,

8    this Court has already considered the meaning of this term within the context of the '813 patent and

9    found that no further clarification of the meaning is appropriate.  Ex. F at 11-12, 28.  Thus, "plurality

10   of radioactive solid particles" should be construed to mean "plurality of radioactive solid particles."

11   There is no need to clarify that "plurality" means "two or more" or that the particles have to be

12   "separate."

13   In any event, no intrinsic evidence supports SenoRx's contention that the "plurality of

14   radioactive solid particles" in claim 12 must be "placed in the inner spatial volume *at the same time*."

15   Claim 12 simply refers to the solid particles having pre-determined locations.  Col. 6:1-5.  Neither the

16   specification nor the prosecution history suggests that the particles must be placed in the inner volume

17   at the same time.  Col. 2:69-3:9; Fig. 5.

18   **F.    "predetermined locations" (Asserted Claim 12)**

19

| Hologic's Proposed Construction | SenoRx's Proposed Construction |
|---|---|
| predetermined locations | more than one predetermined location |

21   Hologic agrees with SenoRx's proposed construction.  Thus, "predetermined locations" should

22   be construed to mean "predetermined locations."  No further construction of this term is necessary.

23   **G.    "plurality of radioactive solid particles placed at predetermined locations"**
     **(Asserted Claim 12)**

24

| Hologic's Proposed Construction | SenoRx's Proposed Construction |
|---|---|
| plurality of radioactive solid particles placed at predetermined locations | two or more separate radioactive solid particles placed in the inner spatial volume at the same time at more than one predetermined location |

27

28

1    Again, the limitation means what it says, making further elaboration on its meaning

2    unnecessary. *See Ethicon,* 103 F.3d at 1568. This term has an ordinary and customary meaning to one

3    of skill in the art, and there is no evidence of any intent by the inventors to impart a novel or special

4    meaning to the term. Furthermore, this Court has already considered the meaning of this term within

5    the context of the '813 patent and found that no further clarification of the meaning is appropriate. Ex.

6    F at 11-12, 28 ("[S]ince the language is understandable as is, no construction of [this claim term] is

7    necessary or appropriate."). Thus, "plurality of radioactive solid particles placed at pre-determined

8    locations" should be construed to mean "plurality of radioactive solid particles placed at predetermined

9    locations."

10    In any event, there is no basis for SenoRx's narrow claim interpretation. Again, there is no

11    intrinsic basis for adding a restriction that multiple, *separate,* solid particles be placed in the inner

12    spatial volume *at the same time*. Neither the specification, the prosecution history, nor Claim 12

13    imposes such a limitation on the unambiguous language of the claim. Col. 6:1-5; Col. 2:69-3:9; Fig. 5.

14    **V.    CONSTRUCTION OF '204 PATENT TERMS**

15    The '204 patent is a continuation-in-part of the '813 patent. The asserted claims are directed

16    toward an apparatus for brachytherapy used to irradiate interstitially diseased cells within the tissue

17    surrounding the cavity created by the surgical removal of proliferative (e.g., cancerous) tissue. The

18    apparatus includes a catheter body member having a proximal end and a distal end, an inner spatial

19    volume proximate to the distal end of the catheter body member, an outer spatial volume defined by an

20    expandable surface element proximate to the distal end of the body member, and surrounding and

21    concentric with the inner spatial volume. In a preferred embodiment, a radiation source is disposed

22    within the inner spatial volume.

23    The '204 patent describes a number of different sources of radioactivity that can be used to

24    deliver the therapeutic radiation to the excision cavity, including, without limitation, radioactive

25    microspheres (FIG. 4), concentric non-spherical chambers (FIG. 5), a single, solid radiation emitting

26    material surrounded by an expandable cage defining the shape of the tumor cavity (FIG. 6), a

27    radioactive fluid filling the inner chamber and the outer chamber filled with air or other radiation

28

absorbing substance (FIG. 7b), and a single, solid source surrounded by an outer chamber filled with a radiation absorbing substance (FIG. 7c). Figure 7d shows examples of radiation profiles which might be obtained by the embodiments shown in Fig. 7a-7c where the depth of interest is shown as 2 cm from the surface of the outer volume. As can be seen, different embodiments can be used to vary the ratio of the dose at the prescribed depth to the dose at the wall of the cavity.

