F.T. Alexandra Mahaney, State Bar No. 125984
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
12235 El Camino Real, Suite 200
San Diego, CA 92130
Telephone: (858) 350-2300
Facsimile: (858) 350-2399
Email: amahaney@wsgr.com

Bruce R. Genderson (*admitted pro hac vice*)
Aaron P. Maurer (*admitted pro hac vice*)
Rachel Shanahan Rodman (*admitted pro hac vice*)
Adam D. Harber (*admitted pro hac vice*)
WILLIAMS & CONNOLLY LLP
725 Twelfth St. NW
Washington, DC 20005
Telephone: (202) 434-5000
Facsimile: (202) 434-5029

Attorneys for Defendant and Counterclaimant
SENORX, INC.

## IN THE UNITED STATES DISTRICT COURT

### NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| HOLOGIC, INC., CYTYC CORP., and HOLOGIC L.P., <br><br> Plaintiffs, <br><br> v. <br><br> SENORX, INC., <br><br> Defendant. | CASE NO.: 08-CV-0133 RMW <br><br> **DEFENDANT SENORX, INC.'S RESPONSIVE CLAIM CONSTRUCTION BRIEF** <br><br> <u>REDACTED VERSION</u> |
| SENORX, INC., <br><br> Counterclaimant, <br><br> v. <br><br> HOLOGIC, INC., CYTYC CORP., and HOLOGIC L.P., <br><br> Counterdefendants. | Date: June 25, 2008 <br> Time: 2:00 p.m. <br> Courtroom: 6, 4th Floor <br> Judge: Hon. Ronald M. Whyte |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...............................................................................................ii

PRELIMINARY STATEMENT .........................................................................................1

CONSTRUCTION OF THE DISPUTED TERMS .............................................................2

I.    "Plurality"...............................................................................................................2

II.   The '813 and '204 Patents......................................................................................4

    A.    "Predetermined Constant Spacing" ('813 Patent Claim 1). ......................4

    B.    "Predetermined Spacing" ('204 Patent Claim 3). ......................................7

    C.    Substantially Similar "Three-Dimensional Isodose Profile" ('204 Patent
        Claims 1, 17). .............................................................................................9

    D.    "Inner Spatial Volume" ('813 Patent Claim 1; '204 Patent Claim 1)........11

    E.    "Means . . . For Rendering Uniform" ('813 Patent Claim 1). ...............14

    F.    "Inner Closed Chamber" ('813 Patent Claim 2). ....................................15

    G.    Providing a "Controlled Dose . . . to Reduce or Prevent Necrosis" ('204
        Patent Claim 2)..........................................................................................16

III.  The '142 Patent .....................................................................................................18

    A.    "Apparatus Volume" ('142 Patent Claims 1); "Located so as to be Spaced
        Apart from the Apparatus Volume" ('142 Patent Claim 1) ....................18

        1.    "Apparatus Volume." .........................................................19

        2.    "Located so as to be Spaced Apart from the Apparatus Volume."...........21

    B.    "Predetermined Asymmetric Isodose Curves" ('142 Patent Claims 1, 8). ..........23

    C.    "Asymmetrically Located and Arranged Within the Expandable Surface"
        ('142 Patent Claim 1). ...............................................................................24

    D.    "Being Provided on At Least Two Elongate Members" ('142 Patent Claim
        6)................................................................................................................25

CONCLUSION ...............................................................................................................25

1

**TABLE OF AUTHORITIES**

2

**FEDERAL CASES**

3

*Applied Med. Res. Corp. v. U.S. Surgical Corp.*,
4
    448 F.3d 1324 (Fed. Cir. 2006) ............................................................................................. 14

5

*Bilstad v. Wakalopulos*,
    386 F.3d 1116 (Fed. Cir. 2004) ............................................................................................... 3
6

*Chimie v. PPG Indus., Inc.*,
7
    402 F.3d 1371 (Fed. Cir. 2005) ............................................................................................. 11

8

*Computer Docking Station Corp. v. Dell, Inc.*,
9
    519 F.3d 1366 (Fed. Cir. 2008) ............................................................................................. 11

10

*Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*,
    424 F.3d 1293 (Fed. Cir. 2005) ............................................................................................... 4
11

12

*Dayco Prods., Inc. v. Total Containment, Inc.*,
    258 F.3d 1317 (Fed. Cir. 2001) ............................................................................................... 3

13

*Glaxo Group Ltd. v. Ranbaxy Pharms., Inc.*,
14
    262 F.3d 1333 (Fed. Cir. 2001) ............................................................................................. 16

15

*Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.*,
16
    488 F.3d 982 (Fed. Cir. 2007) ............................................................................................... 11

17

*Irdeto Access, Inc. v. Echostar Satellite Corp.*,
    383 F.3d 1295 (Fed. Cir. 2004) ....................................................................................... 12, 13
18

19

*K-2 Corp. v. Salomon S.A.*,
    191 F.3d 1356 (Fed. Cir. 1999) ....................................................................................... 19, 22

20

*Markman v. Westview Instruments, Inc.*,
21
    517 U.S. 370 (1996) ................................................................................................................. 1

22

*MSM Invs. Co., LLC v. Carolwood Corp.*,
    259 F.3d 1335 (Fed. Cir. 2001) ............................................................................................. 21
23

24

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*,
    521 F.3d 1351 (Fed. Cir. 2008) ..................................................................................... passim

25

*Omega Eng'g, Inc. v. Raytek Corp.*,
26
    334 F.3d 1314, 1324 (Fed. Cir. 2003) ................................................................................... 11

27

*Process Control Corp. v. HydReclaim Corp.*
28
    190 F.3d 1350 (Fed. Cir. 1999) ....................................................................................... 18, 22

*York Prods., Inc. v. Central Tractor Farm & Family Ctr.*,
   99 F.3d 1568 (Fed. Cir. 1996) ................................................................................................. 3

1

**PRELIMINARY STATEMENT**

2       By asserting that numerous claim terms should be accorded their "plain meaning,"

3 Plaintiffs attempt to circumvent this Court's role in construing the claims of the patents-in-suit.

4 Plaintiffs' motive is easy to discern.  They seek the freedom to argue claim construction to the

5 jury – for example, that a "plurality" of sources is met by a single source.  And that an "inner,

6 closed chamber" is not inner, and not closed.  And that spacing that is "constant" means spacing

7 that can change.  But the law requires this Court, not the jury, to construe the claims, *see*

8 *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 388-89 (1996) (judges "are the better

9 suited to find the acquired meaning of patent terms"), and Plaintiffs' invitation to leave these

10 disputed claim terms unconstrued so they can present unsupported (and unsupportable) claim

11 construction arguments to the jury should be declined.  "When the parties raise an actual dispute

12 regarding the proper scope of these claims, the court, not the jury, must resolve that dispute."  *O2*

13 *Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008); *id.*

14 at 1361 ("A determination that a claim term 'needs no construction' or has the 'plain and

15 ordinary meaning' may be inadequate when . . . reliance on a term's 'ordinary' meaning does not

16 resolve the parties' dispute.").  In this case, as in *O2 Micro*, "the 'ordinary' meaning of a term

17 does not resolve the parties' dispute, and claim construction requires the court to determine what

18 claim scope is appropriate in the context of the patents-in-suit." *Id.*

19       Plaintiffs also suggest that SenoRx's constructions unnecessarily add structures that are

20 not part of the claim.  That is wrong.  As will be explained below, in each instance, the

21 specification and/or prosecution history require the structure be included as part of the claim.

22 Indeed, it is Plaintiffs who run afoul of the purposes of claim construction by seeking to cover

23 devices they did not conceive of, describe, or claim.  Plaintiffs' motive is yet again clear –

24 Plaintiffs want the Court to avoid precisely defining the claims so that they later can argue to the

25 jury that devices clearly outside the claims infringe.

26

27

28

1

**CONSTRUCTION OF THE DISPUTED TERMS**[1]

2

**I.      "PLURALITY"**

3

| Claim Term | SenoRx's Proposed Construction | Plaintiffs' Proposed Construction |
|---|---|---|
| Plurality of radioactive solid particles placed at predetermined locations ('813 patent, claim 12) | Two or more separate radioactive solid particles placed in the inner spatial volume at the same time at more than one predetermined location. | No construction necessary |
| Plurality of solid radiation sources ('204 patent, claim 17) | Two or more separate radioactive solid sources placed in the inner spatial volume at the same time. | No construction necessary |
| Plurality of solid radiation sources ('142 patent, claim 6) | Not applicable.[2] | No construction necessary |

4

5

6

7

8

9

10

11

12          Plaintiffs agree with SenoRx that "plurality of radioactive solid particles" and "plurality

13     of solid radiation sources" should be construed the same way, Pl. Br. at 12, 13, 17, 25, and argue

14     that "this term means what it says – 'a plurality of radioactive solid particles.'" *Id.* at 12.

15     Plaintiffs assert, however, that "[t]here is no need to clarify that 'plurality' means 'two or more'

16     or that the particles have to be 'separate.'" *Id.*

17          To the contrary, there is indeed a need to construe this term, because Plaintiffs do not

18     mean what they say.  Despite their "no construction necessary" position, Plaintiffs are not really

19     saying that the term requires no further "clarification" in order to be properly understood.

20     Rather, Plaintiffs hope to dissuade the Court from construing the term and then argue to the jury

21     a meaning that is directly contrary to its plain meaning.  "Clarification" that Plaintiffs' approach

22     is incorrect is plainly required.  Plaintiffs' true position is exposed on page 25 of their brief: "In

23     fact, the plain meaning of this element encompasses a <u>single</u> radioactive seed inserted into

24     different lumens at different times."  *Id.* at 25 (emphasis added); *compare also id.* at 12 ("There

25

26          [1] The parties' constructions are summarized in the table attached herein at Appendix A.

27          [2] On May 30, 2008, Plaintiffs informed SenoRx that they are dropping their assertions of infringement of claim 6 of the '142 patent.  Accordingly, SenoRx will not further address the limitations of claim 6.

28

1   is no need to clarify that . . . the particles <u>have to be 'separate</u>.'" (emphasis added)) *with id.* at 13

2   ("[T]here is no intrinsic basis for adding a restriction that multiple, <u>separate</u>, solid particles be

3   placed in the inner spatial volume…" (emphasis in original)).  Plaintiffs' infringement

4   contentions likewise state the claim limitation of a "plurality" of sources is literally met by "a

5   <u>single</u> solid radionuclide on a source wire . . . inserted sequentially into one or more

6   predetermined locations."  Ex. 11[3] (Pls' Infr. Cont. Appx. A) at 15 (emphasis added); *see also*

7   Ex. 11 (Pls' Infr. Cont. Appx. B) at 16-17 ("<u>one</u> or more solid radiation sources") (emphasis

8   added).  Clearly, the parties have a real dispute about whether a claim limitation requiring a

9   "plurality" of sources literally encompasses a "single" source – a dispute that is purely a matter

10  of claim construction which is exclusively within the province of the Court to resolve.  *See O2*

11  *Micro*, 521 F.3d at 1360 ("When the parties raise an actual dispute regarding the proper scope of

12  these claims, the court, not the jury, must resolve that dispute.").

