1  Henry C. Su (SBN 211202; suh@howrey.com)
   Katharine L. Altemus (SBN 227080; altemusk@howrey.com)
2  HOWREY LLP
   1950 University Avenue, 4th Floor
3  East Palo Alto, California  94303
   Telephone:  (650) 798-3500
4  Facsimile:  (650) 798-3600

5  Robert Ruyak
   Matthew Wolf (Admitted *Pro Hac Vice*)
6  Marc Cohn (Admitted *Pro Hac Vice*)
   Andrew R. Sommer (Admitted *Pro Hac Vice*)
7  HOWREY LLP
   1299 Pennsylvania Avenue, NW
8  Washington, DC 20004
   Telephone:  (202) 783-0800
9  Facsimile:  (202) 383-6610

10 Attorneys for Plaintiffs
   HOLOGIC, INC., CYTYC CORPORATION and HOLOGIC L.P.

11

                    UNITED STATES DISTRICT COURT
12
                   NORTHERN DISTRICT OF CALIFORNIA
13
                          SAN JOSE DIVISION
14

15 HOLOGIC, INC., CYTYC CORPORATION,        Case No. C08 00133 RMW (RS)
   and HOLOGIC L.P.,
16                                          **PLAINTIFFS' REPLY CLAIM
                  Plaintiffs,               CONSTRUCTION BRIEF (PATENT L.R. 4-
17                                          5(c))**
          vs.
18                                          Markman Hearing
   SENORX, INC.,                            Date: June 25, 2008
19                                          Time: 2:00 p.m.
                  Defendant.                Room: Courtroom 6, 4th Floor
20                                          Judge: Hon. Ronald M. Whyte

21 AND RELATED COUNTERCLAIMS.

22

23

24

25

26

27

28
   Plaintiffs' Reply Claim Construction Brief
   Case No.  C08 00133 RMW (RS)

1

**TABLE OF CONTENTS**

2   PRELIMINARY STATEMENT ............................................................................................... 1

3   ARGUMENT .......................................................................................................................... 2

4   I.    THE '813 AND '204 PATENTS ..................................................................................... 2

5         A.    "Predetermined Constant Spacing" and "Predetermined Spacing" -
               SenoRx's Proposed Constructions Ignore Clear Differences in the
6              Claim Language and Usage in the Specification ............................................. 2

7              1.    "Predetermined Constant Spacing Between Said Inner
                     Spatial Volume and the Radiation Transparent Wall" -
8                    SenoRx's Construction Adds Limitations That Are Not
                     Supported (Claim 1, '813 Patent) ..................................................... 3
9
               2.    "Predetermined Spacing . . . Between Said Inner Spatial
10                   Volume and the Expandable Surface Element" – SenoRx
                     Ignores Clear Differences in Claim Language (Claim 3,
11                   '204 Patent) ....................................................................................... 4

12        B.    "Three-Dimensional Isodose Profile" - SenoRx Improperly Reads
               "Concentricity" and "Finality" into the Claims (Claim 1, 17, '204
13             Patent) ............................................................................................................. 5

14        C.    "Inner Spatial Volume" - SenoRx Would Improperly Limit the
               Claim To Only the Preferred Embodiments .................................................... 7
15
               1.    There Is No Justification for Importing "Distensible" into
16                   the Claim .......................................................................................... 7

17             2.    Limiting the "Inner Spatial Volume" to a Radionuclide
                     "Sphere" Improperly Limits the Claim to Preferred
18                   Embodiments ..................................................................................... 9

19        D.    "Means . . . For Rendering Uniform" -  SenoRx's Proposed
               Construction Impermissibly Adds An Unclaimed Function ('813
20             Patent, Claim 1) ............................................................................................ 11

21        E.    "Inner Closed Chamber" – SenoRx Adds a Limitation Without
               Support in the Specification ('813 Patent, Claim 11) .................................. 14
22
           F.    "Providing a Controlled Dose at the Outer Spatial Volume
23             Expandable Surface to Reduce or Prevent Necrosis in Healthy
               Tissue Proximate to the Expandable Surface" ('204 Patent, Claim
24             4) .................................................................................................................. 15

25   II.   SENORX'S PROPOSED CONSTRUCTIONS OF THE TERMS FROM
          THE '142 PATENT IMPROPERLY DIVORCE INDIVIDUAL TERMS
26        FROM THE REMAINDER OF THE INTRINSIC EVIDENCE ........................... 16

27        A.    "Apparatus Volume" and "Located So As To Be Spaced Apart
               From the Apparatus Volume" ('142 Patent, Claim 1) ................................. 16

28

1                    1.    An "Apparatus Volume," in the Context of the Claimed
                              Invention, Is a Structure Composed of an Expandable Outer
2                              Surface ........................................................................................ 17

3                    2.    "Located So As To Be Spaced Apart From the Apparatus
                              Volume" – Once the Term "Apparatus Volume" Is
4                              Properly Construed, the Term "Spaced Apart" Is Clear ................. 19

5          B.    "Asymmetrically Located and Arranged Within the Expandable
                  Surface" - Means Not on the Longitudinal Axis ('142 Patent,
6                  Claim 1)................................................................................................. 20

7          C.    "Predetermined Asymmetric Isodose Curves" ('142 Patent, Claims
                  1 & 8) ..................................................................................................... 21
8
   III.    SENORX'S CONSTRUES THE "PLURALITY" TERMS TOO
9          NARROWLY – DIVORCED FROM THE ACCOMPANYING CLAIM
           LANGUAGE AND SPECIFICATIONS ................................................................. 22
10
           A.    "Plurality of Radioactive Solid Particles Placed At Predetermined
11                Locations" ('813 Patent, Claim 12) and "Plurality of Solid
                  Radiation Sources" ('204 Patent, Claim 17) ............................................. 23
12

1          **TABLE OF AUTHORITIES**

2    <u>**CASES**</u>

3    *ACTV, Inc. v. Walt Disney Co.,*
            346 F.3d 1082 (Fed. Cir. 2003) ........................................................................................... 19
4
     *Afga Corp. v. Creo Prods. Inc.,*
5            451 F.3d 1366 (Fed. Cir. 2006) ........................................................................................... 23

6    *Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.,*
            340 F.3d 1298 (Fed. Cir. 2003) ............................................................................................. 8
7
     *Applied Med. Res. Corp. v. U.S. Surgical Corp.,*
8            448 F.3d 1324 (Fed. Cir. 2006) ........................................................................................... 12

9    *BBA Nonwovens Simpsonville, Inc. v. Superior Nonwovens, L.C.C.,*
            303 F.3d 1332 (Fed. Cir. 2002) ........................................................................................... 11
10
     *CollegeNet, Inc. v. ApplyYourself, Inc.,*
11           418 F.3d 1225 (Fed. Cir. 2005) ........................................................................................... 11

12   *Computer Docking Station Corp. v. Dell,*
            519 F.3d 1366 (Fed. Cir. 2008) ............................................................................................. 6
13
     *Elbex Video, Ltd. v. Sensormatic Elecs. Corp.,*
14           508 F.3d 1366 (Fed. Cir. 2007) ...................................................................................... 6, 13

15   *Elkay Mfg. Co. v. Ebco Mfg. Co.,*
            192 F.3d 973 (Fed. Cir. 1999) ............................................................................................. 18
16
     *Forest Labs, Inc. v. Abbott Labs.,*
17           239 F.3d 1305 (Fed. Cir. 2001) ............................................................................................. 4

18   *Hill-Rom Co., Inc. v. Kinetic Concepts, Inc.,*
            209 F.3d 1337 (Fed. Cir. 2000) ........................................................................................... 21
19
     *Innogenetics, N.V. v. Abbott Labs.,*
20           512 F.3d 1363 (Fed. Cir. 2008) ........................................................................................... 10

21   *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.,*
            381 F.3d 1111 (Fed. Cir. 2004) ........................................................................................... 17
22
     *Invitrogen Corp. v. Biocrest Mfg., L.P.,*
23           424 F.3d 1374 (Fed. Cir. 2005) ........................................................................................... 17

24   *Jonsson v. The Stanley Works,*
            903 F.2d 812, (Fed.Cir.1990) .............................................................................................. 18
25
     *LG Elecs., Inc. v. Bizcom Elecs., Inc.,*
26           453 F.3d 1364 (Fed. Cir. 2006) ......................................................................................12, 13

27   *Libel-Flarsheim Co. v. Medrad, Inc.,*
            358 F.3d 898 (Fed. Cir. 2004) ............................................................................................... 8
28

*Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.*,
    248 F.3d 1303 (Fed. Cir. 2001) ............................................................ 18

*Merck & Co. v. Teva Pharms USA, Inc.*,
    395 F.3d 1364 (Fed. Cir. 2005) ............................................................ 19

*Micro Chemical, Inc. v. Great Plains Chemical Co., Inc.*,
    194 F.3d 1250 (Fed. Cir. 1999) ............................................................ 5