### A. "inner spatial volume" (All Asserted Claims)

| Hologic's Proposed Construction | SenoRx's Proposed Construction |
| --- | --- |
| a region of space surrounded by an outer spatial volume and either enclosed by a polymeric film wall or defined by the outside surface of a solid radionuclide. | A region of space surrounded by an outer spatial volume that is either enclosed by a distensible polymeric film wall or defined by the outside surface of a solid radionuclide sphere |

Constructions proposed by both parties consider the phrase "inner spatial volume" within the parent '813 to be the same within the child '204 patent. Because the '813 and '204 patents are related, this claim term should carry the same construed meaning in both patents. *See Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1334 (Fed. Cir. 2003) ("[W]e presume, unless otherwise compelled, that the same claim term in the same patent or related patents carries the same construed meaning."); *PCTEL, Inc. v. Agere Sys., Inc.*, 2005 WL 2206683, at *3 (N.D. Cal., Sept. 8 2005) ( "[w]here patents-in-suit share the same disclosures, common terms are construed consistently across all claims in both patents"). Thus, as explained above in section IV.A, "inner spatial volume" should be construed to mean "a region of space surrounded by an outer spatial volume and either enclosed by a polymeric film wall or defined by the outside surface of a solid radionuclide."[9]

### B. "outer spatial volume" (All Asserted Claims)

The parties have agreed to adopt the construction "a region of space defined by an expandable surface element and surrounding an inner spatial volume." No further construction of this term is

---

[9] In addition to the reasons already given for interpreting "inner spatial volume" as Hologic proposes, claim 9 of the '204 patent states that "the inner spatial volume is an inner closed, distensible chamber," suggesting that claims that do not include the "distensible" element are not so limited. *See Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374, 1380 (Fed. Cir. 2006) (claim differentiation creates a "presumption that an independent claim should not be construed as requiring a limitation added by a dependent claim.").

1  necessary.

2  **C.    "providing a controlled dose at the outer spatial volume expandable surface to reduce or prevent necrosis in healthy tissue proximate to the expandable surface" (Asserted Claim 4)**[10]

3

4

| Hologic's Proposed Construction | SenoRx's Proposed Construction |
|---|---|
| controlling the ratio of the dose at the expandable surface of the outer spatial volume to the prescribed dose at the depth of interest in the target tissue so that the dose at the expandable surface is not so high that it lethally damages cells in healthy tissue in contact with the expandable surface | Controlling the ratio of the dose at the expandable surface of the outer spatial volume to the prescribed dose at the depth of interest in the target tissue so as to reduce or eliminate the risk of damage to healthy tissue in contact with the expandable surface as compared to devices in which the tissue is directly adjacent to the radiation source |

10      The Court has already considered this limitation and agreed with Hologic's proposed

11  construction. Ex. F at 23.  The '204 specification clearly explains that the various embodiments of the

12  apparatus work to control the ratio of the dose at the surface of the outer spatial volume to the dose at

13  the prescription depth, thereby reducing or preventing necrosis proximate the expandable surface.  Col.

14  1:55-60, 2:7-18, 51-55.; 6:52-60.  SenoRx's proposed language "so as to reduce or eliminate the risk of

15  damage*"* is inconsistent with one of the purposes of the invention.  One of the inventor's express

16  objectives was to reduce or eliminate necrosis—not to reduce or eliminate "risk." *Id*.  Similarly, the

17  applicant sought to prevent healthy cells from dying (*i.e.*, "necrosis")—not merely from being sub-

18  lethally "damaged." *Id*.  Hologic's proposed construction more accurately reflects the invention's

19  stated purpose—and the language of the claim.  *See Phillips*, 415 F.3d at 1316 ("The construction that

20  stays true to the claim language and most naturally aligns with the patent's description of the invention

21  will be, in the end, the correct construction.").

22      There is also no basis for adding a limitation that the '204 patent invention provide a controlled

23  dose of radiation that improves upon "devices in which the tissue is directly adjacent to the radiation

24  source."  The claimed invention discloses a better way to perform brachytherapy, but is not limited to

25  an improvement over unspecified prior art devices.  SenoRx's argument lacks adequate support in the

26

27  _____

10 This element is contained within Claim 2 on which asserted Claim 4 depends.

28

1  language of the claim - or, for that matter, elsewhere in the intrinsic record.  This absence of support

2  undermines any justification for construing this term in a way that would limit the invention to an

3  improvement over a particular prior art technique.