13           Substantively, SenoRx's proposed construction is plainly correct.  "Plurality" means that

14  there are two or more separate radioactive solid particles placed in the inner spatial volume at the

15  same time.  "Plurality" is a commonly-used claim term whose meaning is well-established.  As

16  the Federal Circuit has repeatedly observed, the term "'plurality,' when used in a claim, refers to

17  <u>two or more items</u>, absent some indication to the contrary."  *Dayco Prods., Inc. v. Total*

18  *Containment, Inc.*, 258 F.3d 1317, 1327-28 (Fed. Cir. 2001) (emphasis added); *see also Bilstad*

19  *v. Wakalopulos*, 386 F.3d 1116, 1122-23 (Fed. Cir. 2004) (affirming Board of Patent Appeals

20  and Interferences' construction of "plurality" as a "numerical range . . . bounded by two . . . and .

21  . . infinity"); *York Prods., Inc. v. Central Tractor Farm & Family Ctr.*, 99 F.3d 1568, 1575 (Fed.

22  Cir. 1996) ("The term means, simply, 'the state of being plural.'").

23           Furthermore, that the particles are "separate" " is supported by the claim term "plurality,"

24  which means "two or more," as well as by the specifications of the patents, which expressly

25  distinguish a "single" radiation source from a "plurality" of separate radiation sources.  *See* Ex. 1

26

27        [3] All exhibits ("Ex.") referenced herein are exhibits to the Declaration of Adam D. Harber in
          Support of SenoRx's Opening Claim Construction Brief, unless otherwise specified.
28

('813 patent), Figure 5; *id.* at col. 2:64-66;  Ex. 2 ('204 patent), Figure 4; *id.* at col. 3:33-35, 5:1-4.  For example, the '813 and '204 patents describe "individual radiation sources," which can not be understood in any way other than "separate."   Ex. 1 ('813 patent), col. 3:7-8; Ex. 2 ('204 patent), col. 5:11.

Finally, the claim language also mandates that the particles are in the apparatus at the same time.  The claims here are to specific devices and comprise a combination of elements.  If every element of the claim is not present – *e.g.*, two or more radioactive particles at predetermined locations – then there is no claimed device.  *See Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1311 (Fed. Cir. 2005) ("To infringe an <u>apparatus</u> claim, the device must meet <u>all</u> of the structural limitations.") (emphases added).  This is not a temporal limitation, but a structural limitation that requires every element of the claim – here, two or more radiation sources – to be present at the same time for an infringing apparatus to exist.

## II.    THE '813 AND '204 PATENTS.

### A.    "Predetermined Constant Spacing" ('813 Patent Claim 1).

| Claim Term | SenoRx's Proposed Construction | Plaintiffs' Proposed Construction |
|---|---|---|
| predetermined constant spacing between said inner spatial volume and the radiation transparent wall | Fixed spacing, predetermined by one skilled in the art before administering radiation, between the wall or edge of the inner spatial volume and the radiation transparent wall of the outer, closed inflatable chamber, when inflated, which for each point on the wall or edge of the inner spatial volume, the distance to the closest point on the outer chamber is the same (*i.e.*, the inner spatial volume and outer chamber are concentric and the same shape). | spacing predetermined by one skilled in the art between the wall or edge of the inner spatial volume and the radiation transparent wall of the outer, closed, inflatable chamber, when inflated, which is constant in all directions if the outer chamber is spherical, or constant along a radial plane if the outer chamber is not spherical |

This claim limitation requires "a predetermined constant spacing" between the inner and outer spatial volumes.  SenoRx's definition of "predetermined constant spacing" – a definition that is precise and explains the claim language and its consequence as set forth in the intrinsic evidence – should be adopted.

The '813 patent describes and claims as an essential feature of its invention the avoidance of "hot spots" in the tissue, *i.e.*, areas of tissue that receive a higher dose of radiation than other areas of tissue spaced equidistant from the radiation source. *See* SenoRx Opening Brief ("Op. Br.") at 5-6. The patent accomplishes this by ensuring that the inner volume (when it contains a radiation-emitting material) is centered in the outer volume and spaced apart from the outer surface of the device by a constant distance over their entire surfaces.[4] As Plaintiffs conceded in their opening brief: "The distance between the radiation source and the wall of the outer chamber can be made substantially constant. This embodiment permits the controlled delivery of radiation to a layer of tissue surrounding the surgical cavity." Pl. Br. at 4-5.

The plain claim language and the repeated description of the invention in the specification, *see* Op. Br. at 5-6, as well as applicants' distinction of prior art, *see* Op. Br. at 6, require "fixed" spacing. The patent is clear that by "constant," it means fixed, stating for example that "the distance from the spatial volume and the wall is maintained substantially constant over their entire surfaces," Ex. 1 ('813 patent), col. 1:55-57; that the "spacing between the wall of the inner chamber and the wall of the outer chamber remain generally constant," *id.* at 3:11-13, and that "In either the concentric spherical embodiment of FIG. 1 or the non-spherical configuration of FIG. 3, the spacing between the inner and outer chambers needs to be held somewhat constant to avoid 'hot spots.'" *Id.* at 4:13-16.

That the inner spatial volume and outer chamber are the same shape and concentric with each other follows as a consequence of the laws of geometry. If the inner spatial volume is spaced apart from the outer wall by a constant distance over their entire surfaces – the correct understanding of the claim – the two volumes necessarily are the same shape and concentric with each other (*i.e.*, sharing the same center and orientation). *See* Orton Decl. ¶ 25;

---

[4] The '204 patent describes and claims the same features, as discussed below.

[5] Exs. 15-16 are exhibits to the Declaration of Adam D. Harber in Support of SenoRx's Responsive Claim Construction Brief.

1            Plaintiffs concede that "The '813 patent relates to an instrument

2   comprising a <u>concentric</u> arrangement of an inner spatial volume and an outer spatial

3   volume . . . ." Pl. Br. at 4. And, as they admitted at the *Markman* hearing in *Xoft*, a non-constant

4   spacing results in the volumes not having the same shape: "if it's not constantly spaced, if it's,

5   for example, an oblong figure in a spherical balloon, then you don't have a constant distance."

6   Ex. 7 (*Xoft Markman* Tr.) at 71:3-5.[6]

7            Plaintiffs in their opening brief raise two issues with SenoRx's proposed construction.

8   First, Plaintiffs state that their construction would allow "chang[ing] the spacing during

9   treatment," Pl. Br. at 8, whereas SenoRx's would not. But there is no description whatsoever in

10   any intrinsic evidence for Plaintiffs' contention that the invention allows the spacing to be

11   changed during treatment, Pl. Br. at 8, and Plaintiffs do not provide <u>any</u> citation (even to their

12   own expert) for any such understanding. *Id.*

13   

14   

15         Plaintiffs' argument that "constant" spacing "may . . . change" is inherently self-

16   contradictory and incorrect.

17            Plaintiffs also criticize SenoRx for construing the claim limitation the same for spherical

18   balloons as for non-spherical balloons. That criticism is unfounded, and again, unsupported by

19   the evidence. No intrinsic evidence suggests that "constant spacing" means something different

20   for spherical balloon as compared to non-spherical balloons. To the contrary, the specification

21   expressly states that the same configuration is needed to avoid hot spots: "In <u>either</u> the

22   concentric <u>spherical</u> embodiment of FIG. 1 or the <u>non-spherical</u> configuration of FIG. 3, <u>the</u>

23   <u>spacing between the inner and outer chambers needs to be held somewhat constant to avoid 'hot</u>

24   <u>spots.'</u>" Ex. 3 ('813 patent), col. 4:13-16 (emphases added); *see also id.* at 3:11-13. Further,

25   _____

26        [6] Furthermore, as discussed in SenoRx's opening brief at page 6, Plaintiffs distinguished the
prior art Ishiwara patent from claim 1 because the "constant spacing" limitation required the

27   same shape inner and outer surfaces, arguing that Ishiwara "teaches away from applicants'
invention given the elongate, cylindrical shape of the radiation source employed and the oblong-

28   shaped outer balloon surrounding it." Ex. 5 (Sep. 1, 1998 Am., '813 Prosecution History) at 6-7.

1  Plaintiffs are incorrect in asserting that SenoRx's construction would exclude Figure 3 (the non-

2  spherical "hot dog in a hot dog"-shaped embodiment) from the scope of the claim.

3      Figure 3 of the patent has constant spacing over the entire surfaces of the two volumes, as

4  seen from the annotated illustration below (annotations in red added):



5

6

7

8

9

10

11  And the patent expressly states that "the spacing between the wall of the inner chamber and the

12  wall of the outer chamber remain[s] generally constant, such as is illustrated in FIG. 3."  *Id.* at

13  3:11-13; *see also id.* at 4:13-16; Ex. 5 (Sep. 1, 1998 Am., '813 Prosecution History) at 6 ("In a

14  second embodiment, attention is paid to the spacing between the inner and outer radiation

15  transparent walls so that it is constant <u>over the entire surfaces of the two chambers</u>.") (emphasis

16  added).

17

18

19

20

21

22

23      **B.    "Predetermined Spacing" ('204 Patent Claim 3).**

24

| Claim Term | SenoRx's Proposed Construction | Plaintiffs' Proposed Construction |
|---|---|---|
| Predetermined spacing . . . between said inner spatial volume and the expandable surface element | Fixed spacing, predetermined by one skilled in the art before administering radiation, between the wall or edge of the inner spatial volume and the wall of the expandable surface element, when inflated, which for each point on the wall or edge of the inner spatial | the distance between the inner spatial volume and the expandable surface element is determined in advance |

25

26

27

28

| | volume, the distance to the closest point on the expandable surface element is the same (*i.e.*, the inner spatial volume and expandable surface element are concentric and the same shape). | |
|---|---|---|

Noting that "the '204 and '813 patents share similar disclosures," Plaintiffs largely repeat and incorporate their arguments relating to "predetermined constant spacing" in their discussion of "predetermined spacing."  *See* Pl. Br. at 16.  For the same reasons set forth above, those arguments should be rejected.