*NeoMagic Corp. v. Trident Microsystems, Inc.*,
    287 F.3d 1062 (Fed. Cir. 2002) ........................................................16, 19

*Omega Eng'g, Inc. v. Raytek Corp.*,
    334 F.3d 1314 (Fed. Cir. 2003) ............................................................ 13

*Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*,
    520 F.3d 1358 (Fed. Cir. 2008) ............................................................ 19

*Pfizer, Inc. v. Teva Pharms., USA, Inc.*,
    429 F.3d 1364 (Fed. Cir. 2005) ............................................................ 10

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) ...................................passim

*Renishaw PLC v. Marposs Societa' per Azioni*,
    158 F.3d at 1243 (Fed. Cir. 1998) ...................................................... 7, 10

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996) ............................................................ 16

*Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*,
    239 F.3d 1225 (Fed. Cir. 2001) ............................................................ 12

**STATUTES**

35 U.S.C. § 112 ..............................................................................11, 16

35 U.S.C. § 282 (2006) ...................................................................... 17

1    Plaintiffs Hologic, Inc., Cytyc Corporation, and Hologic L.P. (collectively "Hologic")

2    respectfully submit this Reply Brief addressing SenoRx, Inc.'s ("SenoRx") proposed construction of

3    disputed terms, phrases, and clauses in the asserted claims of U.S. Patent Nos. 5,913,813 (the "'813

4    patent"), 6,413,204 (the "'204 patent"), and 6,482,142 (the "'142 patent") (collectively, "the patents-

5    in-suit").

6    **PRELIMINARY STATEMENT**

7    SenoRx's proposed constructions of the disputed claim terms should be rejected.  Even a

8    cursory review of SenoRx's proposed constructions reveals a tactic repeated time and time again – the

9    attempt to add limitations where none exist, thereby narrowing the inventions that the patentee sought

10    and was granted by the PTO.  For the most part, SenoRx's claim construction methodology is contrary

11    to applicable Federal Circuit precedent.  For example, by reading the words "concentric" and

12    "spherical" into certain claim terms, SenoRx seeks to impose on the claimed inventions a degree of

13    geometrical precision that is neither required by the plain language of the claim, nor counseled by the

14    specification.  Indeed, the relevant portions of the specifications teach that geometric precision is

15    unnecessary, evidenced by the use of terms such as "generally" and "substantially."   Further, SenoRx

16    attempts to construe the claims to exclude embodiments that the plain meaning of the claims would

17    otherwise cover.  In some instances, SenoRx attempts to read the claims to exclude *all* of the disclosed

18    embodiments.  This, of course, is in all but the rarest cases impermissible.

19    SenoRx's proposed constructions run afoul of other fundamental claim construction principles.

20    For example, in another effort to narrow the claimed inventions, SenoRx contends that "predetermined

21    constant spacing" means the same thing as "predetermined spacing."  In so arguing, SenoRx disregards

22    the glaring difference between these terms on their face, ignores language from the specification

23    confirming that they mean different things, discounts the Court's own prior ruling that these two terms

24    have different meanings, and overlooks clear Federal Circuit precedent that where a patentee uses

25    different terms, those differences are presumed to reflect a difference in claim scope.

26    Finally, in some instances, SenoRx simply misunderstands the import of the intrinsic record

27    and how that record applies to the claims.  In these cases, SenoRx again defaults to the narrowest

28

1   interpretation of the claim terms that it can conceive, notwithstanding the broad language actually used

2   in the claims.  Claim construction is not an exercise of juxtaposing the accused product and the

3   disputed terms and concocting a construction that removes the accused device from the scope of the

4   invention.  Hologic respectfully requests that its proposed constructions, which (with one exception)

5   are consistent with the Court's prior construction of many of these same terms, more accurately reflect

6   the plain meaning and the teachings of the intrinsic evidence.  Thus, SenoRx's proposed constructions

7   should be rejected.[1]

8                                           **ARGUMENT**

9   **I.      THE '813 AND '204 PATENTS**

10      **A.    "Predetermined Constant Spacing" and "Predetermined Spacing" - SenoRx's
             Proposed Constructions Ignore Clear Differences in the Claim Language and
11            Usage in the Specification**

12          The term "predetermined constant spacing" appears in claim 1 of the '813 patent, whereas the

13  facially broader term "predetermined spacing" appears in claim 3 of the '204 patent.[2]  SenoRx

14  suggests that "predetermined constant spacing" and "predetermined spacing" should be construed as

15  meaning ***exactly the same thing***, despite apparent differences in the phrases themselves.  In so doing,

16  SenoRx ignores the general rule that different claim terms are presumed to reflect a different scope.

17  As described in further detail below, Hologic's proposed construction stays true to the express

18  language of the claim and is consistent with the intrinsic evidence.

19  \\

20

21

22

_____

23  [1] Many of the claim terms at issue here have already been disputed, briefed, argued by litigants, and
    construed by this Court in a prior infringement action involving two of the three patents asserted here.
24  *Xoft, Inc. v. Cytyc Corp. et. al.*, Case No. C-05-05312 RMW (the "Xoft litigation") (involving both the
    '813 and '204 patents).  With one exception (discussed below), Hologic agrees with all of the Court's
25  prior constructions.  Conversely, with one exception, SenoRx disagrees with all of the Court's prior
    constructions but it fails to offer any persuasive reason why the prior constructions are wrong.
26
    [2] The '813 patent and the '204 patents are related and share common subject matter between their
27  respective specifications.  The '204 patent is a continuation-in-part of the '813 patent due in part to the
    disclosure of additional subject matter.
28

**1.    "Predetermined Constant Spacing Between Said Inner Spatial Volume and the Radiation Transparent Wall" - SenoRx's Construction Adds Limitations That Are Not Supported (Claim 1, '813 Patent)**

Hologic urges that the Court adopt its previous construction of this term, *i.e.*, "spacing determined by one skilled in the art between the wall or edge of the inner spatial volume and the radiation transparent wall of the outer, closed, inflatable chamber, when inflated, which is constant in all directions if the outer chamber is spherical, or constant along a radial plane if the outer chamber is not spherical." Dkt. No. 135-6 at 6-7, 28 (Claim Construction Order from the Xoft litigation). SenoRx offers no principled basis for altering the Court's prior construction. SenoRx's proposed requirement of a "fixed" spacing – such that, "*for each point* on the wall or edge of the inner spatial volume, the distance *to the closest point* on the outer chamber is the same" – is contradicted by the specification, which counsels against reading the claim term "constant" too narrowly. For example, the specification states that one objective is to keep the distance between the inner spatial volume and the radiation transparent wall "substantially constant," '813 patent, 1:50-57, "generally constant," *id.* at 3:10-13, "somewhat constant," *id.* at 4:13-16. These words confirm that the spacing is not "fixed" or "the same." The specification's less restrictive description of the claim element is consistent with its description of the radiation transparent wall as conforming tissue to the surface of the balloon; such a wall inherently would not be "fixed" or at the same distance from the wall of the inner spatial volume "*for each point* on the wall or edge of the inner spatial volume," as SenoRx incorrectly contends.

Moreover, SenoRx's proposed construction ignores the practical limitations of radiotherapy that existed in 1997 and today. Verhey Decl. ¶¶ 4-5. Brachytherapy balloons and the lumpectomy margins against which they are expanded are generally spherical in shape but cannot be *perfect* spheres. *Id.* The patent's specification expressly recognizes this limitation by avoiding words of exactitude. *Id.* SenoRx's narrow reading of this claim term to require a "fixed" spacing is divorced from the specification and the understanding of one skilled in the art, and should be rejected.

SenoRx also insists that the inner spatial volume and the outer wall must be "concentric" and "the same shape." The Court has already construed this term and concluded that no such limitations are required or supported by the specification. While the patentee clearly contemplated configurations

1    having concentricity and similarly shaped surfaces, it specifically chose **not** to limit claim 1 to such

2    configurations or embodiments.  SenoRx's repeated references to the patent figures are unavailing

3    because the claimed invention is not limited to specific examples or embodiments set forth in the

4    specification.  *Id*.  If the patentee had intended to so limit the invention's scope, then he would have

5    said so.  SenoRx's proposed additional limitations should be rejected.

6             **2.    "Predetermined Spacing . . . Between Said Inner Spatial Volume and the**
               **Expandable Surface Element" – SenoRx Ignores Clear Differences in Claim**
7             **Language (Claim 3,[3] '204 Patent)**

8             SenoRx ignores the fact that the phrase "predetermined spacing" in the '204 patent is facially

9    broader than the term "predetermined constant spacing" used in the '813 patent.  When read in light of

10   the specification and file history of the '204 patent, "predetermined spacing" must be given a broader

11   meaning than "predetermined constant spacing."  Indeed, that is exactly what the Court did in the Xoft

12   litigation when it broadly defined this term to mean that "the distance between the inner spatial volume

13   and the expandable surface element is determined in advance."  Dkt. No. 135-6 at 24-25 (Claim

14   Construction Order from Xoft litigation).  The Federal Circuit has held that "[w]here claims use

15   different terms, those differences are presumed to reflect a difference in the scope of the claims."