**D.    "predetermined spacing…between said inner spatial volume and the expandable surface element" (Asserted Claim 4)[11]**

| Hologic's Proposed Construction | SenoRx's Proposed Construction |
|---|---|
| the distance between the inner spatial volume and the expandable surface element is determined in advance | Fixed spacing, predetermined by one skilled in the art before administering radiation, between the wall or edge of the inner spatial volume and the wall of the expandable surface element, when inflated, which for each point on the wall or edge of the inner spatial volume, the distance to the closest point on the expandable surface element is the same (*i.e.*, the inner spatial volume and expandable surface element are concentric and the same shape) |

12      This term is similar to the term "predetermined constant spacing between said inner spatial

13  volume and the radiation transparent wall," discussed above in Section IV.B.  However, in some

14  respects, this term is broader.  First, it does not require "constant" spacing.  Second, rather than

15  claiming a "radiation transparent wall," the claim calls for an "expandable surface element."  Hologic

16  contends that this "predetermined spacing" is "the distance between the inner spatial volume and the

17  expandable surface element" and that the spacing "is determined in advance."

18      As it did with respect to the '813 patent, SenoRx again attempts to read limitations into the

19  claim that are not supported by the claim language itself, the written description or the prosecution

20  history.  Because the '204 and '813 patents share similar disclosures, Hologic incorporates its

21  arguments set forth in Section IV.B and requests that the Court reject SenoRx's unduly restrictive

22  reading of this term.

**F.    "plurality of solid radiation sources" (Asserted Claim 17)**

| Hologic's Proposed Construction | SenoRx's Proposed Construction |
|---|---|
| plurality of solid radiation sources | Two or more separate radioactive solid sources placed in the inner spatial volume at the same time |

---

[11]  This element is contained within claim 3 on which asserted claim 4 depends.

The phrase "plurality of solid radiation sources" in the '204 patent mirrors the nearly identical phrase "plurality of radioactive solid particles" in the parent '813 patent. SenoRx proffers an identical construction for each, and no elaboration on the meaning of either term is necessary. *Ethicon,* 103 F.3d at 1568; Ex. H at 4. Because the '813 and '204 patents are related, this claim term should carry the same construed meaning as the nearly identical terms in the '813 and '204 patents. *See Omega Eng'g, Inc.*, 334 F.3d at 1334; *PCTEL, Inc.*, 2005 WL 2206683, at *3. Thus, "plurality of solid radiation sources" should be construed to mean "plurality of solid radiation sources."

**F.    "three-dimensional isodose profile that is substantially similar in shape to the expandable surface element" (All Asserted Claims)[12]**

| Hologic's Proposed Construction | SenoRx's Proposed Construction |
|---|---|
| three-dimensional isodose profile that is substantially similar in shape to the expandable surface element | a final three-dimensional isodose profile that is substantially similar in shape to the outer spatial volume expandable surface and is concentric with the outer spatial volume expandable surface |

This claim term means what it says and that no further elaboration is necessary. *Ethicon,* 103 F.3d at 1568. This term has an ordinary and customary meaning to one of skill in the art. Moreover, there is no evidence that the inventors intended to impart a novel or special meaning to the term. Thus, "three-dimensional isodose profile that is substantially similar in shape to the expandable surface element" should be construed to mean "three-dimensional isodose profile that is substantially similar in shape to the expandable surface element."

SenoRx's proposed construction fabricates new restrictions on otherwise clear claim language without any support in the intrinsic record. Because SenoRx's approach is contrary to established claim construction principles, it should be rejected. First, SenoRx's proposes adding the word "final" to describe the isodose profile, which serves only to create ambiguity where none exists. The claim language makes no reference to any temporal standard, so there is no baseline against which to evaluate "final." Second, referring to a "final" isodose profile suggests that use of the apparatus

---

[12] This element is contained within Claim 1 on which both asserted claims depend.

1  generates multiple, "intermediate," isodose profiles, and that only the "final" one is substantially

2  similar in shape to the expandable surface element.  No intrinsic evidence supports this conclusion or

3  provides justification for adding such a limitation.