It is clear that in the '204 patent, as in the '813 patent, the spacing between the inner and outer volumes is fixed.  The '204 patent (much like the '813 patent that it expressly incorporates) teaches that the claimed device should "ensur[e] that the spacing between the wall of the inner volume and the wall of the outer volume remain[s] generally constant," Ex. 2 ('204 patent), col. 5:22-27, which necessarily requires that the spacing be fixed.  Plaintiffs should not be allowed to argue to the jury that "a predetermined spacing" may include circumstances where the spacing between the inner volume and outer volume changes during treatment (*i.e.*, once the expandable surface element has been inflated in a surgical cavity).  There is no teaching whatsoever that the spacing between surfaces of the inner and outer volumes can change once the outer volume is inflated.

On this point, both parties' experts are in agreement.  Dr. Verhey, Plaintiffs' expert, admits that the spacing of claim 3 is constant in his expert declaration on claim construction.  *See* Ex. H to Altemus Decl. (Verhey Decl., (Oct. 12, 2006) Appx. C at 9-10).[7]  He construes "predetermined spacing" to require that "spacing between the inner and outer spatial volumes can be set to a predetermined and constant value."  *Id.* at 10:16-18, (emphasis added).  For support, Dr. Verhey cites to the same portion of the specification as does SenoRx, *i.e.*, col. 5, ll. 22-32, that teaches:

---

[7] For clarity, Plaintiffs' exhibits are designated by lettering (A, B, C, etc.), whereas SenoRx's exhibits are designated by numbering.

1
2
3
4

> the spacing between the wall of the inner volume and the wall of the outer volume remain[s] generally constant.  In either the concentric spherical embodiment of FIG. 1 or the non-spherical configuration of FIG. 5, this result can be achieved by careful placement of precision blown or molded polymer partitions or by using compressible foams or mechanical spacers in the form of webs joining the inner wall 32 to the outer wall 36.

5  Furthermore, in construing claim 4 of the '204 patent (the asserted claim here, which

6  incorporates the "predetermined spacing" limitation of claim 3), Dr. Verhey again concludes the

7  claim requires constant spacing: "the desired shape of the expandable surface element is that

8  shape which provides the <u>predetermined constant spacing</u> between the inner spatial volume and

9  the conformed surface of the resection cavity."  Ex. H to Altemus Decl. (Verhey Decl., (Oct. 12,

10  2006) Appx. C at 9:22-24) (emphasis added); *see also* Orton Decl. ¶ 25.

11    **C.    Substantially Similar "Three-Dimensional Isodose Profile" ('204 Patent
12           Claims 1, 17).**

| Claim Term | SenoRx's Proposed Construction | Plaintiffs' Proposed Construction |
|---|---|---|
| three-dimensional isodose profile that is substantially similar in shape to the expandable surface element ('204 patent, claim 1);<br><br>isodose profile having a shape substantially similar to the shape of the outer spatial volume ('204 patent, claim 17) | A final three-dimensional isodose profile that is substantially the same shape as the outer spatial volume expandable surface and is concentric with the outer spatial volume expandable surface. | No construction necessary. |

20      For both claims 1 and 17, Plaintiffs contend that "the claim term means what it says" and

21  "no further elaboration is necessary," because the "term has an ordinary and customary meaning

22  to one of skill in the art."  Pl. Br. at 17, 18.  That is incorrect.[8]  Plaintiffs again ask this Court to

23
24
25

---

26  [8] And, Plaintiffs are wrong that the ordinary meaning of "isodose profile" is used here.
  "Isodose profile," in its ordinary use, is a description of the dose received by points in tissue
27  plotted as a function of distance, *e.g.*, a plot of dose versus distance from the center of a source,
  as shown at Fig. 4, curves 40 and 42.  *See* Ex. H to Altemus Decl. (Verhey Decl., (Oct. 12, 2006)
28  Appx. C at 8:15-17;

1   avoid construing a term in dispute so that they can have the freedom argue to the jury that it

2   means something it plainly does not. *See O2 Micro*, 521 F.3d at 1360.

3       Without stating what they believe the meaning – ordinary or otherwise – of this term is,

4   Plaintiffs dispute that the "three-dimensional isodose profile" recited by the claim means the

5   cumulative absorbed dose of radiation administered by the apparatus to the tissue (in other

6   words, the complete and final dose), and assert that no intrinsic evidence supports SenoRx's

7   position. To the contrary, the patent's specification and prosecution history clearly indicate the

8   "isodose profile" discussed in the claim is the representative curve showing the cumulative

9   absorbed dose as delivered to the tissue by the device during treatment. Thus the patent's

10   purpose is to provide an "<u>absorbed</u> dose within the target tissue" that is "substantially uniform in

11   substantially every direction." Ex. 2 ('204 patent), col. 5:13-19. *See also id.* at col. 2:46-55 (The

12   device must achieve a dose in the tissue "between a minimum prescribed <u>absorbed</u> dose for

13   delivering therapeutic effects to tissue that may include cancer cells, and a maximum prescribed

14   <u>absorbed</u> dose above which healthy tissue necrosis may result."); *id.* at col. 2:21-26 ("It is

15   desirable to keep the radiation that is delivered to the tissue in the target treatment region within

16   a narrow <u>absorbed</u> dose range . . . .") (emphases added). As explained in detail by Dr. Orton,

17   Orton Decl. ¶ 50, the claim term is referring to the final, cumulative absorbed dose delivered by

18   the device to the tissue, and the "isodose profile" of claim 1 should be construed accordingly.[9]

19       Plaintiffs also miss the mark in contending that SenoRx is "manufacturing" a requirement

20   of concentricity. As discussed in SenoRx's opening brief at pages 7-8, the '204 patent's

21   specification clearly describes the "substantially the same shape" limitation as requiring

22   concentricity, and the applicants relied on concentricity in the prosecution history to distinguish

23   the prior art. In particular, the applicants added the "substantially similar in shape" limitation to

24   claim 1 to overcome the Williams '582 patent (among others). Ex. 9 (Dec. 20, 2000 Am., '204

25   Prosecution History) at 2, 10-16. Figure 7 of the Williams '582 patent (depicted at page 11 of

26

27       [9] Accordingly, should the Court so desire, the word "final" in SenoRx's proposed
    construction can augmented by "cumulative" or "absorbed".

28

SenoRx's opening brief) shows a device with an inner balloon and an outer balloon.  Although

the inner balloon is the same shape as the outer balloon, the applicants stated that Williams '582

did not meet the "substantially the same shape limitation."  The reason was not based on shape,

but because the inner balloon was not located concentric with the outer balloon:  "As seen in

Figure 7 of Williams, <u>outer lumen 28B is not evenly spaced apart from inner lumen 28A</u> that

contains the radiation source. . . .  <u>[B]ecause the balloons are not equally spaced apart, Williams'</u>

<u>apparatus cannot create an isodose profile that has substantially the same shape as the outer</u>

<u>element.</u>" Ex. 9 (Dec. 20, 2000 Am., '204 Prosecution History) at 15-16 (emphases added).

Prosecution disclaimer "promotes the public notice function of the intrinsic evidence and

protects the public's reliance on definitive statements made during prosecution." *Omega Eng'g,*

*Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003). Because the applicants clearly made

the argument that "substantially the same shape" requires concentricity in order to gain

allowance of claim 1, Orton Decl. ¶ 52, the public notice function demands the claim limitation

be construed to include concentricity.  *See, e.g.*, *Computer Docking Station Corp. v. Dell, Inc.*,

519 F.3d 1366, 1374-75 (Fed. Cir. 2008); *Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1384 (Fed.

Cir. 2005).

**D.      "Inner Spatial Volume" ('813 Patent Claim 1; '204 Patent Claim 1).**

| Claim Term | SenoRx's Proposed Construction | Plaintiffs' Proposed Construction |
|---|---|---|
| inner spatial volume | A region of space surrounded by an outer spatial volume that is either enclosed by a distensible polymeric film wall or defined by the outside surface of a solid radionuclide sphere. | A region of space surrounded by an outer spatial volume that is either enclosed by a polymeric film wall or defined by the outside surface of a solid radionuclide. |

The term "inner spatial volume" is one unique to the '813 and '204 patents, and thus has

no ordinary meaning to a person skilled in the art at the time of filing of the patent application.

Accordingly, it is necessary to refer to the specification for the meaning: "Without a customary

meaning of a term within the art, the specification usually supplies the best context for

deciphering claim meaning."  *Honeywell Int'l Inc. v. Universal Avionics Sys. Corp.*, 488 F.3d

982, 991 (Fed. Cir. 2007).  "[A]bsent such an accepted meaning, we construe a claim term <u>only</u>

1    as broadly as provided for by the patent itself." *Irdeto Access, Inc. v. Echostar Satellite Corp.*,

2    383 F.3d 1295, 1300 (Fed. Cir. 2004) (emphasis added).

3         This is the approach the Court took in *Xoft*, and it is the approach SenoRx advocates here.

4    As the Court discussed in *Xoft*, the inner spatial volume referred to in the patents is disclosed to

5    be one of two structures, either a polymeric film-walled balloon or a solid radionuclide sphere,

6    and that is the way the claims should be construed. Ex. 4 (*Xoft* Cl. Constr. Order) at 3-5, 16.

7         Plaintiffs dispute that the solid radionuclide must be spherical, contrary to this Court's

8    prior construction. Pl. Br. at 5-7, 14. But a spherical source is precisely what the patent

9    specification requires and is the only solid source disclosed. The portion of the specification

10   Plaintiffs cite for their contention that the solid source can be non-spherical is directed to the

11   polymeric film-walled balloons, hence the patent's discussion that "chambers 30 and 34" do not

12   necessarily require spherical walls. Ex. 3 ('813 patent), col. 3:9-10. Likewise, dependent claim

13   13 of the '813 patent is limited to "spherical" inner and outer chambers (*e.g.*, balloons), and is

14   not applicable to solid embodiments. Furthermore, it is undisputed that non-spherical sources

15   were known at the time of the filing of the patent. Ex. H to Altemus Decl. (Verhey Decl. (May

16   21, 2008)) at 3-4. Despite that fact, the applicants made the conscious decision not to reference

17   any of those sources, but instead to specifically state that "instead of having the inner spatial

18   volume 30 defined by a generally spherical polymeric film wall as at 32, the catheter body

19   member 12 may have a solid spherical radiation emitting material . . . ." Ex. 1 ('813 patent), col.

20   2:56-63 (emphasis added); *see also id.* at 2:64-65 ("inner spatial volume comprising a single

21   solid sphere") (emphasis added); Ex. 2 ('204 patent), col. 4:44-50 (describing using "a solid

22   spherical radiation emitting material 44 as the inner spatial volume 30. For example, radioactive

23   micro spheres of the type available from the 3M Company of St. Paul, Minn., may be used.")

24   (emphasis added).

25        Plaintiffs ask the Court to re-write the specification to capture non-spherical

26   radionuclides such as SenoRx's cylindrical source. Pl. Br. 5-7, 14. The Court should not do so.