16   *Forest Labs, Inc. v. Abbott Labs.*, 239 F.3d 1305, 1310 (Fed. Cir. 2001); *cf. Phillips v. AWH Corp.*,

17   415 F.3d 1303, 1314 (Fed. Cir. 2005) (*en banc*) ("Differences among claims can also be a useful guide

18   in understanding the meaning of particular claim terms.")

19            SenoRx is unable to point to any intrinsic evidence suggesting that "predetermined spacing" is

20   the same as "predetermined constant spacing."  As Hologic demonstrated in its initial claim

21   construction brief, the plain meaning of "predetermined spacing" – *i.e.* "the distance between the inner

22   spatial volume and the expandable surface element," which is "determined in advance" – should be

23   adopted.   Dkt. No. 134 at 16.  SenoRx's reference to Dr. Verhey's prior declaration misses the point.

24   Dkt. No. 130 at 8.  The fact that the spacing *can be* predetermined or made substantially constant does

25   not mean the claim *requires* a "constant" spacing.  Verhey Decl. ¶¶ 6-7.

26

27   ─────────────────────

     [3] This term appears in claim 3, on which asserted claim 4 depends.

28

1
2

**B.    "Three-Dimensional Isodose Profile" - SenoRx Improperly Reads "Concentricity" and "Finality" into the Claims (Claim 1, 17, '204 Patent)**

3    The term "three-dimensional isodose profile that is substantially similar in shape to the

4    expandable surface element" means just that; the plain meaning is apparent without altering the

5    language used by the patentee.  Again, SenoRx attempts to add limitations, this time suggesting that

6    the term requires (1) that the isodose profile be "concentric with the outer spatial volume expandable

7    surface," and (2) that the isodose profile be "final."  Dkt. No. 130 at 8-11 (SenoRx's Opening Claim

8    Construction Brief).  These additional limitations are not supported by the intrinsic evidence.

9    *First*, SenoRx improperly conflates specification and prosecution statements regarding the

10   claim language "substantially similar in shape" with the notion of "concentricity."  In the specification,

11   when the patentee described an embodiment requiring concentricity, it expressly stated so.  *See* '204

12   patent, col. 5:28-29 ("In either the *concentric* spherical embodiment or the non-spherical configuration

13   of FIG. 5 . . . .").[4]  Moreover, contrary to SenoRx's contention, "concentricity" was not the basis upon

14   which the inventors distinguished their inventions from the prior art during prosecution before the

15   PTO.  The prosecution statements describing "a three-dimensional isodose profile that is substantially

16   similar in shape to the expandable surface element" do not mean that the "three-dimensional isodose

17   profile" must be "concentric," as SenoRx suggests.  The mere fact that the balloons in the Williams

18   prior art discussed by the application were not concentric does not provide a basis for limiting the

19   claims to concentric embodiments.  Importantly, the arguments accompanying the addition of the

20   "substantially similar in shape" element do not point out or distinguish the Williams balloons as being

21   non-concentric.  *Cf. Micro Chemical, Inc. v. Great Plains Chemical Co., Inc.*, 194 F.3d 1250, 1260-61

22   (Fed. Cir. 1999) (finding statements used during prosecution describing differences between the claim

23   and prior art were only relevant to the extent that the difference was recited in the claim—and were not

24   relevant to unclaimed features).  It would be inappropriate to limit the claimed invention based on

25   distinctions the inventors did not draw during prosecution.  *Cf. Computer Docking Station Corp. v.*

26
27
28

[4] In fact, the word "concentric" appears only once in the entire specification.

1    *Dell*, 519 F.3d 1366, 1376 (Fed. Cir. 2008) ("Prosecution disclaimer does not apply, for example, if the

2    applicant simply describes features of the prior art and does not distinguish the claimed invention

3    based on those features."). The implicit limitations that SenoRx strains to see in the prosecution

4    history do not exist and cannot "prevail over the plain language of the claim." *Elbex Video, Ltd. v.*

5    *Sensormatic Elecs. Corp.*, 508 F.3d 1366, 1373 (Fed. Cir. 2007). The prosecution statements in this

6    instance are far from being the requisite "clear and unmistakable" statements necessary to require the

7    importation of concentricity into the phrase "substantially similar in shape," SenoRx's arguments

8    notwithstanding. *See* Verhey Decl. ¶¶ 8-9.

9          *Second*, by adding the word "final" to its proposed construction (which is not found in either

10   the claim language or anywhere the specification), SenoRx improperly attempts to import a temporal

11   limitation into the term "three-dimensional isodose profile that is substantially similar in shape to the

12   expandable surface element." To support its construction, SenoRx mischaracterizes the purposes of

13   the invention and proffers unhelpful, conclusory expert testimony. The '204 patent describes two

14   primary purposes of the invention:  one purpose is to provide a radiation dose delivered to the target

15   tissue that is "substantially uniform in substantially every direction" ('204 patent, 5:13-19) and another

16   is to provide a "predetermined dose range" such that cancerous tissue is destroyed and healthy or

17   "normal" tissue is not destroyed, *i.e.* by necrosis. *See, e.g. id.* at 2:51-55; 6:48-60. Neither of these

18   objectives imposes any requirement of finality; to the contrary, the whole point of the invention is that

19   it will be used flexibly in conjunction with treatment planning software to achieve the desired

20   therapeutic result. One skilled in the art would understand and expect that the desired therapeutic

21   result may call for the dose profile to be modified or adjusted. Accordingly, there is no such thing as a

22   "final" isodose profile. Moreover, as stated previously (dkt. no. 134 at 17), inserting the word "final"

23   into the claim would render the claim vague rather than provide clarification (how would a jury

24   determine when an isodose profile is to be considered "final"). Verhey Decl. ¶ 9. Accordingly, this

25   term should be construed to mean what it says, namely a "three-dimensional isodose profile that is

26   substantially similar in shape to the expandable surface element," and nothing more.

27

28

1

**C.    "Inner Spatial Volume" - SenoRx Would Improperly Limit the Claim To Only the Preferred Embodiments**

2

3    The claim term "inner spatial volume" appears in claim 1 of the '813 patent and claim 3 of the

4    '204 patent.[5]  Again, the meaning of this term was briefed and argued in the prior Xoft litigation and it

5    should mean what the Court construed it to mean, with one modification – "a region of space

6    surrounded by an outer spatial volume and either enclosed by a polymeric film wall or defined by the

7    outside surface of a solid radionuclide []."  Dkt. No. 135-6 at 3-5 (Claim Construction Order in Xoft

8    litigation.)  SenoRx's proposed changes to the Court's prior construction are overly narrow and

9    impermissibly import aspects of certain embodiments from the disclosure into the claims.  Specifically,

10   the parties disagree on whether the term "distensible" should be read into the claim and whether, when

11   the inner spatial volume is a radionuclide, it must be "spherical."  In both cases, SenoRx's attempt to

12   import these limitations from the specification is improper.  Hologic's proposed construction should be

13   adopted because it "stays true to the claim language and most naturally aligns with the patent's

14   description of the invention."  *Phillips*, 415 F.3d at 1316 (quoting *Renishaw PLC v. Marposs Societa'*

15   *per Azioni*, 158 F.3d at 1243, 1250 (Fed. Cir. 1998)).

16    **1.    There Is No Justification for Importing "Distensible" into the Claim**

17   SenoRx contends that the specification of the '813 and '204 patents "consistently describe" the

18   "inner spatial volume" as being distensible, thus "mak[ing] clear that the polymeric film walls must be

19   distensible."  Dkt. No. 130 at 12 (SenoRx's Opening Claim Construction Brief).  To the contrary, the

20   specification never says that an "inner spatial volume" has to be distensible if it is a polymeric film

21   wall:

22
      - "Affixed to the tubular body 12 proximate to the distal end 28 thereof is an inner spatial
23         volume 30 which may be defined by a generally spherical polymeric film wall 32." '813
           patent, 2:33-36; '204 patent, 3:57-59;

24
      - "Those skilled in the art will appreciate that instead of having the inner spatial volume 30
25         defined by a generally spherical polymeric film wall as at 32 . . . ." '813 patent, 2:56-58;

26
_____

27   [5] SenoRx and Hologic agree that this term should have the same meaning in both the '813 and '204 patents.