4        Again, with the language "concentric with the outer spatial volume expandable surface,"

5  SenoRx manufactures a claim limitation where none exists.  This is not an attempt to clarify the

6  "substantially similar" claim language—SenoRx retains that language, but then seeks to impose a

7  requirement that the profile be "concentric."  The claims do not require this.  *Phillips*, 415 F.3d at 1313

8  (the words of the claims define the subject matter that the inventors intended to claim).  Likewise,

9  neither the written description nor the prosecution history suggests that the claim language be so

10 limited.  SenoRx's proposed construction should be rejected.

11      **G.    "isodose profile having a shape substantially similar to the shape of the outer
             spatial volume" (Claim 17)**

12

13

| Hologic's Proposed Construction | SenoRx's Proposed Construction |
|---|---|
| isodose profile having a shape substantially similar to the shape of the outer spatial volume | a final three-dimensional isodose profile that is substantially similar to the shape of the outer spatial volume expandable surface and is concentric with the outer spatial volume expandable surface |

14

15

16

17      This claim term means what it says and that further elaboration of that meaning is unnecessary.

18 *See Ethicon, Inc.* 103 F.3d at 1568.  One of ordinary skill in the art would understand the meaning of

19 this claim term without  altering the claim language.  Ex. H at 4.  Thus, "isodose profile having a shape

20 substantially similar to the shape of the outer spatial volume" should be construed to mean "isodose

21 profile having a shape substantially similar to the shape of the outer spatial volume."

22      SenoRx's proposed construction is identical to its definition of the similar phrase within claim

23 1 ("three-dimensional isodose profile that is substantially similar in shape to the expandable surface

24 element") discussed immediately above.  *See, supra,* at section V.F.  As discussed in section V. F.

25 above, SenoRx's proposal, rather than clarifying the language at issue, creates ambiguity and adds

26 unsupported limitations to the claim term.  SenoRx's proposed construction should be rejected. *MBO*

27 *Labs.,* 474 F.3d 1323 at 1333; *JVW Enters.*, 424 F.3d at 1335.

28

1  **VI.    CONSTRUCTION OF '142 PATENT TERMS**

2          The '142 patent, a continuation-in-part of both the '813 and '204 patents, describes an

3  apparatus that delivers localized radiation in an asymmetric fashion to target tissue surrounding a

4  surgical extraction site.  The apparatus includes an expandable outer surface element defining an

5  apparatus spatial volume, a radiation source disposed within the apparatus volume, and a means for

6  providing a predetermined asymmetric isodose profile within the target tissue.  Several embodiments

7  include a radiation source shaped or located so as to be asymmetrically placed with respect to the

8  longitudinal axis of the apparatus to create asymmetric isodose curves within the target tissue.  *See,*

9  *e.g.,* FIGS. 1, 3-7.  In particular, FIG. 4 illustrates an embodiment in which three curved radiation

10  source wires, each including a number of solid radiation particles, are arranged asymmetrically with

11  respect to the longitudinal axis of the device to achieve the desired asymmetric isodose profiles.

12          **A.    "located so as to be spaced apart from the apparatus volume" (Claim 1)**

| Hologic's Proposed Construction | SenoRx's Proposed Construction |
|---|---|
| located so as to be not on or touching the apparatus volume | located outside (*i.e.*, not within) the apparatus volume |

16          The proper construction of the phrase "located so as to be spaced apart from the apparatus

17  volume" is one in which the claim term is not read in isolation, "but in the context of the entire patent,

18  including the specification."  *Phillips*, 415 F.3d at 1313.  Both within the specification and during

19  prosecution, the '142 inventors made clear that "spaced apart" referred to the positional relationship

20  between the radiation source and the wall of the expandable outer surface element, and hence the target

21  tissue.  Col. 4:27-30 (an "outer spatial volume 30" is "affixed to the tubular body 12").  This outer

22  spatial volume is "defined by an outer polymeric film barrier 32 that is appropriately *spaced from the*

23  *radioactive source*."  Col. 4:27-30.  Indeed, the inventors distinguished the prior art on the basis that

24          [T]he radiation source is disposed completely within the expandable surface and spaced
            apart from the apparatus volume.  (*See* Page 8, line 23 to page 9 line 13, noting the
25          advantages of providing the radiation source within the interstitial volume and spaced
            apart from the target tissue . . .).