27   Patentees justifiably are held to the descriptions of their inventions in their patents. Plaintiffs

28   also suggest that the omission of non-spherical sources was a mere oversight. *Id.* at 6-7. The

1    prosecution history, however, reveals a different story.  Indeed, the applicants distinguished prior

2    art in part because of the prior art's use of cylindrical radionuclides:  "In fact, it is proper to say

3    that the Ishiwara et al. reference teaches away from applicants' invention given the <u>elongate,</u>

4    <u>cylindrical shape of the radiation source employed</u> and the oblong-shaped outer balloon

5    surrounding it."  Ex. 5 (Sep. 1, 1998 Am., '813 Prosecution History) at 6-7 (emphasis added).

6    The claim should be construed to cover what the applicants described – spherical solid

7    radionuclides.

8        The polymeric film walled embodiment likewise should be construed "only as broadly as

9    provided for by the patent itself," *Irdeto Access*, 383 F.3d at 1300, *i.e.*, to require that the wall be

10    distensible.  The patents consistently describe the polymeric film wall used to define the "inner

11    spatial volume" to be distensible.  *E.g.*, Ex. 2 ('204 patent), col. 2:56-60 ("the inner spatial

12    volume can be defined by a distensible polymeric wall containing radioactive source material");

13    *id.* at col. 3:66-4:3 ("the distensible polymeric film walls may comprise a biocompatible,

14    radiation resistant polymer"); *id.* at col. 5:22-23 ("inner and outer spatial volumes are created by

15    <u>inflatable</u> membranes"); Ex. 1 ('813 patent), Abstract ("inner and outer <u>distensible</u>, spherical

16    chambers").  Plaintiffs point to the Summary of Invention of the '813 patent to support their

17    contention that the inner spatial volume need not be defined by a "distensible" film wall, stating

18    that the specification "while referring to the 'polymeric film wall' does not describe it as

19    'distensible.'"  Pl. Br. at 6.  However, the portion of the specification quoted by Plaintiffs is

20    plainly referring to the expandable surface of the <u>outer</u> spatial volume, about which there is no

21    dispute that it is expandable.  Thus, this actually supports SenoRx's contention – the patents,

22    when discussing the "polymeric film walls" of the inflatable chambers, are referring to chambers

23    whose walls are distensible.[10]  Non-distensible polymeric walls are described nowhere in the

24    patents, and were plainly not conceived of or claimed by the inventors as part of their invention.

25

26

    _____

27        [10] For this same reason, the amendment to claim 2 of the '204 patent, discussed by Plaintiffs
    at page 6 of their opening brief, is not relevant.

28

Accordingly, the "polymeric film wall" embodiment of the "inner spatial volume" should be construed to require "distensible" polymeric film walls.

### E.    "Means . . . For Rendering Uniform" ('813 Patent Claim 1).

| Claim Term | SenoRx's Proposed Construction | Plaintiffs' Proposed Construction |
|---|---|---|
| means . . . for rendering uniform the radial absorbed dose profile of the emissions from the one of the inner spatial volume and outer chamber containing the radionuclides | Function: Making the absorbed dose of radiation substantially more uniform between the surface of the outer chamber and a predetermined depth in the target tissue.<br><br>Structure: A radiation absorbing or attenuating material, e.g., air, x-ray contrast fluid, contrast media used in angiography, water, a gas, barium sulfate, or their equivalents, that performs this function by absorbing or attenuating radiation. | Function: making the absorbed dose of radiation more uniform to prevent over-treatment of body tissue at or close to the outer wall of the instrument<br><br>Structure: a radiation absorbing or attenuating material, e.g. air, x-ray contrast fluid, contrast media used in angiography, water, a gas, or barium sulfate or their equivalents |

There are three fundamental disputes as to this claim term. First, the parties dispute the precise definition of the function in this means-plus-function claim element. Plaintiffs import a functional limitation – "to prevent overtreatment of body tissue at or close to the outer wall of the instrument" – that is not found in the claim language. This is erroneous, and should be rejected. *See Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 448 F.3d 1324, 1334 (Fed. Cir. 2006) ("A court errs when it improperly imports unclaimed functions into a means-plus-function claim limitation. . . . [T]his can occur during claim construction by defining a claimed function to require more than is actually claimed.").

Second, the parties dispute the extent to which the dose profile must be "rendered uniform." While the claim states, without qualification, "rendering uniform," in *Xoft*, this Court correctly rejected the argument that the profile must be completely uniform, *i.e.*, flat. *See* Ex. 4 (*Xoft* Cl. Constr. Order) at 8-10. However, SenoRx submits that construing the limitation as "substantially more uniform" is far closer to the claim language and the intent of the inventors (as shown in Figure 4) than simply "more uniform," which would encompass greater uniformity of any magnitude, however trivial. *See, e.g.*, Ex. 1 ('813 patent), claim 1 ("Apparatus for

delivering radioactive emissions to a body location with a uniform radiation profile . . . ."); *id.* at col. 1:36 ("as uniform as possible").

Finally, although the parties agree on the structure associated with the claimed function ("a radiation absorbing or attenuating material, e.g., air, x-ray contrast fluid, contrast media used in angiography, water, a gas, barium sulfate, or their equivalents"), they disagree about the way in which the structure performs this function. SenoRx contends that the "radiation absorbing or attenuating material" must perform the claimed function by absorbing or attenuating radiation.[11] Plaintiffs, on the other hand, contend the limitation is satisfied so long as a "radiation absorbing or attenuating" material is present, even if it does not render the dose uniform by absorbing or attenuating radiation. The patent clearly emphasizes on the nature of the structure as a radiation-absorbing material in performing the claimed function, and that accordingly should be reflected in the claim construction. Otherwise, it will be the case that any material that provides space between the inner and outer spatial volumes will fulfill the claim limitation – a plainly overbroad reading of the patent disclosure. As discussed in SenoRx's opening brief at pages 14-17, it is the radiation absorbing or attenuating material in the spatial volumes that was meant to affect the dose curve. *See also* Orton Decl. ¶¶ 37-38. The claim should be so construed.

### F.    "Inner Closed Chamber" ('813 Patent Claim 2).

| Claim Term | SenoRx's Proposed Construction | Plaintiffs' Proposed Construction |
|---|---|---|
| inner closed chamber | A compartment located completely inside of the outer chamber and closed off within the outer chamber. | No construction necessary. |

As with previous terms, Plaintiffs again argue that the term "inner closed chamber" has a "plain meaning" and should not be construed. But, as before, the Court should construe this term as there is an actual dispute between the parties as to its meaning. The determination of precisely

---

[11] SenoRx has proposed adding this requirement to the structural limitation, although it could alternatively be added to the description of the function. Accordingly, should the Court not link the "by absorbing or attenuating radiation" limitation to the "structure," SenoRx respectfully requests the Court construe the function as "Making the absorbed dose of radiation substantially more uniform between the surface of the outer chamber and a predetermined depth in the target tissue by absorbing or attenuating radiation."

1    what "inner closed chamber" means cannot be and should not be left to the jury.  Instead, the

2    jury should be given clear guidance by this Court as to the scope of the claim limitation.  *See O2*

3    *Micro*, 521 F.3d at 1360.  SenoRx's proposed construction should be adopted because it

4    precisely defines what the claim means, and is consistent with the intrinsic evidence and the

5    inventor testimony.

6          Plaintiffs' sole argument is that SenoRx's construction cannot be correct because "it

7    would exclude a preferred embodiment."  But that confuses the role of independent and

8    dependent claims.  Dependent claims, such as the claim at issue here, are required to narrow the

9    scope of the independent claims, which necessarily means that not all embodiments must be or

10   should be covered by dependent claims.  *See Glaxo Group Ltd. v. Ranbaxy Pharms., Inc.*, 262

11   F.3d 1333, 1336 (Fed. Cir. 2001) ("Dependent claims are generally narrower in scope than the

12   claims from which they depend.").

13

14

15

16

17

18

19

20

21

22

23                                              SenoRx's proposed construction is consistent with the clear import

24   of the claim language as well as the rest of the evidence and should be adopted.

25        **G.    Providing a "Controlled Dose . . . to Reduce or Prevent Necrosis" ('204**
              **Patent Claim 2).**
26

| Claim Term | SenoRx's Proposed Construction | Plaintiffs' Proposed Construction |
|---|---|---|
| providing a controlled dose at | Controlling the ratio of the dose at the expandable surface of the outer spatial | controlling the ratio of the dose at the expandable surface of the outer |

| the outer spatial volume expandable surface to reduce or prevent necrosis in healthy tissue proximate to the expandable surface | volume to the prescribed dose at the depth of interest in the target tissue so as to reduce or eliminate the risk of damage to healthy tissue in contact with the expandable surface as compared to devices in which the tissue is directly adjacent to the radiation source. | spatial volume to the prescribed dose at the depth of interest in the target tissue so that the dose at the expandable surface is not so high that it lethally damages cells in healthy tissue in contact with the expandable surface. |

There are two primary differences in the parties' constructions of this term. First, SenoRx's construction tracks the language of the claim, and require the dose be controlled so as to "reduce or eliminate" necrosis, whereas Plaintiffs' construction does not incorporate the concept of "reducing" damage to the tissue. The inclusion of "reduce" in SenoRx's construction comes directly from the language of the claim and the specification of the patent. *See* Ex. 2 ('204 patent), col. 7:26-28 (the device allows physicians "to reduce or eliminate the risk of healthy tissue necrosis"). The patent also makes clear the answer to the question: "reduce" necrosis as compared to what? The specification addresses this in detail at Figures 7A-7D, as described in the specification at column 5:66-7:28. In particular, the devices of the invention are said to avoid "necrosis inducing radiation 'hot spots'" that were created by prior art devices "having a single spatial volume filled with a radioactive material," *id.* at col. 5:66-6:6, such that "the tissue [is] directly adjacent the wall" of the radiation-filled volume of the prior art device. *Id.* at 2:7-26. Thus, the applicants conclude, "[t]he capability of the apparatus of the invention to deliver absorbed doses deeper into the target tissue than prior interstitial brachytherapy devices while controlling the dose in proximity to the apparatus to reduce or eliminate the risk of healthy tissue necrosis allows for the use of brachytherapy in a greater number of cases." *Id.* at col. 7:23-28. In other words, the risk of necrosis is reduced by the claimed inventions by placing space in between the radiation source and the tissue, as compared to prior art devices in which the radiation source was placed directly adjacent the tissue.