28

- "[I]nstead of having the inner spatial volume 30 defined by a generally spherical polymeric film wall as at 32 . . . ." '204 patent, 4:44-46;

- "It is not essential to the invention that the chambers 30 and 34 have spherical walls . . . ." '813 patent, 3:10-11;

- "[W]herein said inner spatial volume is an inner closed, chamber defined by a further radiation transparent wall." '813 patent, 4:53-55 (claim 2);

- "[R]adioactive source material . . . may be coated on, chemically bonded to, or copolymerized with the material forming inner spherical wall 32." '204 patent, 4:24-27.

These passages from the '813 and '204 patents describe embodiments in which the inner spatial volume is a "polymeric wall" and nowhere is there a requirement that it be "distensible." As the Federal Circuit has held, "varied use of a disputed term in the written description attests to the breadth of the claim term rather than providing a limiting definition." *Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298, 1308 (Fed. Cir. 2003). Thus, the proper construction of "inner spatial volume" does not import the limitation "distensible" because doing so would be inconsistent with the varied use of that term in the specification. *Id.*

In addition, the prosecution history of the '813 patent demonstrates that the inventors did not limit their claims to an "inner spatial volume" with a "distensible" polymeric film wall. For example, the original claims filed in connection with the application that became the '813 patent, original claim 2, recited that the "inner spatial volume is an inner closed, distensible chamber." Dkt. No. 135-10 at 1-2. That claim was amended to ***broaden*** the language by deleting the term "distensible" so that the claim called for an "inner spatial volume" that "is an inner closed chamber." *Id.*; *see also* '813 patent, 4:53-55. By this amendment, the inventors clearly expressed their intent—consistent with the scope of the specification—that the "inner spatial volume" need not be "distensible." It would be improper to ignore "the effect of [this amendment] on the scope of the claims." *See Libel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 911 (Fed. Cir. 2004).

Other claims of the '813 and '204 patents "provide substantial guidance as to the meaning of" the "inner spatial volume" claim term. *Phillips*, 415 F.3d at 1314. Comparing claim 2 of the '813 patent and claim 9 of the '204 patent demonstrates that the "inner spatial volume" may or may not be

1   distensible.  *Compare* '813 patent, 4:53-55 ("wherein said inner spatial volume is an inner closed,

2   chamber defined by a further radiation transparent wall") *with* '204 patent, 8:59-61 ("wherein the inner

3   spatial volume is an inner closed <u>distensible</u> chamber defined by a further radiation transparent wall"

4   (emphasis added)).  Again, if the inventors wanted to claim an invention more narrowly, they knew

5   how to do so by adding the word "distensible" to an "inner closed chamber."  *See* Verhey Decl. ¶¶ 10-

6   11.  This is no different from the situation in *Phillips*, in which the selective use of the term "steel"

7   makes clear that the term "baffles" does "not inherently mean objects made of steel."  415 F.3d at

8   1314.  Thus, there is no reason to limit the even broader term "inner spatial volume" to structures that

9   are "distensible."

10          **2.      Limiting the "Inner Spatial Volume" to a Radionuclide "Sphere"**
                     **Improperly Limits the Claim to Preferred Embodiments**
11

12          SenoRx requests that the Court read the term "spherical" into the meaning of "inner spatial

13   volume."  SenoRx places substantial weight on this Court's construction of "inner spatial volume"

14   from the *Xoft* litigation as limiting the claim to a polymeric film wall or a "radionuclide ***sphere***."  Dkt.

15   No. 130 at 11-13 (SenoRx's Opening Claim Construction Brief).  It must be noted that the question of

16   whether a "radionuclide" must be spherical when the "inner spatial volume" is a radionuclide was not

17   briefed by either party in the Xoft case, nor was it relevant to the resolution of any issues raised in that

18   case.  *See* Dkt. No. 134 at 6 n.5 (Hologic's Opening Claim Construction Brief).  With the Court and

19   the parties now focused on this issue, it becomes apparent from the intrinsic evidence that

20   radionuclides comprising the "inner spatial volume" do not need to be (but can be) spherical.

21          Requiring that radionuclide inner spatial volumes be spherical imports features of a preferred

22   embodiment from the specification into the claims, in derogation of the general disclosure in the

23   specification, which provides that "[i]t is not essential to the invention that the chambers 30 and 34 [*i.e.*

24   the inner and outer volumes] have spherical walls . . . ."  '813 patent, 3:9-10; '204 patent, 5:13-16.

25   The specifications of both the '813 and '204 patents include a number of exemplary embodiments.

26   Among these are two principal embodiments (each of which has numerous variations): (1) an

27   embodiment in which the inner and outer spatial volumes are "generally spherical," (*e.g.* '813 patent,

28

1:35; Fig. 1), and (2) one in which the inner and outer spatial volumes are non-spherical. (*e.g.* '813 patent, 3:9-14; Fig. 3). Nothing in the specification—or elsewhere in the intrinsic record—limits solid radionuclides to embodiments where they are "generally spherical." Rather, it describes "radioactive particles," '813 patent, 2:66, "radioactive beads," '813 patent, 3:3, "solid radioactive core[s]," '813 patent, 4:6-7, '204 patent, 4:56, "solid radionuclides," '813 patent, 4:9; '204 patent, "radiation emitting particles," '204 patent, 5:3-4, or "radioactive particle sources," '204 patent, 5:35. None of these passages requires the radionuclide to be "spherical." To the contrary, the specification makes the point that "[s]olid radionuclides that could be used with the delivery device of the present invention are currently generally available as brachytherapy radiation sources," '813 patent, 4:10-12; '204 patent, 4:58-61, and "radioactive micro spheres" are merely one example that was then available from a particular vendor, '813 patent, 4:1-3; '204 patent, 4:48-50. *See also* Verhey Decl. ¶¶ 12-13 (explaining that the invention's objectives can be achieved whether or not the radionuclide is spherical, and noting that both spherical and non-spherical radionuclides in this context are effectively point sources); *see also* Dkt. No. 135-7 at 3-4 (Verhey Decl., noting that in 1997, radionuclides used in brachytherapy were often not spherical). Thus, the claim term "inner spatial volume" should not be limited to "spherical" radionuclides because the intrinsic record read as a whole supports a broader construction. *See Pfizer, Inc. v. Teva Pharms., USA, Inc.*, 429 F.3d 1364, 1373-76 (Fed. Cir. 2005) (refusing to construe term "saccharides" as being limited to sugars despite a reference in the specification to "saccharides" (*i.e.*, sugars)).

It is improper to "add a narrowing modifier [i.e., "spherical"] before an otherwise general term [radionuclide] that stands unmodified in a claim . . . ." [citations omitted]. For example, if an apparatus claim recites a general structure *e.g.,* a noun [inner spatial volume] without limiting that structure to a specific subset of structures (*e.g.,* with an adjective [*e.g.,* "spherical"]), we will generally construe the claim to cover all known types of that structure that are supported by the patent disclosure. *Reinshaw PLC*, 158 F.3d at 1249-50. To do otherwise improperly imports aspects of preferred embodiments into the claims—thereby violating fundamental Federal Circuit precedent. *See, e.g.*, *Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1370 (Fed. Cir. 2008) (quoting *CollegeNet, Inc. v.*

1   *ApplyYourself, Inc.*, 418 F.3d 1225, 1231 (Fed. Cir. 2005) for the proposition that "[i]n examining the

2   specification for proper context, however, this court will not at any time import limitations from the

3   specification into the claims").

4       **D.    "Means . . . For Rendering Uniform" -  SenoRx's Proposed Construction
            Impermissibly Adds An Unclaimed Function ('813 Patent, Claim 1)**

5

6       The parties agree that this term is a means-plus-function element and is subject to 35 U.S.C. §

7   112, ¶ 6, requiring the identification of the claimed function and corresponding structure.[6]   Hologic

8   requests that the Court construe this term as it did the first time.  SenoRx seeks to add limitations to the

9   Court's previous construction of both function and structure.[7]  SenoRx first argues that the absorbed

10  dose profile must be rendered "substantially" more uniform (rather than simply "more uniform" – as

11  the Court previously concluded).  SenoRx further contends that the structure must perform the stated

12  function (*i.e.* rendering the dose more uniform) "by absorbing or attenuating radiation"—despite the

13  claim making no reference to this additional requirement.

14      *First*, SenoRx identifies no justification for requiring that the absorbed dose profile be rendered

15  "substantially" more uniform, rather than simply "more uniform" – as the Court previously decided.

16  This proposed change adds nothing but ambiguity to the claim term.  Verhey Decl. ¶ 15.  Dr. Orton's

17  assertion that some radiation absorbing or attenuating materials, in conjunction with a low energy

18  source, *can* "significantly affect the dose versus distance curve" (dkt. no. 132 at 11) provides no basis

19  for narrowing the claim term by *requiring* that the absorbed dose profile be rendered "substantially"

20  more uniform.  *Id.*

21

22  _____

23  [6]  *BBA Nonwovens Simpsonville, Inc. v. Superior Nonwovens, L.C.C.*, 303 F.3d 1332, 1343 (Fed. Cir.
     2002) (construction of means-plus-function claims requires identification of claimed function and
24  corresponding structure).