27  Ex. J at 6-7.  The inventors further stated that "the radiation source is arranged within the device so

that asymmetric dosing appears *at the apparatus volume*," indicating that the apparatus volume is located adjacent to the band of tissue to be treated, and is not intended to be a geometric volume of space encapsulated by the expandable outer surface. *Id.* at 7 (Response to Office Action); *see also id.* at 8 (comparing the balloon disclosed in the Apple reference to the "apparatus volume" of claim 1). In short, SenoRx's proposed construction would do what is virtually never proper: exclude all disclosed embodiments of the patent. SenoRx cannot present the "highly persuasive evidentiary support" necessary to do so.[13] *Vitronics*, 90 F.3d at 1583.

As recognized by both this Court and Dr. Verhey, "a common sense reading indicates that one of skill in the art could understand the claim to mean that the radiation source must be inside and spaced apart from the surface of the expandable outer surface." Ex. E at 16; Ex. H at 5-6. SenoRx's proposed construction should be rejected as contrary to the language of both the specification and prosecution history.

**B.   "being provided on at least two elongate members extending into the apparatus volume" (Claim 6)**

| Hologic's Proposed Construction | SenoRx's Proposed Construction |
|---|---|
| being provided on at least two elongate members extending into the apparatus volume | radiation sources are attached to two or more elongate members (e.g., wires or rods) that extend into the three-dimensional region of space within the expandable outer surface at the same time |

One of ordinary skill in the art would understand the meaning of this claim term. . Nothing in the intrinsic record demonstrates that the inventors attempted to impart a novel interpretation to this

_____

[13] SenoRx has relied heavily on Cytyc's construction of "inner spatial volume" from the *Xoft* case. Although the '142 patent is a continuation-in-part of the '813 patent at issue in *Xoft*, the terms "apparatus volume" and "inner spatial volume" are quite different and served different purposes. Moreover, the relevant specification and prosecution history are distinct with respect to the term "apparatus volume" and "spaced apart from the apparatus volume." The construction of "inner spatial volume" from the '813 patent is thus irrelevant to the construction of "apparatus volume" in the '142 patent. Indeed, the claims in a continuation-in-part may have different meanings than in their parent patents. *See, e.g., Medtronic, Inc. v. Advanced Cardiovascular Systems, Inc.*, 248 F.3d 1303, 1315 (Fed. Cir. 2001) (refusing to use intrinsic evidence from parent application pertaining to a claim term different than the term under consideration); *cf. Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 980 (Fed. Cir. 1999) (citing *Jonsson v. The Stanley Works,* 903 F.2d 812, 817-818 (Fed.Cir.1990), for the proposition that "[w]hen multiple patents derive from the same initial application, the prosecution history regarding a claim limitation in any patent that has issued applies with equal force to subsequently issued patents *that contain the same claim limitation*" (emphasis added)).

1  language.  Therefore, it should be construed to mean what it says.  Thus, "being provided on at least

2  two elongate members extending into the apparatus volume" should be construed to mean "being

3  provided on at least two elongate members extending into the apparatus volume."

4      SenoRx's arguments should be rejected.  SenoRx impermissibly adds the limitation that two or

5  more elongate members extend "at the same time."  *MBO Labs.,* 474 F.3d at 1333.  Nothing in the

6  patent validates this proposed additional limitation.  To the contrary, the specification contemplates

7  removing the radionuclide during treatment, noting that

8      it is desirable to provide an interstitial brachytherapy device configured to provide a
    dose in a therapeutic range, say between 40 to 60 Gray, at a distance between 0.5 and

9      1.0 cm from the outer spatial volume for an outer spatial volume having a diameter of
    4.0 cm and being in contact with the resection cavity wall.  In a typical embodiment, the

10      radioactive source material ranges from approximately 150 to 450 mCi in activity and
    encompasses most of the target treatment area with a 0.4 to 0.6 Gray/hour isodose

11      contour.  At this treatment rate, treatment may be completed in approximately 3 to 7
    days, or more commonly, in approximately 3 to 5 days.