Second, the parties disagree on how to characterize "necrosis." SenoRx's construction focuses on damage to "tissue," while Plaintiffs' construction focuses on cell death. As demonstrated by the patent, SenoRx clearly is correct that "necrosis" relates to systemic tissue damage, not merely cell death: "With increasing cell death comes increasing risk of necrosis or

tissue death in healthy tissue that is treated with a high dose of radiation." *Id.* at 6:55-57. Thus, cell death and necrosis, while related, are not the same thing, and the claim uses "necrosis." Plaintiffs assertion, that the claim requires not "lethally damag[ing] cells in healthy tissue in contact" with the balloon is found nowhere in the claims or specification and cannot be met by any device, as every internal radiation device that destroys cancer cells will lethally damage some cells in healthy tissue in contact with the device.

## III.    THE '142 PATENT

### A.    "Apparatus Volume" ('142 Patent Claims 1); "Located so as to be Spaced Apart from the Apparatus Volume" ('142 Patent Claim 1)

| Claim Term | SenoRx's Proposed Construction | Plaintiffs' Proposed Construction |
|---|---|---|
| Apparatus volume (claim 1) | The three-dimensional region of space within the expandable outer surface. | Apparatus volume. |
| Three-dimensional apparatus volume configured to fill an interstitial void (claim 1) | The three-dimensional region of space within the expandable outer surface. | A three-dimensional geometric solid composed of an expandable outer surface. |
| Located so as to be spaced apart from the apparatus volume (claim 1) | Located outside (*i.e.*, not within) the apparatus volume. | Located so as to be not on or touching the apparatus volume. |

In order to rewrite claim 1 of the '142 patent to preserve its validity – something that they are forbidden to do – Plaintiffs contort and twist the ordinary meaning of "volume." Plaintiffs' construction here not only is confused and confusing, but contradicts statements made in their brief and expert declaration. It also contradicts arguments made in the *Xoft* case (on which they prevailed), ignores the claim's definition of the "apparatus volume" and "expandable outer surface," and completely undermines the notice function of the claims of the patent. In amending claim 1 of the '142 patent during prosecution, Plaintiffs' representative wrote the claim to require an impossibility. Regardless of how Plaintiffs may feel about that now, the law is clear that the claims cannot be rewritten by this Court to say something different than what they say, nor can the same result be achieved under the rubric of claim construction. *Process Control Corp. v. HydReclaim Corp.* 190 F.3d 1350, 1357 (Fed. Cir. 1999) ("[W]e do not permit

1  courts to redraft claims."); *K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1364 (Fed. Cir. 1999)

2  ("Courts do not rewrite claims; instead, we give effect to the terms chosen by the patentee.").

3                          **1.    "Apparatus Volume."**

4        Claim 1 requires in relevant part:

5              an expandable outer surface defining a three-dimensional apparatus
              volume configured to fill an interstitial void created by the surgical
6              extraction of diseased tissue and define an inner boundary of the
              target tissue being treated;
7
              a radiation source disposed completely within the expandable outer
8              surface and located so as to be spaced apart from the apparatus
              volume, . . .
9
10       Dr. Verhey, Plaintiffs' expert, describes his understanding of the first element of claim 1

11  as follows:

12             [T]he "three-dimensional apparatus volume" is something that is
              defined by the "expandable outer surface." What this expandable
13             outer surface defines is a three-dimensional geometric solid (e.g., a
              sphere) having both volume that fills an interstitial void created by
14             the surgical extraction of diseased tissue and a surface area that
              defines an inner boundary of the target tissue being treated.
15             Accordingly, in my opinion, the term "three-dimensional apparatus
              volume" means "a three-dimensional geometric solid composed of
16             an expandable outer surface." By "solid," I mean a geometric shape,
              such as a sphere, having three dimensions and a surface area.

17  Ex. H to Altemus Decl. (Verhey Decl. (May 21, 2008) at 5:4-10 (emphases added).  Thus, Dr.

18  Verhey understands the "three-dimensional apparatus volume" not to be a "region of space"

19  defined the expandable surface – the plain and ordinary definition ascribed to "volume" by

20  Plaintiffs in the *Xoft* case – but as encompassing "both volume . . . and a surface area."  *Id.*

21  (emphasis added).  Expanding upon this view, Plaintiffs explain "by way of analogy, the skin of

22  a basketball defines a three-dimensional basketball."  Pl. Br. at 22, n.14.

23       The fatal flaw in Plaintiffs' construction is found in the first clause of the claim.  That

24  limitation clearly states and requires that the expandable outer surface and apparatus volume are

25  different things, not that one is part of the other.  Plaintiffs' construction would have the claim

26  read as a nonsensical tautology: "An expandable outer surface defining a three-dimensional

27  geometric solid composed of an expandable outer surface."  Or, applying Plaintiffs' analogy,

28  "the skin of a basketball defining a basketball composed of the skin of a basketball."

1    Dr. Verhey admits that if his definition of the claim term is applied "the patentee's use of

2    the word 'volume' here is <u>somewhat unusual</u>." Ex. H to Altemus Decl. (Verhey Decl. (May 21,

3    2008) at 5:11-12 (emphasis added). It certainly is. Indeed, more than "unusual," Dr. Verhey's

4    definition of the "apparatus volume" as encompassing both the surface <u>and</u> the volume is

5    contrary to '142 specification itself. "Three dimensional geometric solid" is a concept found

6    nowhere in the intrinsic evidence. Instead, the specification states that the "present invention" of

7    the '142 patent has "an expandable outer surface element defining an <u>apparatus spatial volume</u>."

8    Ex. 3 ('142 patent), col. 2:55-64. This makes clear the inventors, in using the term apparatus

9    volume, do so in exactly the way that SenoRx does – to delineate a volume that is a region of

10    space, hence the description of the apparatus volume as a "spatial volume." *See also, e.g.*, *id.* at

11    3:20-23 ("An interstitial brachytherapy apparatus of the invention may also be implemented in a

12    device having an expandable outer surface defining an apparatus volume . . . ."). The

13    specification never states or implies that the apparatus volume encompasses both the surface and

14    the space inside of it, or that the expandable outer surface is part of the "apparatus volume."

15    Plaintiffs' construction and contentions also directly contradict their arguments in the

16    *Xoft* litigation. Here, Plaintiffs contend their construction – that "apparatus volume" includes,

17    and can refer to, the "outer expandable surface" of the device – is supported by the following

18    passage from the '142 patent, which they cite and quote <u>twice</u> in their brief:

19        By way of illustration, the specification describes an "<u>outer spatial</u>
         <u>volume</u>" that is "defined by an outer polymeric film barrier 32 that
20        is appropriately spaced from the radioactive source." Col. 4:27-30.

21    Pl. Br. at 19, 22 (emphasis added). But, in the *Xoft* case, Plaintiffs argued directly to the

22    contrary:

23        Xoft's proposed construction of the term [outer spatial volume] . . .
         confuses the outer spatial volume with the "expandable surface
24        element" that defines its boundary. The "<u>outer spatial volume</u>" is a
         <u>region of space that is defined by an "expandable surface element"</u>
25        <u>but it is not the "expandable surface element" itself.</u> If the Court is
         inclined to construe "outer spatial volume," then the term should be
26        construed as "a region of space defined by an expandable surface
         element and surrounding an inner spatial volume." This is consistent
27        with the ordinary meaning of the claim term in view of the
         specification.

28

1    Ex. 6 (Cytyc Br.) at 19:21-28.[12]  Plaintiffs were right before – the surface and the volume it

2    defines are plainly different things.

3         Although Plaintiffs criticize SenoRx for reading the disputed terms of claim 1 out of

4    context, it is Plaintiffs who have done so, leading to their flawed construction.  Plaintiffs'

5    argument simply assumes the conclusion Plaintiffs are trying to prove, all the while discounting

6    the evidence to the contrary.  SenoRx on the other hand starts, as is proper, with the language of

7    the claim.  *MSM Invs. Co., LLC v. Carolwood Corp.*, 259 F.3d 1335, 1338-39 (Fed. Cir. 2001).

8    That language – which states that the "expandable outer surface defin[es] a three-dimensional

9    apparatus volume configured to fill an interstitial void created by the surgical extraction of

10   tissue" – read in light of the specification and intrinsic evidence, compels the result that the

11   apparatus volume is the region of space within the expandable outer surface.  To decide to the

12   contrary, as Plaintiffs urge the Court, requires impermissibly rewriting the claim language.

13        Finally, as noted in SenoRx's opening brief, the limitation of "an expandable outer

14   surface defining an apparatus volume" is found not only in claim 1, but also in every other claim

15   in the patent.  Not one of those claims uses "apparatus volume" in the manner that Plaintiffs'

16   contend.  To the contrary, "apparatus volume" is used to refer to a volume, *i.e.*, a region of space

17   defined by the expandable outer surface.  *See, e.g.*, Claim 3 ("a catheter in communication with

18   the apparatus volume"); Claim 4 (an "elongate member . . . taking on a substantially straight

19   shape while being inserted through the catheter to the apparatus volume, and resuming an

20   asymmetric shape when extended into the apparatus volume"); Claim 6 ("two elongate members

21   extending into the apparatus volume"); *cf.* Claim 9 ("a radiation source disposed completely

22   within and spaced apart from the expandable outer surface").

23        **2.    "Located so as to be Spaced Apart from the Apparatus Volume."**

24        Contrary to what they say in their brief, Plaintiffs are not asking the Court to read the

25   limitation of "a radiation source . . . located so as to be spaced apart from the apparatus volume"

26   

27        [12] Notably, the '204 patent is expressly incorporated into the '142 patent.  Ex. 3 ('142 patent,
     col. 1:6-12).

28   

DEFENDANT SENORX, INC.'S RESPONSIVE          -21-          CASE NO. 08-CV-0133 RMW
CLAIM CONSTRUCTION BRIEF

1  in the "context" of the specification. What Plaintiffs are really asking is for the Court to rewrite

2  the claim, so that it reads "a radiation source . . . located so as to be spaced apart from the

3  expandable outer surface." In so doing, Plaintiffs are championing a claim construction practice

4  forbidden by the Federal Circuit. *See Process Control Corp.*, 190 F.3d at 1357; *K-2 Corp.*, 191

5  F.3d at 1364.

6        To be sure, Plaintiffs' newly-minted construction of this phrase – "located so as to be <u>not</u>

7  <u>on or touching</u> the apparatus volume" – ignores the claim language. But it also is inconsistent

8  with Plaintiffs' <u>own</u> construction of "apparatus volume." Plaintiffs' expert Dr. Verhey explains

9  his construction of the "spaced apart" element as follows:

10        As noted above, the three-dimensional apparatus volume is a
   geometric solid defined by the expandable outer surface that has

11  both volume and surface area. Understood in this context, the phrase
   "located so as to be spaced apart from the apparatus volume"

12  logically refers to the surface area of the apparatus volume that
   defines the inner boundary of the target tissue being treated.