25  [7]  The parties agree that the corresponding structure is "a radiation absorbing or attenuating material."
     Dkt. No. 130 at 14 (SenoRx's Opening Claim Construction Brief).  Moreover, both parties agree that
     the specification discloses certain materials that, if they or their equivalents are present in the accused
26  device, are encompassed within the literal scope of the claim (*e.g.*, air, x-ray attenuating material,
     contrast fluid, contrast media used in angiography, water, a gas, or barium sulfate, and their
27  equivalents).  *Id.* SenoRx, however, believes that these materials must perform a function ***other than
     that recited in the claim***.

28

1    *Second*, it is well settled that the addition of an unstated functional limitation to a claim, as

2    urged by SenoRx, is impermissible. *See, e.g.*, *Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 448

3    F.3d 1324, 1334 (Fed. Cir. 2006) (stating that it is improper to "import[] unclaimed functions into a

4    means-plus-function claim" by "defining a claimed function to require more than is actually claimed");

5    *Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*, 239 F.3d 1225, 1233 (Fed. Cir. 2001) ("In construing a

6    means-plus-function limitation, a court must identify both the claimed function and the corresponding

7    structure in the written description for performing that function."). The Federal Circuit has cautioned

8    that where "the recited function is clear on its face, it [is] improper to incorporate . . . additional

9    functional limitation[s]" into the claim." *LG Elecs., Inc. v. Bizcom Elecs., Inc.*, 453 F.3d 1364, 1379

10   (Fed. Cir. 2006), *cert. granted on other grounds,* 128 S. Ct. 28 (2007). Therefore, SenoRx's proposed

11   construction, which seeks to import an additional function to be performed by the disclosed structure

12   (*i.e.*, the radiation absorbing or attenuating material), should be rejected.

13           The intrinsic record does not dictate the construction urged by SenoRx. SenoRx contends "the

14   radiation absorbing material must perform the function by absorbing or attenuating the radiation" (dkt.

15   no. 130 at 14) - based on a single embodiment disclosed at column 3, lines 51-65 of the '813 patent.

16   This passage is merely illustrative of how one embodiment performs the recited function. Moreover,

17   that discussion pertains to an embodiment where the attenuating material is in the inner spatial volume

18   and the radionuclide is in the outer spatial volume. *Id.* SenoRx admits that claim 1 also encompasses

19   an embodiment in which the attenuating material is in the outer spatial volume and the radionuclide is

20   in the inner spatial volume. Dkt. No. 130 at 16 (SenoRx's Opening Claim Construction Brief).

21   SenoRx's conclusion from this – *i.e.*, that the material "for performing the claimed function must

22   perform that function by absorbing or attenuating radiation" flies in the face of the claim language,

23   which does not recite a specific mechanism by which the function of "rendering uniform . . ." is

24   performed. Thus, it is impermissible to limit the recited function to a particular scientific mechanism

25

26

27

28

1  of "attenuation," as SenoRx proposes.[8]  SenoRx's construction improperly imports an unclaimed

2  function into the claim.  *See, e.g.*, *LG Elecs.*, 453 F.3d 1364, 1379 (Fed. Cir. 2006).

3      SenoRx's reliance on the prosecution history also fails to justify the importation of an

4  additional functional limitation.  SenoRx ignores the rule that "[f]or a prosecution statement to prevail

5  over the plain language of the claim, the statement must be clear and unmistakable such that the public

6  should be entitled to rely on any 'definitive statements made during prosecution.'"  *Elbex Video, Ltd. v.*

7  *Sensormatic Elecs. Corp.*, 508 F.3d at 1373 (quoting *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d

8  1314, 1323 (Fed. Cir. 2003)).  Here, the prosecution history does not clearly state that the "means . . .

9  for rendering uniform" must include the function of attenuating or absorbing radiation.  Indeed, the

10  prosecution history does not refer to any particular mechanism (such as absorption or attenuation) by

11  which the claimed function is performed—nor did it distinguish the prior art on that basis.[9]  *See, e.g.*,

12  Dkt. No. 135-10 at 5 ("There is then provided a means disposed in the chamber, not having the

13  radiation source, for <u>rendering uniform</u> the radial absorbed dose profile of emissions from the chamber

14  that contains the radiation source." (emphasis in original).)  Far from constituting a "clear and

15  unmistakable" statement sufficient to overcome the plain language of the claimed function, the

16  prosecution history does not require the function of "rendering uniform" to be performed in any

17  particular way.  Therefore, SenoRx's proposed construction should be rejected.  *See also* Verhey Decl.

18  ¶ 16 (explaining that SenoRx's proposed language would improperly limit the claim by adding a

19  requirement that is not always true).

20

21

22  _____

23  [8] The fact that the specification discloses as corresponding structures materials in the outer spatial
   volume that attenuate or absorb the radiation of no moment; one cannot conflate the recited function in
24  the claim with the behavior of the corresponding structures disclosed in the specification.  All that is
   required is that the corresponding structures disclosed in the specification perform the *claimed*
25  function.

26  [9] Rather, the distinction over the Ishiwara *et al.* '360 patent was that the chamber "cannot provide a
   uniform radiation profile" or how it could be modified to provide a uniform radial absorbed dose
27  profile.  Dkt. No. 135-10 at 5.

28

1    **E.    "Inner Closed Chamber" – SenoRx Adds a Limitation Without Support in the**
     **Specification ('813 Patent, Claim 11)[10]**

2

3        This claim term should be entitled to its plain and ordinary meaning.  Verhey Decl. ¶ 17.

4    SenoRx appears to agree that "[b]y its plain meaning, this claim further limits the inner spatial volume

5    to a 'closed chamber' or compartment located inside of the outer chamber."  Dkt. No. 130 at 17

6    (SenoRx's Opening Claim Construction Brief).  Instead of stopping there, however, SenoRx seeks to

7    add a limitation requiring that the "inner closed chamber" also be "completely inside . . . and closed

8    within the outer chamber."  To support this proposed addition, SenoRx relies only on the conclusory

9    statement of its expert, Dr. Orton.  *Id.*  This "conclusory, unsupported assertion[]"is "not useful to [the]

10   [C]ourt."  *Phillips*, 415 F.3d at 1318.[11]  Nor does it make sense as a matter of logic; since the claimed

11   function of the inner closed chamber is to contain the radioactive material (*see* claim 8, from which

12   claim 11 depends), the chamber cannot be "completely inside and closed off within the outer chamber"

13   because then there would be no way of getting the radioactive material into or out of it.

14       In the absence of any support in the intrinsic evidence for narrowing this claim term, SenoRx's

15   acknowledgement that the plain meaning of "inner closed chamber" is "a 'closed chamber' or

16   compartment located inside of the outer chamber" supports Hologic's construction.  Moreover, as set

17   forth in Hologic's Opening Claim Construction Brief (Dkt. No. 134 at 11), the specification and other

18   intrinsic evidence describe embodiments of the invention that would be excluded by SenoRx's unduly

19   narrow claim interpretation.  Therefore, SenoRx's interpretation should be rejected.[12]

20

21

22

23   [10] This term is found in claim 2 of the '813 patent, on which asserted claim 11 depends.

24   [11] Indeed, Dr. Orton's testimony as to this claim term consists of one conclusory statement: that "[a]
     person of ordinary skill in the art would understand the term 'inner closed chamber' to mean an inner
     chamber completely closed off within the outer, closed, inflatable chamber."  Dkt. No. 132 at 11, ¶ 37

25   (Orton Declaration).

26   [12] The Court previously found that the term "outer, closed, inflatable chamber" means exactly that –
     and requires no construction.  Dkt. No. 135-6 at 28 (Claim Construction Order in *Xoft v. Cytyc Corp.*)

27   The same should be true for "inner, closed chamber."

28

1

**F.    "Providing a Controlled Dose at the Outer Spatial Volume Expandable Surface to Reduce or Prevent Necrosis in Healthy Tissue Proximate to the Expandable Surface" ('204 Patent, Claim 4)[13]**

2

3      The Court previously construed a near identical term in the Xoft litigation. Dkt. No. 135-6 at

4  23. The same construction should apply here. Verhey Decl. ¶¶ 18-20. SenoRx seeks to alter the

5  Court's construction by (1) replacing the language referring to "lethally damaging cells" with "reduce

6  or eliminate the risk of damage . . ."; and (2) adding the phrase "as compared to devices in which the

7  tissue is directly adjacent to the radiation source." Neither proposed addition is supported. As Hologic

8  has shown, those skilled in the art at the time the patent applications were filed understood the term

9  necrosis to mean the death of tissue.[14]   SenoRx's construction confuses the plain understanding of

10  reduce or prevent necrosis" by introducing a wholly new and undefined concept: reduce or eliminate

11  "risk of damage." Dkt. No. 130 at 18 (SenoRx's Opening Claim Construction Brief). SenoRx's

12  proposed construction is inconsistent with the specification's description of the process of "necrosis."