12

13  Col. 5:66 –6:10.  To deliver a dose of 40 Gray at a rate of 0.6 Gray/hour, for example, would entail

14  almost 67 hours of treatment with a radionuclide, which treatment the patent instructs can be

15  completed over 3 to 7 days rather than continuously for the full 67 hours.  *Id.*  The patent further

16  teaches that the radioactive source material may be removed before the apparatus is removed.  Col.

17  3:47-52.  Thus, the patentees considered the temporal issues associated with radiation treatment using

18  their device, but chose not to limit the claims to any one temporal embodiment.  To do so now violates

19  the Federal Circuit's proscription against importing new limitations into claims.

20      **C.**    **"at least one of the elongate members being shaped to provide asymmetric**

21      **placement of the radiation source with respect to a longitudinal axis through the**
    **apparatus volume" (Claim 6)**

22

| Hologic's Proposed Construction | SenoRx's Proposed Construction |
| --- | --- |
| At least one elongate member is shaped so as to place the radiation source not on the longitudinal axis through the apparatus volume | at least one elongate member (e.g., a wire or rod) is shaped so that a radioactive source attached to that member is not located on the longitudinal axis of the device |

26      The parties agree to SenoRx's proposed construction of this term as meaning "at least one

27  elongate member (e.g., a wire or rod) is shaped so that a radioactive source attached to that member is

28

1    not located on the longitudinal axis of the device." No further construction of this term is necessary at

2    this time.

3        **D.    "apparatus volume" (Claims 1 & 6)**

| Hologic's Proposed Construction | SenoRx's Proposed Construction |
|---|---|
| apparatus volume | The three-dimensional region of space within the expandable outer surface |

7        Hologic addresses the construction of "apparatus volume" in the context of surrounding claim

8    language, *i.e.*, within the phrase "three-dimensional apparatus volume configured to fill an interstitial

9    void" (discussed immediately below), and a separate construction of this term divorced from the

10   context of the surrounding claim language is neither required nor appropriate. *See Phillips*, 415 F. 3d

11   at 1314.

12       **E.    "three-dimensional apparatus volume configured to fill an interstitial void"**
         **(Claims 1 & 8)**

| Hologic's Proposed Construction | SenoRx's Proposed Construction |
|---|---|
| A three-dimensional geometric solid composed of an expandable outer surface | The three-dimensional region of space within the expandable outer surface |

16

17       Read in light of the intrinsic record, there is only one reasonable meaning of "apparatus

18   volume": "a three-dimensional geometric solid composed of an expandable outer surface."[14]  By way

19   of illustration, the specification describes an "outer spatial volume" that is "defined by an outer

20   polymeric film barrier 32 that is appropriately ***spaced*** from the radioactive source." Col. 4:27-30;  Ex.

21   E at 15.  The '142 inventors relied upon this understanding during prosecution before the PTO. *See,*

22   *supra* at section VI.A.   Dr. Verhey also testified that one of ordinary skill in the art would recognize

23   that the apparatus volume must be defined as by Hologic. Ex. H at 4-5.  Moreover, the Court has

24   already found, in ruling on Hologic's Motion for Preliminary Injunction, that common sense dictates

25   the apparatus volume cannot be a region of space within the expandable outer surface. Ex. E at 16.

26   SenoRx's construction is possible only if one disregards the context of the claim term and improperly

27   _____

28   [14] By way of analogy, the skin of a basketball defines a three-dimensional basketball.

1  reads the claim language in a vacuum, which is improper.  *Phillips*, 415 F.3d at 1313.

2  **F.    "asymmetrically located and arranged within the expandable surface" (Claim 1)**

| Hologic's Proposed Construction | SenoRx's Proposed Construction |
|---|---|
| Located and arranged so as not to be on the longitudinal axis of the expandable surface | Located and arranged inside the expandable surface so as not to be concentric with the expandable outer surface |

6  Hologic advances a construction that harmonizes the plain language of the claim with the

7  explicit disclosures within the specification.  The '142 patent unequivocally calls out the benchmark

8  against which asymmetry of the radiation source is measured:  the longitudinal axis of the apparatus.