13  Accordingly, in my opinion, this claim phrase means "located so as
   to be not on or touching the apparatus volume."

14  
15  Ex. H to Altemus Decl. (Verhey Decl. (May 21, 2008)) at 5:20-25. Dr. Verhey's constructions

16  (adopted as Plaintiffs' constructions) are internally inconsistent in the following way: If the

17  apparatus volume has "<u>both</u> volume and surface area," as Dr. Verhey opines, then the claim term

18  "located so as to be spaced apart from the apparatus volume" must mean located so as to be

19  spaced apart from "<u>both</u> volume and surface area." But that is not what Plaintiffs assert. Instead,

20  Dr. Verhey cherry-picks a portion of the "apparatus volume" – the surface area (which Plaintiffs

21  have strained to improperly insert into the meaning of "apparatus volume" in the first place) –

22  and states that the radiation source has to be located not on or touching the <u>surface</u>, wholly

23  ignoring the fact that their own definition of "apparatus volume" requires the radiation be spaced

24  apart from the <u>volume</u> inside the surface as well. To further Plaintiffs' basketball analogy

25  (where the "basketball" is the apparatus volume, *see* Pl. Br. at 22 n.14), "located so as to be

26  spaced apart from the basketball" would mean that something <u>inside of the basketball</u> would be

27  "spaced apart" <u>from the basketball</u> so long as it was not touching the basketball's surface. That

28  plainly is an absurd construction, with no support in the intrinsic evidence whatsoever.

SenoRx's construction of the volume in accordance with its plain meaning as a "region of space" results in the conclusion that "spaced apart from the apparatus volume" means outside of the volume.

**B.      "Predetermined Asymmetric Isodose Curves" ('142 Patent Claims 1, 8).**

| Claim Term | SenoRx's Proposed Construction | Plaintiffs' Proposed Construction |
|---|---|---|
| predetermined asymmetric isodose curves<br><br>[with respect to the apparatus volume] ('142, claims 1, 8); | Isodose curves determined before radiation is administered which are not substantially the same shape as the apparatus volume and/or not concentric with the apparatus volume. | Predetermined isodose curves that are not symmetric with respect to the longitudinal axis of the apparatus volume. |

Contrary to Plaintiffs' suggestion that "Hologic's construction comports with both the intrinsic and extrinsic record," Pl. Br. at 24, Plaintiffs' construction in fact reads into the claims a feature of the preferred embodiments, a practice that even they acknowledge is improper. Pl. Br. at 3 (quoting *JVW Enters., Inc. v. Interact Access., Inc.*, 424 F.3d 1324, 1335 (Fed. Cir. 2005) ("We do not import limitations into claims from examples or embodiments . . . .")). Rather than comporting with the claim language, the primary determinant in claim construction, Plaintiffs seek to add to the claims the limitation that the curves are asymmetric "with respect to the <u>longitudinal axis</u> of the apparatus volume." This limitation comes not from the claim, which plainly states that the asymmetry is "with respect to the apparatus volume," but from the description of some of the preferred embodiments. *See* Pl. Br. at 24 (referring to and quoting from the specification's description of "one example" of the invention, and the specification's description of the particular "configuration" of Figure 1).

As described in SenoRx's opening brief at pages 24-25, Plaintiffs' construction ignores the description in the patent of other configurations, where the asymmetric isodose curves are described more broadly than Plaintiffs' construction allows, or depicted in a way that contradicts their construction. *See, e.g.*, Ex. 3 ('142 patent), col. 2:56-3:11 ("In another example, the radiation source comprises a plurality of spaced apart solid radioactive particles disposed within the apparatus volume and arranged to provide a <u>predetermined asymmetric isodose curve within</u>

the target tissue.") (emphasis added); *see also, e.g.*, Ex. 14 (Verhey Depo. Tr.) at 146:13-17 ("Q. Is the radiation profile that is provided by the embodiment of Figure 3 asymmetric with respect to the longitudinal axis of the device?  A.  No, actually, it's not with respect to the longitudinal axis.").

Furthermore, Plaintiffs' assertion that SenoRx's construction is "unduly narrow" is also incorrect.  In fact, SenoRx's construction is broader than Plaintiffs' construction.  SenoRx's construction describes asymmetry in a way that captures every embodiment of the patent – isodose curves that are not concentric with the apparatus volume, isodose curves that do not share the same shape as the apparatus volume, or both.  Contrary to Plaintiffs' suggestion, Pl. Br. at 24, SenoRx does not require that in every case the curves be shaped differently from the apparatus volume.  Indeed, it is well understood that the curves could be shaped the same as the apparatus volume, but located so as to not be concentric with the apparatus volume (even on the longitudinal axis) in order to achieve an asymmetric dose curve.

**C.      "Asymmetrically Located and Arranged Within the Expandable Surface" ('142 Patent Claim 1).**

| Claim Term | SenoRx's Proposed Construction | Plaintiffs' Proposed Construction |
|---|---|---|
| asymmetrically located and arranged within the expandable surface | Located and arranged inside the expandable surface so as not to be concentric with the expandable outer surface. | Located and arranged so as not to be on the longitudinal axis of the expandable surface. |

For the same reasons advanced in connection with the "predetermined asymmetric isodose curves with respect to the apparatus volume," SenoRx's construction should be adopted, and Plaintiffs' attempt to read into the claim a limitation not found in the plain language ("on the longitudinal axis") should be rejected.

Furthermore, Plaintiffs misstate that SenoRx's construction excludes the preferred embodiments shown in Figures 3 and 4.  Pl. Br. 23.  The sources in those figures are not concentric (*i.e.*, sharing the same center and orientation) with the expandable outer surface,

1   because the sources are not arranged so as to have the same shape as the expandable outer

2   surface. Orton Decl. ¶ 61.  SenoRx's construction again is <u>broader</u> than Plaintiffs' construction,

3   and covers all of the preferred embodiments.

4        **D.    "Being Provided on At Least Two Elongate Members" ('142 Patent Claim 6).**

| Claim Term | SenoRx's Proposed Construction | Plaintiffs' Proposed Construction |
|---|---|---|
| being provided on at least two elongate members extending into the apparatus volume | Not applicable. | No construction necessary |

9        As discussed above at footnote 2, Plaintiffs today dropped their assertion of infringement

10  of claim 6.  Accordingly, SenoRx will not address this element.

11                              **CONCLUSION**

12       For the foregoing reasons, the Court should adopt SenoRx's proposed constructions of

13  the disputed terms of the '813, '204, and '142 patents.

14

15  Dated:  May 30, 2008                    Respectfully submitted,

16

17                                    By:  ___/s/ F.T.Alexandra Mahaney_____

18                                    F.T. Alexandra Mahaney, State Bar No. 125984
                                      WILSON SONSINI GOODRICH & ROSATI
19                                    Professional Corporation
                                      12235 El Camino Real, Suite 200
20                                    San Diego, CA  92130
                                      Telephone: (858) 350-2300
21                                    Facsimile: (858) 350-2399
                                      Email:  amahaney@wsgr.com
22
                                      Bruce R. Genderson (admitted *pro hac vice*)
23                                    Aaron P. Maurer (admitted *pro hac vice*)
                                      Rachel Shanahan Rodman (admitted *pro hac vice*)
24                                    Adam D. Harber (admitted *pro hac vice*)
                                      WILLIAMS & CONNOLLY LLP
25                                    725 Twelfth St. NW
                                      Washington, DC 20005
26                                    Telephone: (202) 434-5000
                                      Facsimile: (202) 434-5029
27
                                      Attorneys for Defendant and Counterclaimant
28                                    SENORX, INC.

**APPENDIX A:  SUMMARY OF THE PARTIES' PROPOSED CONSTRUCTIONS OF THE DISPUTED TERMS**

*'813 Patent*

| Claim Term | SenoRx's Proposed Construction | Plaintiffs' Proposed Construction |
|---|---|---|
| inner spatial volume<br><br>(claim 1) | A region of space surrounded by an outer spatial volume that is either enclosed by a distensible polymeric film wall or defined by the outside surface of a solid radionuclide sphere. | A region of space surrounded by an outer spatial volume that is either enclosed by a polymeric film wall or defined by the outside surface of a solid radionuclide. |
| predetermined constant spacing between said inner spatial volume and the radiation transparent wall<br><br>(claim 1) | Fixed spacing, predetermined by one skilled in the art before administering radiation, between the wall or edge of the inner spatial volume and the radiation transparent wall of the outer, closed inflatable chamber, when inflated, which for each point on the wall or edge of the inner spatial volume, the distance to the closest point on the outer chamber is the same (*i.e.*, the inner spatial volume and outer chamber are concentric and the same shape). | spacing predetermined by one skilled in the art between the wall or edge of the inner spatial volume and the radiation transparent wall of the outer, closed, inflatable chamber, when inflated, which is constant in all directions if the outer chamber is spherical, or constant along a radial plane if the outer chamber is not spherical |
| means . . . for rendering uniform the radial absorbed dose profile of the emissions from the one of the inner spatial volume and outer chamber containing the radionuclides<br><br>(claim 1) | Function: Making the absorbed dose of radiation substantially more uniform between the surface of the outer chamber and a predetermined depth in the target tissue.<br><br>Structure:  A radiation absorbing or attenuating material, e.g., air, x-ray contrast fluid, contrast media used in angiography, water, a gas, barium sulfate, or their equivalents, that performs this function by absorbing or attenuating radiation. | Function:  making the absorbed dose of radiation more uniform to prevent over-treatment of body tissue at or close to the outer wall of the instrument<br><br>Structure:  a radiation absorbing or attenuating material, e.g. air, x-ray contrast fluid, contrast media used in angiography, water, a gas, or barium sulfate or their equivalents |

| inner closed chamber (claim 2) | A compartment located completely inside of the outer chamber and closed off within the outer chamber. | No construction necessary. |
| plurality of radioactive solid particles placed at predetermined locations (claim 12) | Two or more separate radioactive solid particles placed in the inner spatial volume at the same time at more than one predetermined location. | No construction necessary |