13  *See* '204 patent, 6:55-57 ("With increasing cell death comes increasing risk of *necrosis or tissue death*

14  *in healthy tissue* that is treated with a high dose of radiation." (emphasis added)); *see* Verhey Decl. ¶

15  19 (it is impossible to "eliminate the risk of damage" to healthy tissue – as SenoRx suggests). The

16  intrinsic evidence shows that the reduction or prevention of necrosis is achieved by "keep[ing] the

17  maximum radiation dose delivered by the brachytherapy apparatus as low as possible while still

18  delivering the desired therapeutic dose to the desired range of tissue."[15] '204 patent, 6:57-60. The

19  specification reveals no attempt by the inventors to depart from this common meaning of the term

20  "necrosis," as it was understood in the art.

21

22

_____

23  [13] This term is found in claim 2 of the '204 patent, on which claim 4 depends.

24  [14] Dr. Orton opines that Hologic's proposed construction "would require avoiding any death to cells in
healthy tissue, which is inconsistent with how a person of ordinary skill would understand 'reduce or
25  prevent necrosis in healthy tissue' within the meaning of the claim." Dkt. No. 132 at 17, ¶ 54 (Orton
Declaration). That is not an accurate characterization of Hologic's claim construction. Verhey Decl. ¶
26  19.

27  [15] Moreover, the specification teaches that there is an "inherent difference in radiosensitivity between
the tumor and the adjacent normal tissues," which permits destruction of "cancerous tissue while
causing minimal disruption to surrounding normal tissues." '204 patent, 6:48-52.

28

1    SenoRx also seeks to add the requirement that the claimed "controlled dose . . ." must be

2    viewed in light of a single, specific prior art method of operation in which ". . . the tissue is directly

3    adjacent to the radiation source." Dkt. No. 130 at 18 (SenoRx's Opening Claim Construction Brief)

4    (. . . "*as compared to devices in which the tissue is directly adjacent to the radiation source.*"). The

5    specification and claims fail to teach or suggest such a comparison, nor is one required by the intrinsic

6    record. Moreover, such a comparison is impractical—the degree of necrosis (or in SenoRx's terms:

7    "risk of damage") will depend on the amount of energy radiated by the radiation source, the patient's

8    physical profile, as well as its relative proximity to the tissue, as would be understood by those skilled

9    in the art. Verhey Decl. ¶ 20. Thus, Hologic's proposed definition, which stays true to the language of

10   the claim and the inventions described in the specification, is the proper one and should be adopted.

11   **II.    SENORX'S PROPOSED CONSTRUCTIONS OF THE TERMS FROM THE '142
           PATENT IMPROPERLY DIVORCE INDIVIDUAL TERMS FROM THE**

12   **     REMAINDER OF THE INTRINSIC EVIDENCE[16]**

13   **        A.    "Apparatus Volume" and "Located So As To Be Spaced Apart From the
                  Apparatus Volume" ('142 Patent, Claim 1)**

14

15   SenoRx's flawed construction of the terms "apparatus volume" and "located so as to be spaced

16   apart from the apparatus volume" forms the basis for its motion for summary judgment that the

17   claimed invention is inoperable, rendering the claims invalid under 35 U.S.C. § 112. Dkt. No. 133.

18   However, SenoRx's claim construction is divorced from the context of the patent, reads out every

19   embodiment described in the specification, and runs contrary to the understanding of one skilled in the

20   art - as well as common sense. SenoRx's position runs counter to the rule that "[a] claim construction

21   that excludes preferred embodiments "is rarely, if ever correct and . . . require[s] highly persuasive

22   evidentiary support." *NeoMagic Corp. v. Trident Microsystems, Inc.*, 287 F.3d 1062, 1074 (Fed. Cir.

23   2002) (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996)). Moreover,

24   to the extent that SenoRx's construction would render the claims invalid, SenoRx fails to overcome the

25

26   _____

27   [16] Hologic originally asserted claims 1, 6, and 8 of the '142 patent. Based on representations made by
     SenoRx regarding the accused device after the parties filed their opening claim construction briefs,
     Hologic has agreed not to assert claim 6. Accordingly, claim 6 is not discussed herein.

28

1  statutory presumption of validity, *see* 35 U.S.C. § 282 (2006), which "requires a showing of facts

2  proved by clear and convincing evidence." *Invitrogen Corp. v. Biocrest Mfg., L.P.*, 424 F.3d 1374,

3  1378 (Fed. Cir. 2005).  Because the disputed claim terms are easily amenable to a construction that

4  encompasses the preferred embodiments, that stays true to the language of the claim, are consistent

5  with statements made during prosecution of the '142 patent, and are well understood by those skilled

6  in the art, SenoRx's strained constructions should be rejected.

7         **1.    An "Apparatus Volume," in the Context of the Claimed Invention, Is a
              Structure Composed of an Expandable Outer Surface**

8

9         Hologic's construction of the term "apparatus volume"[17] stays true to the language of the

10  claim, gives effect to what the inventors actually invented, is consistent with the specification, and is

11  reflected in the inventors' statements to the PTO during prosecution of the application that became the

12  '142 patent.  Thus, this Court should reject SenoRx's attempt to impose an unduly literal reading on

13  the term "apparatus volume" and adopt Hologic's construction.  Verhey Decl. ¶¶ 21-23.

14         SenoRx contends that Hologic's proposed construction is contrary to (1) Cytyc's position in the

15  *Xoft* litigation; (2) other intrinsic evidence; and (3) the claim language.  Dkt. No. 130 at 19 (SenoRx's

16  Opening Claim Construction Brief).  On all three points, SenoRx is wrong.

17         *First,* Cytyc's arguments in the *Xoft* case regarding the meaning of "inner spatial volume" do

18  not contradict its proposed construction of the term "apparatus volume" in this case.  As a threshold

19  matter, the "inner spatial volume" is not a claim element in the '142 patent, and the '142 patent was

20  not asserted in the *Xoft* litigation.  As a result, differences in construction are permissible for wholly

21  different terms based upon a different disclosure.  *See Innova/Pure Water, Inc. v. Safari Water*

22  *Filtration Sys., Inc.*, 381 F.3d 1111, 1119 (Fed. Cir. 2004) ("[W]hen an applicant uses different terms

23  in a claim it is permissible to infer that he intended his choice of different terms to reflect a

24  _____

25  [17] It is inappropriate to construe the term "apparatus volume" without resort to the surrounding
     language "three-dimensional apparatus volume configured to fill an interstitial void . . . and define an

26  inner boundary of the target tissue being treated." *See Phillips*, 415 F.3d at 1314.  Therefore, while
     Hologic may refer to the term "apparatus volume," Hologic does so merely by way of shorthand for

27  "three-dimensional apparatus volume configured to fill an interstitial void . . . and define an inner
     boundary of the target tissue being treated."

28

1  differentiation in the meaning of those terms."). Although the '142 patent is a continuation-in-part of

2  the '813 and '204 patents at issue in *Xoft*, (1) the claim terms are different, and (2) the intrinsic

3  evidence for the '142 patent demonstrates that the term "apparatus volume" is not to be limited to a

4  geometric volume. Thus, SenoRx places undue and misguided reliance on the prior construction of the

5  '813 and '204 patents. *See, e.g.*, *Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.*, 248 F.3d

6  1303, 1315 (Fed. Cir. 2001) (refusing to use intrinsic evidence from parent application pertaining to a

7  claim term different than the term under consideration); *cf. Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d

8  973, 980 (Fed. Cir. 1999) (citing *Jonsson v. The Stanley Works,* 903 F.2d 812, 817-818, (Fed.Cir.1990)

9  for the proposition that "[w]hen multiple patents derive from the same initial application, the

10  prosecution history regarding a claim limitation in any patent that has issued applies with equal force

11  to subsequently issued patents *that contain the same claim limitation*" (emphasis added)).

12      Moreover, there is in actuality no conflict between the position taken by Hologic in this case

13  for the term "apparatus volume" and the position taken by Cytyc in the *Xoft* case for the term "inner

14  spatial volume." Similar to the '142 patent, the '813 and '204 patents speak of an "inner spatial

15  volume" with reference to a structure that defines it. *See, e.g.,* '813 patent, claim 2 ("wherein said

16  inner spatial is an inner closed, chamber defined by a further radiation transparent wall"); '204 patent,

17  claim 9 ("wherein the inner spatial volume is an inner closed, distensible chamber defined by a further

18  radiation transparent wall"). Thus, the "inner spatial volume" is not simply a volume of space but it

19  also has a surface or boundary such that there can be a "predetermined spacing" between it and the

20  structure that defines the "outer spatial volume." *See, e.g.,* '813 patent, claim 1, element c; '204

21  patent, claim 3.