9  Col. 2:65-3:1 (" …locating the radiation source so as to be asymmetrically placed with respect to a

10  longitudinal axis of the apparatus"); Col. 5:12-13 ("Radiation source 24 has an asymmetric

11  configuration with respect to a longitudinal axis of the instrument 10.").  Every teaching of asymmetry

12  within the '142 patent refers to the radiation source being offset from the longitudinal axis of the

13  device.  *Id.*; Col. 3:11-19; Col. 5:20-23; FIG. 4; Abstract.  Even when a liquid radioisotope is used, the

14  inner volume containing that isotope is "asymmetrically shaped or located with respect to the

15  longitudinal axis"…and not the expandable outer surface.  Col. 7:5-9.  Hologic's proposed

16  construction is consistent with both the plain meaning of the claim language and the written

17  description.

18  SenoRx, in contrast, promotes a construction that is inconsistent with the patent's explicit

19  teachings.   In fact, SenoRx seeks to exclude preferred embodiments.  For example, the '142 patent

20  discloses embodiments in which a radioactive source is concentric with the expandable outer surface.

21  Solid radiation particles 126 in FIG 6, 52 in FIG. 3, and unnumbered (attached to a wire along the

22  longitudinal axis) in FIG 4, as well as liquid radiation source 108 in FIG. 5 each illustrate radiation

23  sources concentric with the outer expandable surface of the device.  The Court should reject SenoRx's

24  construction because it would exclude those embodiments from the scope of the claim.  *See Oatey,* 514

25  F.3d at 1277 ("At least where claims can reasonably to interpreted to include a specific embodiment, it

26  is incorrect to construe the claims to exclude that embodiment, absent probative evidence on the

27  contrary."); *NeoMagic Corp.*, 287 F.3d at 1074.  Hologic's proposed constructions stay true to the

28

1    claim language and the intrinsic record and should be adopted.

2    **G.    "predetermined asymmetric isodose curves (All Asserted Claims)**

| Hologic's Proposed Construction | SenoRx's Proposed Construction |
|---|---|
| Predetermined isodose curves that are not symmetric with respect to the longitudinal axis of the apparatus volume | Isodose curves determined before radiation is administered which are not substantially the same shape as the apparatus volume and/or not concentric with the apparatus volume |

Hologic's construction comports with both the intrinsic and extrinsic record. Ex. H at 6. The '142 patent repeatedly defines the asymmetry of the isodose profile relative to the longitudinal axis of the device. Col. 5:19-25 ("The asymmetrically shaped isodose curve 40 [in FIG. 1] may be created by providing a plurality of solid radioactive particles 36 on a curved wire 34 in a spaced apart relationship. This configuration will result in certain of the solid radioactive particles 36 being further from the longitudinal axis 38 of the instrument 10 than others, and will result in the illustrated asymmetric isodose profile 40."); Col. 5:14-18 (…radiation source 24 is shaped so as to result in an isodose profile 40 that varies radially about the longitudinal axis 38. More simply, the isodose profile 40 of FIG. 1 has a shorter radius from the longitudinal axis 38 on the top side of the instrument 10 as shown in FIG. 1 than on the bottom side."); Col. 3:1-6 ("In one example …an inner volume containing a liquid radioisotope is asymmetrically placed within the apparatus volume so as to result in an isodose profile in the target tissue that is asymmetric about the longitudinal axis of the apparatus.").

SenoRx's proposed construction is inconsistent with the definition of "asymmetric" provided in the specification. SenoRx would require that the isodose profile not be substantially the same shape as the apparatus volume, and/or not concentric with the apparatus volume. *MBO Labs,* 474 F.3d at 1333. The '142 patent teaches that "[i]n some applications, the desired dosing profile is consistent with the shape of the outer volume 30. That is, the absorbed dose within the target tissue at points equidistant from the surface 32 of the outer spatial volume 30 should be substantially uniform in substantially every direction." Col. 6:11-15. The specification's use of the phrase "in some applications" implies that there are other applications in which the dosing profile is ***not*** "consistent with the shape of the outer volume."

1    Moreover, SenoRx's view that the dosing profile cannot be concentric is unduly narrow – the

2    intrinsic evidence defines "asymmetric" as being off-axis, not simply non-concentric (*i.e.*, relative to a

3    central point).  Thus, a dosing profile centered on the longitudinal axis but not concentric with the

4    balloon – *i.e.*, as in the case of an off-center dwell position of a radionuclide in a central inner lumen –

5    would not be included in the patent's definition of "asymmetric."  SenoRx's construction is therefore

6    incorrect.