### '204 Patent

| Claim Term | SenoRx's Proposed Construction | Plaintiffs' Proposed Construction |
|---|---|---|
| inner spatial volume (claim 1) | A region of space surrounded by an outer spatial volume that is either enclosed by a distensible polymeric film wall or defined by the outside surface of a solid radionuclide sphere. | A region of space surrounded by an outer spatial volume that is either enclosed by a polymeric film wall or defined by the outside surface of a solid radionuclide. |
| three-dimensional isodose profile that is substantially similar in shape to the expandable surface element (claim 1) | A final three-dimensional isodose profile that is substantially the same shape as the outer spatial volume expandable surface and is concentric with the outer spatial volume expandable surface. | No construction necessary. |
| providing a controlled dose at the outer spatial volume expandable surface to reduce or prevent necrosis in healthy tissue proximate to the expandable surface (claim 2) | Controlling the ratio of the dose at the expandable surface of the outer spatial volume to the prescribed dose at the depth of interest in the target tissue so as to reduce or eliminate the risk of damage to healthy tissue in contact with the expandable surface as compared to devices in which the tissue is directly adjacent to the radiation source. | controlling the ratio of the dose at the expandable surface of the outer spatial volume to the prescribed dose at the depth of interest in the target tissue so that the dose at the expandable surface is not so high that it lethally damages cells in healthy tissue in contact with the expandable surface. |
| predetermined spacing . . . between said inner spatial volume and the expandable | Fixed spacing, predetermined by one skilled in the art before administering radiation, between the wall or edge of the inner spatial | the distance between the inner spatial volume and the expandable surface element |

| surface element (claim 3) | volume and the wall of the expandable surface element, when inflated, which for each point on the wall or edge of the inner spatial volume, the distance to the closest point on the expandable surface element is the same (*i.e.*, the inner spatial volume and expandable surface element are concentric and the same shape). | is determined in advance |
|---|---|---|
| plurality of solid radiation sources (claim 17) | Two or more separate radioactive solid sources placed in the inner spatial volume at the same time. | No construction necessary |
| isodose profile having a shape substantially similar to the shape of the outer spatial volume (claim 17) | A final three-dimensional isodose profile that is substantially the same shape as the outer spatial volume expandable surface and is concentric with the outer spatial volume expandable surface. | No construction necessary. |

*'142 Patent*

| Claim Term | SenoRx's Proposed Construction | Plaintiffs' Proposed Construction |
|---|---|---|
| apparatus volume (claim 1) | The three-dimensional region of space within the expandable outer surface. | Apparatus volume. |
| three-dimensional apparatus volume configured to fill an interstitial void (claim 1) | The three-dimensional region of space within the expandable outer surface. | A three-dimensional geometric solid composed of an expandable outer surface. |
| located so as to be spaced apart from the apparatus volume (claim 1) | Located outside (*i.e.*, not within) the apparatus volume. | Located so as to be not on or touching the apparatus volume. |

| | | |
|---|---|---|
| asymmetrically located and arranged within the expandable surface<br><br>(claim 1) | Located and arranged inside the expandable surface so as not to be concentric with the expandable outer surface. | Located and arranged so as not to be on the longitudinal axis of the expandable surface. |
| predetermined asymmetric isodose curves<br><br>[with respect to the apparatus volume]<br><br>(claim 1 ) | Isodose curves determined before radiation is administered which are not substantially the same shape as the apparatus volume and/or not concentric with the apparatus volume. | Predetermined isodose curves that are not symmetric with respect to the longitudinal axis of the apparatus volume. |
| plurality of solid radiation sources<br>(claim 6) | Not applicable.  See footnote 2, *supra*. | No construction necessary |
| predetermined asymmetric isodose curves<br><br>[within the target tissue]<br><br>(claim 6) | Not applicable.  See footnote 2, *supra*. | Predetermined isodose curves that are not symmetric with respect to the longitudinal axis of the apparatus volume. |
| being provided on at least two elongate members extending into the apparatus volume<br><br>(claim 6) | Not applicable.  See footnote 2, *supra*. | No construction necessary |
| apparatus volume<br><br>(claim 6) | Not applicable.  See footnote 2, *supra*. | Apparatus volume. |
| predetermined asymmetric isodose curves<br><br>[with respect to the apparatus volume]<br><br>(claim 8) | Isodose curves determined before radiation is administered which are not substantially the same shape as the apparatus volume and/or not concentric with the apparatus volume. | Predetermined isodose curves that are not symmetric with respect to the longitudinal axis of the apparatus volume. |

CERTIFICATE OF SERVICE
U.S. District Court, Northern District of California,
*Hologic, Inc. et al. v. SenoRx, Inc.*
Case No. C-08-0133 RMW (RS)

I, Kirsten Blue, declare:

I am and was at the time of the service mentioned in this declaration, employed in the County of San Diego, California. I am over the age of 18 years and not a party to the within action. My business address is 12235 El Camino Real, Ste. 200, San Diego, CA, 92130.

On May 30, 2008, I served a copy(ies) of the following document(s):

**DEFENDANT SENORX, INC.'S RESPONSIVE CLAIM CONSTRUCTION BRIEF [REDACTED VERSION]**

on the parties to this action by the following means:

| | |
|---|---|
| Henry C. Su (suh@howrey.com) | Attorneys for Plaintiffs |
| Katharine L. Altemus (altemusk@howrey.com) | HOLOGIC, INC. CYTYC |
| HOWREY LLP | CORPORATION and |
| 1950 University Avenue, 4th Floor | HOLOGIC LP |
| East Palo Alto, CA  94303 | |
| Telephone:  (650) 798-3500 | |
| Facsimile:  (650) 798-3600 | |
| | |
| Matthew Wolf (wolfm@howrey.com) | Attorneys for Plaintiffs |
| Marc Cohn (cohnm@howrey.com) | HOLOGIC, INC. CYTYC |
| HOWREY LLP | CORPORATION and |
| 1229 Pennsylvania Avenue, NW | HOLOGIC LP |
| Washington, DC  20004 | |
| Telephone:  (202) 783-0800 | |
| Facsimile:  (202) 383-6610 | |

☒ **(BY MAIL)** I placed the sealed envelope(s) for collection and mailing by following the ordinary business practices of Wilson Sonsini Goodrich & Rosati, 12235 El Camino Real, Ste. 200, San Diego, CA. I am readily familiar with WSGR's practice for collecting and processing of correspondence for mailing with the United States Postal Service, said practice being that, in the ordinary course of business, correspondence with postage fully prepaid is deposited with the United States Postal Service the same day as it is placed for collection.

☒ **(BY ELECTRONIC MAIL)** I caused such document(s) to be sent via electronic mail (email) to the above listed names and email addresses.

☐ **(BY PERSONAL SERVICE)** I caused to be delivered by hand to the addressee(s) noted above. I delivered to an authorized courier or driver to be delivered on the same date. A proof of service signed by the authorized courier will be filed with the court upon request.

☐ **(BY OVERNIGHT DELIVERY)** I placed the sealed envelope(s) or package(s), to the addressee(s) noted above, designated by the express service carrier for collection and overnight delivery by following the ordinary business practices of Wilson Sonsini Goodrich & Rosati, 12235 El Camino Real, Ste. 200, San Diego, CA. I am readily familiar with WSGR's practice for collecting and processing of correspondence for

-1-

3293557_1.DOC

1   overnight delivery, said practice being that, in the ordinary course of business,
    correspondence for overnight delivery is deposited with delivery fees paid or provided for
2   at the carrier's express service offices for next-day delivery the same day as the
    correspondence is placed for collection.

3   ☐   (BY FACSIMILE)  I caused to be transmitted by facsimile machine (number of sending
        facsimile machine is (858) 350-2399 at the time stated on the attached transmission
4       report(s) by sending the documents(s) to (see above).  The facsimile transmission(s)
        was/were reported as complete and without error.
5
6   ☒   (BY CM/ECF)  I caused such document(s) to be sent via electronic mail through the Case
        Management/Electronic Case File system with the U.S. District Court for the Northern
        District of California.
7

8       I declare under penalty of perjury under the laws of the United States that the above is true
    and correct, and that this declaration was executed on May 30, 2008.

9
10  _____
                          Kirsten Blue
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-2-

3293557_1.DOC

CERTIFICATE OF SERVICE                                          CASE NO. C-08-0133 RMW

1  F.T. Alexandra Mahaney, State Bar No. 125984
   WILSON SONSINI GOODRICH & ROSATI
2  Professional Corporation
   12235 El Camino Real, Suite 200
3  San Diego, CA  92130
   Telephone:  (858) 350-2300
4  Facsimile:  (858) 350-2399
   Email:  amahaney@wsgr.com
5
   Bruce R. Genderson (*admitted pro hac vice*)
6  Aaron P. Maurer (*admitted pro hac vice*)
   Rachel Shanahan Rodman (*admitted pro hac vice*)
7  Adam D. Harber (*admitted pro hac vice*)
   WILLIAMS & CONNOLLY LLP
8  725 Twelfth St. NW
   Washington, DC 20005
9  Telephone:  (202) 434-5000
   Facsimile:  (202) 434-5029
10

11 Attorneys for Defendant and Counterclaimant
   SENORX, INC.
12

13              IN THE UNITED STATES DISTRICT COURT

14              NORTHERN DISTRICT OF CALIFORNIA

15                     SAN JOSE DIVISION

16 HOLOGIC, INC., CYTYC CORP., and          )  CASE NO.:  08-CV-0133 RMW
   HOLOGIC L.P.,                            )
17                                          )
                                            )
18            Plaintiffs,                   )  **DECLARATION OF ADAM D.**
                                            )  **HARBER IN SUPPORT OF**
19       v.                                 )  **DEFENDANT SENORX, INC.'S**
                                            )  **RESPONSIVE CLAIM**
20 SENORX, INC.,                            )  **CONSTRUCTION BRIEF**
                                            )
21            Defendant.                    )
                                            )
22 _____     )
                                            )
23 SENORX, INC.,                            )
                                            )  Date:  June 25, 2008
24            Counterclaimant,              )  Time:  2:00 p.m.
                                            )  Courtroom:  6, 4th Floor
25       v.                                 )  Judge:  Hon. Ronald M. Whyte
                                            )
26 HOLOGIC, INC., CYTYC CORP., and          )
   HOLOGIC L.P.,                            )
27                                          )
              Counterdefendants.            )
28 _____     )

1    I, Adam D. Harber, declare that I am an associate at the law firm of Williams & Connolly

2  LLP, admitted pro hac vice to practice before this Court in the above-captioned matter.  I serve

3  as outside counsel for Defendant SenoRx, Inc. ("SenoRx").  The following declaration is based

4  on my personal knowledge, and if called upon to testify, I could and would competently testify

5  as to the matters set forth herein.

6    1.    Attached hereto as Exhibit 15[1] is a true and correct copy of excerpts of the

7  transcript of the Deposition of Jeffrey F. Williamson (May 19, 2008).

8    2.    Attached hereto as Exhibit 16 is a true and correct copy of excerpts of the

9  transcript of the Deposition of James F. Dempsey (May 24, 2008).

10    3.    Attached hereto as Exhibit 17 is a true and correct copy of excerpts of the

11  transcript of the Deposition of Timothy J. Patrick (May 29, 2008).