22      *Second*, as noted above, the intrinsic record demonstrates that the inventors did not intend for

23  the term "apparatus volume" to be interpreted strictly and literally as a "region of space," but rather,

24  with reference to a structure composed of the expandable outer surface. Thus, rather than requiring the

25  rigid, literal reading SenoRx seeks to impose on the term "apparatus volume," the claims "can and

26  should be interpreted as the patentees intended," *Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*, 520

27

28

1  F.3d 1358, 1363 (Fed. Cir. 2008), with the meaning of the term "apparatus volume" being "the three-

2  dimensional geometric solid composed of an expandable outer surface."

3      *Third*, the claim language shows that Hologic's interpretation is the correct one.  The

4  expandable outer surface element, e.g., a balloon, "defines" (i.e., composes) the apparatus volume.

5  '142 Patent, 8:63-64.  In other words, the phrase "expandable outer surface defining . . ." makes clear

6  that "three-dimensional apparatus volume" is to be understood with reference to the tangible structure

7  that creates or defines—hence the use of the modifiers "three-dimensional" and "apparatus" with the

8  word "volume."  Thus, as the term "steel" modified the term "baffles" in the claim term "steel baffles"

9  in *Phillips*, 415 F.3d at 1314, the term "expandable outer surface" modifies the term "apparatus

10 volume" by conferring upon it structural features, i.e., three dimensions for filling an interstitial void

11 and surface area for defining the inner boundary of the target tissue.  *See ACTV, Inc. v. Walt Disney*

12 *Co.*, 346 F.3d 1082, 1088 (Fed. Cir. 2003) ("[T]he context of the surrounding words of the claim also

13 must be considered in determining the ordinary and customary meaning of those terms.").  Hologic's

14 proposed construction gives effect to all of the claim language and does not render any portion of it

15 superfluous or nugatory.  *Cf. Merck & Co. v. Teva Pharms USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir.

16 2005) (adopting construction that avoids rendering language superfluous).  Moreover, Hologic's

17 interpretation includes certain disclosed embodiments, whereas, as SenoRx points out in its motion for

18 summary judgment of invalidity of claim 1, its interpretation would result in an inoperable device and

19 would exclude all of the embodiments disclosed in the '142 patent.  SenoRx lacks the "highly

20 persuasive evidentiary support" for such a construction.  *NeoMagic Corp.*, 287 F.3d at 1074.

21          **2.    "Located So As To Be Spaced Apart From the Apparatus Volume" – Once**
22              **the Term "Apparatus Volume" Is Properly Construed, the Term "Spaced**
              **Apart" Is Clear**

23      When the term "apparatus volume" (in the phrase "three-dimensional apparatus volume

24 configured to fill an interstitial void . . . and define an inner boundary of the target tissue being

25 treated") is properly construed with reference to the "expandable outer surface" element that defines it,

26 the proper meaning of the term "located so as to be spaced apart from the apparatus volume" is clear.

27 Verhey Decl. ¶ 24.  "Spaced apart" means "located so as to be not on or touching the apparatus

28

1  volume," *i.e.*, the surface area of the apparatus volume that defines the inner boundary of the target

2  tissue to be treated.  Dkt. No. 134 at 19-20 (Hologic's Opening Claim Construction Brief).  Aside from

3  the arguments it asserts with respect to the term "apparatus volume," SenoRx offers no justification for

4  its construction of "spaced apart"—which would exclude all preferred embodiments and potentially

5  render the claim invalid.[18]  Dkt. No. 130 at 23 (SenoRx's Opening Claim Construction Brief).  As set

6  forth above, those arguments have no merit.  Under the proper construction of the "apparatus volume"

7  terms, the "spaced apart" term "can and should be interpreted as the patentees intended," *Ortho-*

8  *McNeil Pharm.*, 520 F.3d at 1363, to mean "located so as to be not on or touching the apparatus

9  volume."

10    **B.  "Asymmetrically Located and Arranged Within the Expandable Surface" - Means**
      **Not on the Longitudinal Axis ('142 Patent, Claim 1)**

11

12    Every reference to "asymmetry" in the '142 refers to the longitudinal axis of the expandable

13  surface – *i.e.*, if a radiation source is not on the longitudinal axis, the source is "asymmetric."

14  Hologic's proposed construction of the term "asymmetrically located and arranged within the

15  expandable surface" says exactly that:  "located and arranged so as not to be on the longitudinal axis of

16  the expandable surface element."  Dkt. No. 134 at 23-4 (Hologic's Opening Claim Construction Brief).

17  SenoRx's only comment with respect to this claim term is that its arguments "substantially track those

18  advanced in connection with the 'predetermined asymmetric isodose curves with respect to the

19  apparatus volume.'" (discussed immediately below)  Dkt. No. 130 at 25 (SenoRx's Opening Claim

20  Construction Brief).  Not so.  SenoRx's arguments with respect to the "predetermined asymmetric

21  isodose curves" pertain to the frame of reference by which the isodose curves are determined in

22  advance not to be symmetrical.  Those arguments are not directly applicable here, where it is the

23  "radiation source" that is "asymmetrically located and arranged within the expandable surface." '142

24  patent, 9:3-5.

25  _____

26  [18] As pointed out above, the '813 and '204 patents similarly claim a "predetermined spacing" between
    the "inner spatial volume" and the structure defining the "outer spatial volume."  This "spaced apart"
27  relationship would make no sense if "volume" were read literally, as SenoRx urges, only as a "region
    of space" and not including also the surface or boundary of the "inner spatial volume."

28

1    The intrinsic evidence dictates that Hologic's construction is the correct one - and that

2   SenoRx's should be rejected.  The '142 patent's abstract (which is relevant to claim construction, *Hill-*

3   *Rom Co., Inc. v. Kinetic Concepts, Inc.*, 209 F.3d 1337, 1341 n.* (Fed. Cir. 2000) ("We have

4   frequently looked to the abstract to determine the scope of the invention")), describes two

5   embodiments.  In the first embodiment, "the asymmetric isodose curves are created in the target tissue

6   by shaping or locating the radiation source so as to be asymmetrically placed *with respect to the*

7   *longitudinal axis of the apparatus*." '142 Abstract (emphasis added).  The second embodiment uses

8   "asymmetric radio opaque shielding" to achieve the asymmetric isodose curves. '142 Abstract.  The

9   "longitudinal axis" is repeatedly referred to as the frame of reference by which asymmetrical location

10  and arrangement of the radioactive sources is judged.  *See, e.g.*, '142 patent, 2:65-3:1 ("[A]symmetric

11  isodose curves are created in the target tissue by shaping or locating the radiation source so as to be

12  asymmetrically placed with respect to a longitudinal axis of the apparatus."); 3:13-15 (" . . . some of

13  the radioactive particles are farther from the longitudinal axis of the apparatus than others"); 3:17-19

14  (". . . members being shaped so as to place at least one radioactive particle asymmetrically with respect

15  to the longitudinal axis of the apparatus"); 5:11-12 ("Radiation source 24 has an asymmetric

16  configuration with respect to a longitudinal axis 38 of the instrument 10.").  The foregoing passages

17  emphatically rebut SenoRx's conclusory allegation (reached with no analysis of the specification) that

18  Hologic seeks to add a limitation to the claim term.  To the contrary, Hologic's construction of the

19  term "asymmetrically located and arranged . . ." as meaning "located and arranged so as not to be on

20  the longitudinal axis of the expandable surface," in light of the specification, is the only proper

21  construction – and should be adopted.  Verhey Decl. ¶ 25.

22  **C.    "Predetermined Asymmetric Isodose Curves" ('142 Patent, Claims 1 & 8)**

23      SenoRx's proposed construction—and its justification for that construction—appear to focus on

24  the wrong frame of reference.  As discussed immediately above, the claims require a "radiation source"

25  to be "asymmetrically located and arranged within the expandable surface," and that term means

26  "located and arranged so as not to be on the longitudinal axis of the expandable surface."  *See supra.*

27  As a direct consequence of this asymmetric location and arrangement of the radiation source,

28

1  "predetermined asymmetric isodose profiles" are created. *See, e.g.*, Abstract ("Asymmetric isodose

2  curves are created . . . by shaping or locating the radiation source so as to be asymmetrically placed

3  with respect to the longitudinal axis."); 2:65-3:1 (similar); 3:13-15 (similar); 3:17-19 (similar).

4  Moreover, as the specification repeatedly states, the asymmetry of an isodose curve is adjudged from

5  the longitudinal axis of the apparatus volume—not based on the shape of the apparatus volume.[19]  *See,*

6  *e.g.*, '142 Patent, 5:19-25; 5:14-18; 3:1-6.  Thus, Hologic's construction—the one that aligns the

7  language of the claim with the disclosure of the '142 patent—is the correct one.  Verhey Decl. ¶ 26.