7    **H.    "plurality of solid radiation sources" (Claim 6)**

8
| **Hologic's Proposed Construction** | **SenoRx's Proposed Construction** |
|---|---|
9
| plurality of solid radiation sources | Two or more separate radioactive solid sources placed within the expandable outer surface at the same time |
10

11    This claim term means what it says.  There is no evidence of any intent by the inventors to

12    impart a novel or special meaning to the term, and those skilled in the art appreciate what is claimed

13    based on the unambiguous claim language itself.  Ex. H at 6.  Thus, "plurality of solid radiation

14    sources" should be construed to mean "plurality of solid radiation sources".

15    Once again, SenoRx attempts to add a temporal limitation ("*at the same time*") to the otherwise

16    unambiguous claim language without support in the intrinsic record.  Neither the specification nor the

17    prosecution history suggests that the particles must be placed in the inner volume at the same time.

18    *See* Col. 2:69-3:9; Fig. 5.  In fact, the plain meaning of this element encompasses a single radioactive

19    seed inserted into different lumens at different times.  This Court should therefore decline SenoRx's

20    invitation to read temporal limitations into this claim term where the claim language calls for none.

21    **VII.    CONCLUSION**

22    Hologic's proposed constructions comport with the intrinsic and extrinsic evidence, as well as

23    with the plain meaning of the terms under construction.  In contrast, SenoRx's proposed constructions

24    import several new claim limitations, and, in general, lack intrinsic support.  For these reasons,

25    plaintiffs respectfully requests that the Court adopt Hologic's proposed constructions.

26    \\

27

28

1  Dated:  May 21, 2008                    HOWREY LLP

2

3

4                                          By:  _____/s/_____
                                                 Katharine L. Altemus
5

6                                          HOWREY LLP
                                           Attorneys for Plaintiffs
7                                          Hologic, Inc., Cytyc Corporation,
                                            and Hologic L.P.
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## PROOF OF SERVICE

2

I am employed in the County of San Mateo, State of California. I am over the age of 18 and
3  not a party to the within action. My business address is 1950 University Avenue, 4th Floor, East Palo
Alto, California 94303.

4

On May 21, 2008, I served on the interested parties in said action the within:

5

**PLAINTIFFS' OPENING CL;AIM CONSTRUCTION BRIEF (PATENT L.R. 4-5(a)) and**
6  **DECLARATION OF KATHARINE L. ALTEMUS IN SUPPORT OF PLAINTIFFS' OPENING**
**CLAIM CONSTRUCTION BRIEF (PATENT L.R. 4-5(a)) with sealed Exhibits E and F**

7

by placing a true copy thereof in a sealed envelope(s) addressed as stated below and causing such
8  envelope(s) to be deposited in the U.S. Mail at East Palo Alto, California.

9  | F.T. Alexandra Mahaney | Bruce R. Genderson |
   | Natalie J. Morgan | Aaron P. Maurer |
10 | Wilson Sonsini Goodrich & Rosati | Rachael Shanahan Rodman |
   | 12235 El Camino Real, Suite 200 | Adam D. Harber |
11 | San Diego, California 92130 | Williams & Connolly LLP |
   | | 725 – 12th Street, N.W. |
12 | | Washington, D.C. 20005 |

13  [X]   (MAIL) I am readily familiar with this firm's practice of collection and processing
correspondence for mailing. Under that practice it would be deposited with the U.S. postal
14       service on that same day in the ordinary course of business. I am aware that on motion of party
served, service is presumed invalid if postal cancellation date or postage meter date is more
15       than 1 day after date of deposit for mailing in affidavit.

16  [X]   (EMAIL/ELECTRONIC TRANSMISSION) Based on a court order or an agreement of the
parties to accept service by e-mail or electronic transmission, I caused the documents to be sent
17       to the persons at the e-mail addresses listed above. I did not receive, within a reasonable time
after the submission, any electronic message or other indication that the transmission was
18       unsuccessful.

19       I declare under penalty of perjury that I am employed in the office of a member of the bar of
this Court at whose direction the service was made and that the foregoing is true and correct.

20

Executed on May 21, 2008, at East Palo Alto, California.

21

22  _____        _____
           Sonya Schwab                          (Signature)
23        (Type or print name)

24

25

26

27

28