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27    [1] The numbers assigned to exhibits attached to this Declaration run consecutively from the
    exhibit numbers of those attached to the Declaration of Adam D. Harber in Support of Defendant
28  SenoRx, Inc.'s Opening Claim Construction Brief.

DECLARATION OF ADAM D. HARBER IN SUPPORT        -1-        CASE NO. C08-0133 RMW (RS)
OF DEFENDANT SENORX, INC.'S RESPONSIVE
CLAIM CONSTRUCTION BRIEF

1         I declare under penalty of perjury that the foregoing is true and correct.

2

3    Dated:  May 30, 2008          By: _____

4                                          Adam D. Harber

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CERTIFICATE OF SERVICE
U.S. District Court, Northern District of California,
*Hologic, Inc. et al. v. SenoRx, Inc.*
Case No. C-08-0133 RMW (RS)

I, Kirsten Blue, declare:

I am and was at the time of the service mentioned in this declaration, employed in the County of San Diego, California. I am over the age of 18 years and not a party to the within action. My business address is 12235 El Camino Real, Ste. 200, San Diego, CA, 92130.

On May 30, 2008, I served a copy(ies) of the following document(s):

**DECLARATION OF ADAM D. HARBER IN SUPPORT OF DEFENDANT SENORX, INC.'S RESPONSIVE CLAIM CONSTRUCTION BRIEF**

on the parties to this action by the following means:

| | |
|---|---|
| Henry C. Su (suh@howrey.com) | Attorneys for Plaintiffs |
| Katharine L. Altemus (altemusk@howrey.com) | HOLOGIC, INC. CYTYC |
| HOWREY LLP | CORPORATION and |
| 1950 University Avenue, 4th Floor | HOLOGIC LP |
| East Palo Alto, CA 94303 | |
| Telephone: (650) 798-3500 | |
| Facsimile: (650) 798-3600 | |
| | |
| Matthew Wolf (wolfm@howrey.com) | Attorneys for Plaintiffs |
| Marc Cohn (cohnm@howrey.com) | HOLOGIC, INC. CYTYC |
| HOWREY LLP | CORPORATION and |
| 1229 Pennsylvania Avenue, NW | HOLOGIC LP |
| Washington, DC 20004 | |
| Telephone: (202) 783-0800 | |
| Facsimile: (202) 383-6610 | |

☒ (BY MAIL) I placed the sealed envelope(s) for collection and mailing by following the ordinary business practices of Wilson Sonsini Goodrich & Rosati, 12235 El Camino Real, Ste. 200, San Diego, CA. I am readily familiar with WSGR's practice for collecting and processing of correspondence for mailing with the United States Postal Service, said practice being that, in the ordinary course of business, correspondence with postage fully prepaid is deposited with the United States Postal Service the same day as it is placed for collection.

☒ (BY ELECTRONIC MAIL) I caused such document(s) to be sent via electronic mail (email) to the above listed names and email addresses.

☐ (BY PERSONAL SERVICE) I caused to be delivered by hand to the addressee(s) noted above. I delivered to an authorized courier or driver to be delivered on the same date. A proof of service signed by the authorized courier will be filed with the court upon request.

☐ (BY OVERNIGHT DELIVERY) I placed the sealed envelope(s) or package(s), to the addressee(s) noted above, designated by the express service carrier for collection and overnight delivery by following the ordinary business practices of Wilson Sonsini Goodrich & Rosati, 12235 El Camino Real, Ste. 200, San Diego, CA. I am readily familiar with WSGR's practice for collecting and processing of correspondence for

-1-

3293557_1.DOC

1   overnight delivery, said practice being that, in the ordinary course of business,
    correspondence for overnight delivery is deposited with delivery fees paid or provided for
2   at the carrier's express service offices for next-day delivery the same day as the
    correspondence is placed for collection.

3   ☐   (BY FACSIMILE)  I caused to be transmitted by facsimile machine (number of sending
        facsimile machine is (858) 350-2399 at the time stated on the attached transmission
4       report(s) by sending the documents(s) to (see above).  The facsimile transmission(s)
        was/were reported as complete and without error.
5
6   ☒   (BY CM/ECF)  I caused such document(s) to be sent via electronic mail through the Case
        Management/Electronic Case File system with the U.S. District Court for the Northern
        District of California.
7
8       I declare under penalty of perjury under the laws of the United States that the above is true
    and correct, and that this declaration was executed on May 30, 2008.
9
10                                                      _____
                                                                Kirsten Blue
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3293557_1.DOC
CERTIFICATE OF SERVICE                                          CASE NO. C-08-0133 RMW

1    F.T. Alexandra Mahaney, State Bar No. 125984
Natalie J. Morgan, State Bar No. 211143
2    WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
3    12235 El Camino Real, Suite 200
San Diego, CA 92130
4    Telephone: (858) 350-2300
Facsimile: (858) 350-2399
5    Email: amahaney@wsgr.com

6    Bruce R. Genderson (admitted *pro hac vice*)
Aaron P. Maurer (admitted *pro hac vice*)
7    Rachel Shanahan Rodman (admitted *pro hac vice*)
Adam D. Harber (admitted *pro hac vice*)
8    WILLIAMS & CONNOLLY LLP
9    725 Twelfth St. NW
Washington, DC 20005
10    Telephone: (202) 434-5000
Facsimile: (202) 434-5029
11

12    Attorneys for Defendant and Counterclaimant
SENORX, INC.

13            UNITED STATES DISTRICT COURT

14          NORTHERN DISTRICT OF CALIFORNIA

15               SAN JOSE DIVISION

16    HOLOGIC, INC., CYTYC CORPORATION and )   Case No. C-08-0133 RMW (RS)
HOLOGIC L.P.,                               )
17                                     )
               Plaintiffs,               )   **DEFENDANT AND**
18                                    )   **COUNTERCLAIMANT SENORX,**
        v.                          )   **INC.'S NOTICE OF MANUAL**
19                                      )   **FILING**
SENORX, INC.,                           )
20                                      )
               Defendant.             )   Date:        June 25, 2008
21                                      )   Time:        2:00 p.m.
                                     )   Ct. Rm:    Courtroom 6, Fourth Floor
22                                      )   Judge:     Hon. Ronald M. Whyte
SENORX, INC.,                           )
23                                      )
           Counterclaimant,        )
24                                      )
        v.                          )
25                                      )
HOLOGIC, INC., CYTYC CORPORATION and )
26    HOLOGIC L.P.,                          )
                                     )
27           Counterdefendants.       )

28

1    Regarding:  **Exhibits 15, 16 and 17 to the Declaration of Adam D. Harber in Support**

2    **of Defendant SenoRx, Inc.'s Responsive Claim Construction Brief and confidential version**

3    **of Defendant SenoRx, Inc's Responsive Claim Construction Brief.**

4    This filing is in paper or physical form only, and is being maintained in the case file in

5    the Clerk's office.  If you are a participant in this case, this filing will be served in hard-copy

6    shortly.  For information on retrieving this filing directly from the court, please see the court's

7    main web site at http://www.cand.uscourts.gov under Frequently Asked Questions (FAQ).

8    This filing was not efiled for the following reason(s):

9    [X]  Item(s) Under Seal

10

11   Dated: May 30, 2008

12                                                          Respectfully submitted,

13

14                                                          By:    s/F.T. Alexandra Mahaney

15                                                          F.T. Alexandra Mahaney, State Bar No. 125984
                                                            WILSON SONSINI GOODRICH & ROSATI
16                                                          Professional Corporation
                                                            12235 El Camino Real, Suite 200
17                                                          San Diego, CA  92130
                                                            Telephone: (858) 350-2300
18                                                          Facsimile: (858) 350-2399
                                                            Email:  amahaney@wsgr.com
19
                                                            Bruce R. Genderson (admitted *pro hac vice*)
20                                                          Aaron P. Maurer (admitted *pro hac vice*)
                                                            Rachel Shanahan Rodman (admitted *pro hac vice*)
21                                                          Adam D. Harber (admitted *pro hac vice*)
                                                            WILLIAMS & CONNOLLY LLP
22                                                          725 Twelfth St. NW
                                                            Washington, DC 20005
23                                                          Telephone: (202) 434-5000
                                                            Facsimile: (202) 434-5029
24
25                                                          Attorneys for Defendant and Counterclaimant
                                                            SENORX, INC.
26

27

28

CERTIFICATE OF SERVICE
U.S. District Court, Northern District of California,
*Hologic, Inc. et al. v. SenoRx, Inc.*
Case No. C-08-0133 RMW (RS)

I, Kirsten Blue, declare:

I am and was at the time of the service mentioned in this declaration, employed in the County of San Diego, California. I am over the age of 18 years and not a party to the within action. My business address is 12235 El Camino Real, Ste. 200, San Diego, CA, 92130.

On May 30, 2008, I served a copy(ies) of the following document(s):

**DEFENDANT AND COUNTERCLAIMANT SENORX, INC.'S NOTICE OF MANUAL FILING**

on the parties to this action by placing them in a sealed envelope(s) addressed as follows:

| | |
|---|---|
| Henry C. Su (suh@howrey.com)<br>Katharine L. Altemus (altemusk@howrey.com)<br>HOWREY LLP<br>1950 University Avenue, 4th Floor<br>East Palo Alto, CA 94303<br>Telephone: (650) 798-3500<br>Facsimile: (650) 798-3600 | Attorneys for Plaintiffs<br>HOLOGIC, INC. CYTYC<br>CORPORATION and<br>HOLOGIC LP |
| Matthew Wolf (wolfm@howrey.com)<br>Marc Cohn (cohnm@howrey.com)<br>HOWREY LLP<br>1229 Pennsylvania Avenue, NW<br>Washington, DC 20004<br>Telephone: (202) 783-0800<br>Facsimile: (202) 383-6610 | Attorneys for Plaintiffs<br>HOLOGIC, INC. CYTYC<br>CORPORATION and<br>HOLOGIC LP |

☒ **(BY MAIL)** I placed the sealed envelope(s) for collection and mailing by following the ordinary business practices of Wilson Sonsini Goodrich & Rosati, 12235 El Camino Real, Ste. 200, San Diego, CA. I am readily familiar with WSGR's practice for collecting and processing of correspondence for mailing with the United States Postal Service, said practice being that, in the ordinary course of business, correspondence with postage fully prepaid is deposited with the United States Postal Service the same day as it is placed for collection.

☒ **(BY ELECTRONIC MAIL)** I caused such document(s) to be sent via electronic mail (email) to the above listed names and email addresses.

☒ **(BY CM/ECF)** I caused such document(s) to be sent via electronic mail through the Case Management/Electronic Case File system with the U.S. District Court for the Northern District of California.

I declare under penalty of perjury under the laws of the United States that the above is true and correct, and that this declaration was executed on May 30, 2008.

_____
Kirsten Blue