8

9  **III.    SENORX'S CONSTRUES THE "PLURALITY" TERMS TOO NARROWLY –**
   **DIVORCED FROM THE ACCOMPANYING CLAIM LANGUAGE AND**
   **SPECIFICATIONS**

10

11         Contrary to SenoRx's suggestion, the parties do not dispute the meaning of the word

12  "plurality."  The dispute here involves the claim terms "plurality of radioactive solid particles" and

13  "plurality of solid radiation sources" - as those phrases are used in the patents-in-suit.  SenoRx's

14  position is a classic example of construing claim terms in isolation – divorced from both the claim

15  language in which they appear and the remainder of the specification.  SenoRx clings to particular

16  embodiments of the claimed inventions described in the specification (*see* Fig. 5 of the '813 patent) –

17  insisting that the "plurality" claim terms are limited to those embodiments.  Further, wherever the word

18  "plurality" appears in the claims, SenoRx contends the specifications of each patent-in-suit impose a

19  temporal limitation on the claim—*i.e.*, requiring that multiple radiation particles or sources to be

20

21  ─────────────

    [19] To support its flawed argument, SenoRx unfairly capitalizes on what appears to have been a

22  misinterpretation of Figures 3 and 3A of the '142 patent by Dr. Verhey, made during his deposition.
    Dkt. No. 130 at 25, lines 5-14 (SenoRx's Opening Claim Construction Brief); Dkt. No. 130:16 at

23  146:13-17 (Dr. Verhey's Deposition Transcript).  Figures 3 and 3A are different views of the same
    device **50**; Figure 3 is a side-view and Fig. 3A is an end view, looking straight down the longitudinal

24  axis of the device.  '142 patent, col. 3:66-67, col. 4:1-2.  The isodose curve **64** produced by this device
    is shown only in Figure 3A, the end view, as a dotted line.  *Id.*, col. 6:36-38.  Understood together with

25  the corresponding passage of the specification, it is clear that the asymmetry of the isodose curve **64** is
    defined with respect to the longitudinal axis of the device, which would appear as a point in the center

26  of element **56**.  *Id.*, col. 6:42-46 ("By providing extending portions **58, 60** having radioactive particles
    in the indicated co-planar relationship, areas of reduced dosage can be created *on opposed sides of the*

27  *device* . . .").

28

1    present "at the same time."  The specifications provide no support for adding such a limitation.  Once

2    again, SenoRx seeks to narrow the inventions by importing examples from the written description into

3    the claims.  SenoRx's constructions should be rejected.

     **A.    "Plurality of Radioactive Solid Particles Placed At Predetermined Locations"**
4            **('813 Patent, Claim 12) and "Plurality of Solid Radiation Sources" ('204 Patent,**
5            **Claim 17)**

6         This Court already addressed the "plurality" claim language in the Xoft litigation – and

7    concluded that these terms mean what they say.  Dkt. No. 135-6 at 11-12 (Claim Construction Order in

8    Xoft litigation).  Hologic agrees.  Not surprisingly, SenoRx disagrees.  SenoRx defines the two phrases

9    slightly differently but both proposed constructions include the following limitations:  (1) "two or more

10   separate" particles / sources within the expandable surface element (2) "at the same time."  Dkt. No.

11   130 at 26-29 (SenoRx's Opening Claim Construction Brief).  SenoRx couches this dispute as a

12   disagreement over the meaning of plurality – as that term is typically used in patent parlance.  It is not.

13   SenoRx's proposed constructions conflict with the meaning of these terms in light of the surrounding

14   claim language and the specifications, and should be rejected.  Verhey Decl. ¶¶ 27-29.

15        *First*, with regard to both the "two or more separate" and "at the same time" limitations,

16   SenoRx seeks to import aspects of preferred embodiments into the claims by requiring that discrete

17   radiation sources be present and used simultaneously.  *See* '813 patent, Fig. 5.  This, of course, is

18   improper unless the specification makes clear that the preferred embodiments *are the invention*. *See,*

19   *e.g.*, *Afga Corp. v. Creo Prods. Inc.*, 451 F.3d 1366, 1376 (Fed. Cir. 2006) (refusing to read the term

20   "stack" as limited to "horizontal stacks," even though only horizontal stacks were shown in the patent).

21   "Without any indication beyond the necessary depiction to suggest limiting the invention to this single

22   embodiment, the broader language of the claims cannot carry that unexpressed and unintended (at the

23   time of patent drafting) limitation."  *Id.* at 1377.  The specification of the '813 patent provides no basis

24   for limiting the claims to the disclosed embodiments.  Nor does the '204 patent, which refers to the

25   invention shown in Figure 4 as "a further embodiment," 5:1, and that "desired isodose profiles . . . can

26   also be obtained, *for example*, by strategic placement of a plurality of radioactive particle sources"

27   5:32-36 (emphasis added).  Thus, the specifications impose no such limitations on the claimed

28

1    inventions. *Phillips v. AWH Corp.*, 415 F.3d at 1317 (claims must be given their "broadest reasonable

2    construction in light of the specification as it would be interpreted by one of ordinary skill in the art").

3        *Second*, the claims in which these terms appear teach emitting therapeutic rays from more than

4    one location to achieve "a desired composite radiation profile." *See* '813, claim 12.  The objective of

5    these claims, *i.e.* achieving a desired composite radiation profile, can be achieved whether one uses a

6    single particle or source, or twenty particles or sources.  Indeed, as Dr. Verhey states, from a

7    dosimetric standpoint, there is no difference between moving a radiation source to multiple locations at

8    different times (known as dwell times) and the embodiments depicted in Fig. 5 of the '813 patent and

9    Fig. 4 of the '204 patent.  Verhey Decl. ¶ 28.

10        *Third*, as Dr. Verhey explains, at the time the applications that led to the patents-in-suit were

11    filed, the remote afterloaders necessary to practice the multi-core embodiment depicted in Fig. 5 of the

12    '813 patent and Fig. 4 of the '204 patent did not exist.  Verhey Decl. ¶ 29.  Remote afterloaders

13    capable of stepping a single radionuclide through multiple locations within a brachytherapy balloon

14    applicator, however, were available.  This fact conflicts with SenoRx's proposed constructions and the

15    teaching of the specifications that "[t]he solid radiation emitting material **44** can be inserted through

16    catheter **12** on a wire **46**, for example, using an afterloader (not shown)."  '204 patent, 4:54-56.  In

17    other words, the inventors clearly contemplated that their inventions would be compatible with the

18    afterloaders available at that time, as well as loader technology that might not have yet been developed.

19        In any event, nowhere does the claim language or the specifications impose a temporal

20    limitation on the "plurality" claims—*i.e.*, requiring that multiple radiation particles or sources be

21    present and utilized "at the same time."  That language appears nowhere in the patents.  SenoRx

22    provides no justification for drafting such a limitation into the claims.

23    \\

24

25

26

27

28

1    Hologic respectfully requests that the Court conclude exactly what it did previously – that the

2    "plurality" claim terms mean exactly what they say.

3    Dated:  May 30, 2008                              HOWREY LLP

4

5                                                      By: _____/s/_____

6                                                           Henry C. Su

7

8                                                      HOWREY LLP
                                                       Attorneys for Plaintiffs
9                                                      Hologic, Inc., Cytyc Corporation,
                                                        and Hologic L.P.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiffs' Reply Claim Construction Brief            -25-
Case No.  C08 00133 RMW (RS)

**PROOF OF SERVICE**

I am employed in the County of San Mateo, State of California. I am over the age of 18 and not a party to the within action. My business address is 1950 University Avenue, 4th Floor, East Palo Alto, California 94303.

On May 30, 2008, I served on the interested parties in said action the within:

**PLAINTIFFS' REPLY CLAIM CONSTRUCTION BRIEF**

by placing a true copy thereof in a sealed envelope(s) addressed as stated below and causing such envelope(s) to be deposited in the U.S. Mail at East Palo Alto, California.

F.T. Alexandra Mahaney (amahaney@wsgr.com)        Bruce R. Genderson (bgenderson@wc.com)
Natalie J. Morgan (nmorgan@wsgr.com)              Aaron P. Maurer (amaurer@wc.com)
Wilson Sonsini Goodrich & Rosati                 Rachael Shanahan Rodman (rrodman@wc.com)
12235 El Camino Real, Suite 200                  Adam D. Harber (aharber@wc.com)
San Diego, California 92130                       Williams & Connolly LLP
                                                  725 – 12th Street, N.W.
                                                  Washington, D.C. 20005

[X]    (EMAIL/ELECTRONIC TRANSMISSION) Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the documents to be sent to the persons at the e-mail addresses listed above. I did not receive, within a reasonable time after the submission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury that I am employed in the office of a member of the bar of this Court at whose direction the service was made and that the foregoing is true and correct.

Executed on May 30, 2008, at East Palo Alto, California.

_____                    _____
      Sonya Schwab                                    (Signature)
   (Type or print name)